Vincent James John Romeo
Nevada Bar No.: 9670
Email: vincent.james.john.romeo@lvvjjr.com
VJJR Attorney at Law
3692 Poker Hand Court
Las Vegas, NV 89129
Telephone: 702-530-9242

Attorneys for Plaintiff
TECHNOLOGY ONLINE, LLC

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| Technology Online, LLC, a Nevada limited liability company,<br><br>     Plaintiff,<br><br>  vs.<br><br>Jeffers, Inc., an Alabama corporation,<br><br>     Defendant. | **Case No.:**<br><br>**Dept. No.:**<br><br>**COMPLAINT FOR DECLARATORY RELIEF**<br><br>**DEMAND FOR TRIAL BY JURY** |

## COMPLAINT

### Nature of the Case

By its Complaint, Plaintiff Technology Online, LLC ("Plaintiff") seeks declaratory relief, as set forth below, to establish that its registration and use of the domain name <jeffers.com> (the "Domain") is not unlawful and that it is the rightful and proper owner of said domain name.

### PARTIES

1.   Plaintiff Technology Online, LLC ("Plaintiff") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada. Plaintiff is a citizen of Nevada.

2.   Plaintiff is informed and believes and based thereupon alleges that Defendant Jeffers, Inc. ("Defendant") is a corporation organized and existing under the laws of the State of Alabama, with its principal places of business in Dothan, Alabama.   Plaintiff is informed and believes and based thereupon alleges that Defendant is a citizen of Alabama.

### JURISDICTION AND VENUE

3.   This Court has jurisdiction over the subject matter of this action under 15 U.S.C. § 1121 (original jurisdiction over Lanham Act claims), 28 U.S.C. §§ 1331 (federal question) and 1338(a) (jurisdiction to adjudicate federal trademark claims).

4.   Venue is proper in the State of Nevada because the parties agreed to litigate any disputes arising out of the decision entered by World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center in accordance with the terms of the Uniform Dispute Resolution Policy ("UDRP"), as affirmed in Section I, "Introduction," of the Amended Complaint filed by Defendant in the WIPO proceeding.  *See* Exhibit A.  Section ¶ 3(b)(xiii) of the UDRP provides that "Complainant [here Defendant] will submit, with respect to any challenges to a decision in the administrative proceeding canceling or transferring the domain name, to the jurisdiction of the courts in at least one specified Mutual Jurisdiction."

1   "Mutual Jurisdiction" is defined as "a court jurisdiction at the location of either (a)
2   the principal office of the Registrar (provided the domain-name holder has
3   submitted in its Registration Agreement to that jurisdiction for court adjudication of
4   disputes concerning or arising from the use of the domain name); or (b) the domain-
5   name holder's address as shown for the registration of the domain name in
6   Registrar's Whois database at the time the complaint is submitted to the Provider."
7   *See* Exhibit B.  At Section IX of the Second Amended Complaint, Defendant agreed
8   to mutual jurisdiction at the domain name holder's address, i.e. the State of Nevada.

9       5.    Here, the domain name holder's address is 3430 Cypress Street, Silver
10  Springs, Nevada 89429.  This was the correct address for Plaintiff, the holder of the
11  Domain at the time the Complaint was filed in the WIPO proceeding, as evidenced
12  by the allegations made by Defendant in the Amended Complaint, Section II which
13  accurately identified Plaintiff, a citizen of Nevada, as the Respondent.

14                           **COMMON ALLEGATIONS**

15      6.    The location of individual sites on the internet is denoted by an internet
16  protocol ("IP") address composed of a string of four groups of digits separated by
17  periods. Each site has a unique numeric internet address. For ease of access, the
18  numeric addresses typically correspond to more easily remembered alphanumeric
19  "domain names" (such as <google.com>), which internet users can enter in their
20  web browser to access specific sites.  Domain names provide a means of accessing
21  information located on the Internet at a specific IP address.

22      7.    A domain name is composed of two parts, separated by a period. The
23  portion to the right of the period, *i.e.*, the "com" in <google.com>, is known as the
24  "top level domain" or "TLD."  The portion to the left of the period, generally a
25  series of numbers and letters chosen by the operator of the site, *i.e.*, the "google" in
26  <google.com>, is known as the "second level domain" or "SLD."

27      8.    One wishing to use a specific domain name must register the name with
28  one of numerous competing companies known as registrars.  The United States

federal government adopted a policy favoring competitive domain name registration and in furtherance of this policy, a private, non-profit corporation, the Internet Corporation for Assigned Names and Numbers ("ICANN"), was formed to assume responsibilities for managing the allocation of Internet Protocol numbers and the domain name system.

9.   Customers seeking to register specific domain names interact with registrars.   Thus, an individual seeking to use a domain name submits an online application to a registrar.  If someone submits an application for a particular domain name that already exists in the publicly accessible database of information concerning all domain names in a TLD, known as the Whois (or WHOIS) database by virtue of a prior registration, that name cannot be registered again, and the applicant is advised that the sought domain name is unavailable.  If there is no existing registration for a given SLD name within a given TLD, however, that domain name is considered available and generally may be registered on a first-come, first served basis. A registrar must be accredited by ICANN for each TLD in which it operates.

10.   As part of the accreditation process, all registrars must sign the ICANN Registrar Accreditation Agreement (the "ICANN RAA").   ICANN RAA, in turn, mandates that all accredited registrars implement the UDRP, as promulgated by WIPO, to resolve domain name disputes.

11.   Once registered, a domain name is not required to be tied to an active website, be capable of receiving e-mail at the address or otherwise be functional. Nonetheless, there are numerous ways in which domain names may be commercially exploited.   A legitimate business practice on the internet is to administer domain names corresponding to common words, phrases, first names, surnames, colloquialisms and generic terms, such as "Jeffers," a common last name. These generic domains are then used to drive traffic to a corresponding landing page, which is populated by syndicated advertisements by Google, Yahoo or some

1   other search engine.  Alternatively, domain names can simply collect and re-direct

2   traffic resulting to these websites as a result of links from search engines, which

3   traffic consistently increases in accordance with the lifespan of the domain in

4   question due to the manner in which search engine catalogues of sites are

5   maintained and developed.

6       12.   A browsing user ending up at such a page may end up clicking on an

7   advertisement offering products or services loosely related to the domain.  For

8   instance, the links appearing at a landing page for <watches.com> may include a

9   link leading to the website for Rolex.  Each click results in pay-per-click advertising

10  revenue flowing to the parking company administering the landing page and,

11  eventually, to the registrant of the domain.  Alternatively, the user can take

12  advantage of whatever services or products are offered at the site in question.

13      13.   Separately, an established legitimate use for domains consisting of

14  common last names is to allow willing users to set up e-mail websites at the domain

15  consisting of their last name.  In this case, an individual with the name Peter Jeffers,

16  may wish to set up an e-mail account at: peter@jeffers.com, rather than

17  peter@yahoo.com, in an approach aimed at personalizing the user's e-mail address.

18      14.   In this case, the Domain was first registered on June 3, 1996.  The

19  Amended Complaint filed by the Defendant in the WIPO proceeding references an

20  incorrect registration date of March 6, 1996, likely resulting from the manner in

21  which the registration date is designated in the Whois output: "1996-06-03."  *See*

22  Exhibit A, ¶ 21, Annex A[1].  In any event, the registration year of the Domain is

23  indisputably 1996.

24      15.   Until Plaintiff acquired the Domain, the Domain was registered with

25  Hover, which provided the very customized e-mail services discussed above.  This

26  _____

27  [1] "Annex" references in this Complaint refer to exhibits designated as Annexes to
the Amended Complaint filed by Jeffers, Inc.  The Amended Complaint is attached
as Exhibit A hereto.

28

is acknowledged in Annex B to the Amended Complaint, which is the user agreement for the company that offered the subject personalized email services before Plaintiff took control of the Domain.  *See also* Exhibit C.

16.    This use has been routinely validated as legitimate in prior UDRP disputes.  Complaints brought by mark holders challenging sale of e-mail services at the disputed domains were denied in: *Grasso's Koninklijke Machinefabrieken N.V., currently acting as Royal GEA Grasso Holding N.V. v. Tucows.com Co*., Case No. D2009-0115; *Lorenzo International Limited v. Tucows.com Co. / Tucows Inc.,* WIPO Case No. D2010-2254, *Ancient Restaurant Chartier v. Tucows.com Co*., Case No. D2008-0272; *F. Hoffmann-La Roche AG v. Domain Admin Tucows.com Co.,* Case No. D2006-1488; *Markel Corporation. v. Tucows.com Co*., Case No. D2007-1750; *Marden Group B.V. v. Tucows.com*, Case No. D2011-1061; and *Lorenzo v. Tucows.com Co*., WIPO Case No.: D2010-2254.  The respondent in each of these proceedings, Tucows.com, is the owner/operator of Hover.

17.    This use continues to be the intended use of Plaintiff.  Indeed, past users of Hover's service have inquired as to the reason for why their services were terminated. *See* Exhibit D.

18.    Unfortunately, before Plaintiff was able to put up a website offering personalized email services, Defendant commenced the UDRP proceedings subject of this suit, which caused the domain registrar for the Domain to lock the Domain and freeze the DNS settings.  In other words, the commencement of the WIPO proceeding blocked Plaintiff's ability to manipulate the settings for the Domain and direct it to an operational website.

19.    As repeatedly found in the above-cited decisions, the sale of e-mail addresses at common last names is a legitimate use of the Domain and does not constitute "bad faith" within the meaning of the UDRP.  The Complaint filed by Defendant in the WIPO proceeding should have been denied on that basis alone.

20.     Separately, as earlier mentioned, the Domain was created on June 3, 1996, **prior** to the registration of the claimed "JEFFERS" mark by Defendant on October 7, 1997.

21.     On February 28, 2014, Defendant initiated a WIPO proceeding with respect to the Domain, under proceeding no. D2014-0314.

22.     On May 8, 2014, the WIPO center remitted a decision entered in the WIPO proceeding by a single panelist which instructed the transfer of the Domain on the grounds of a finding of a bad-faith registration in view of the existence of Defendant's registered mark, "JEFFERS," whose registration post-dates the original registration date of the Domain. *See* Exhibit E.  The panelist failed to consider the separate and legitimate use of the Domain for offering for sale personalized domains.

23.     Separately, in predicating its decisions upon the trademark registration date which post-dates the creation date for the Domain, the panel ignored the applicable provisions of the UDRP, their interpretations by other panelists presiding over similar matters as well as the recent decision of the Ninth Circuit Court of Appeals entered on September 22, 2011, in a matter entitled *GoPets Ltd., v. Hise*, 657 F.3d 1024 (9th Cir. 2011).  The *GoPets* decision established that "bad faith," which is mandatory to warrant a transfer under the Policy, is determined exclusively at the time of the original registration.

24.     Here, it is undisputed that the Domain was originally registered in 1996, a year prior to the 1997 trademark registration by Defendant.  Given the nature of the classes in which the mark was registered and the absence of inherent distinctiveness in the mark, neither Plaintiff nor the original registrant could legitimately be charged with constructive knowledge of Defendants' mark which prevents the legitimate use consisting of sale of personalized email addresses.  Consequently, under established legal principles, Defendant has not and cannot

prove the requisite "bad faith" at the time of the registration required under the Policy and the Panel reached the wrong conclusion.  Its finding must be reversed.

25.   For these reasons, Plaintiff contests the findings of the WIPO panel and seeks a declaration by this Court that its use is not unlawful, amounting to a legitimate exploitation of the Domain, whose registration predated any rights held by Defendant in the term "JEFFERS" as permitted under Section K of the Uniform Domain Name Resolution Policy:

> **k. Availability of Court Proceedings.** The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded. If an Administrative Panel decides that your domain name registration should be canceled or transferred, we will wait ten (10) business days (as observed in the location of our principal office) after we are informed by the applicable Provider of the Administrative Panel's decision before implementing that decision. We will then implement the decision unless we have received from you during that ten (10) business day period official documentation (such as a copy of a complaint, file-stamped by the clerk of the court) that you have commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) of the Rules of Procedure. (In general, that jurisdiction is either the location of our principal office or of your address as shown in our Whois database. See Paragraphs 1 and 3(b)(xiii) of the Rules of Procedure for details.) If we receive such documentation within the ten (10) business day period, we will not implement the Administrative Panel's decision, and we will take no further action, until we receive (i) evidence satisfactory to us of

1                  a resolution between the parties; (ii) evidence satisfactory to us that

2                  your lawsuit has been dismissed or withdrawn; or (iii) a copy of an

3                  order from such court dismissing your lawsuit or ordering that you do

4                  not have the right to continue to use your domain name.

5 Exhibit B.

6 ## COUNT I

7 ## (Declaratory Relief)

8        26.     Plaintiff refers to, repeats and incorporates by reference paragraphs 1

9 through 25, inclusive, of this Complaint as though fully set forth herein.

10        27.     In registering the Domain, Plaintiff did not have a bad faith intent, as

11 provided in Paragraph 4 of the UDRP.

12        28.     The Domain is not identical, confusingly similar to, or dilutive of

13 Defendant's claimed mark in the term "JEFFERS."

14        29.     Plaintiff believed and had reasonable grounds to believe that its

15 registration and use of the Domain was a fair use, or otherwise lawful use, as

16 provided for in the UDRP.

17        30.     Plaintiff has given notice to Defendant, through the registrar, of its

18 intent to file an action to establish that the Plaintiff's registration and use of the

19 Domain is not unlawful under the UDRP or any statute addressing an appeal of a

20 WIPO Panel decision.

21        31.     Plaintiff seeks control of the Domain and a declaration that it is the

22 owner of the Domain.

23

24 ## PRAYER FOR RELIEF

25      **WHEREFORE**, Plaintiffs pray for judgment as follows:

26        1.     Declaring that Plaintiff's registration and use of the domain name

27 <jeffers.com> is not unlawful;

28

1    2.    Declaring that Plaintiff is not required to transfer the domain name

2  <jeffers.com > to Defendant;

3    3.    Awarding Plaintiff its costs and attorneys' fees; and

4    4.    Providing all such other and further relief as the Court deems just and

5  proper.

6

7  Dated this 12th day of May, 2014

8                                                          VJJR Attorney at Law

9

10                                                        By: /s/ Vincent, James, John Romeo
                                                          VINCENT JAMES JOHN ROMEO
11                                                        Nevada Bar Number 9670
                                                          3692 Poker Hand Court
12                                                        Las Vegas, NV 89129
                                                          (702) 530-9242
13                                                        Attorney for the Plaintiff
14                                                        TECHNOLOGY ONLINE, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

1

## **DEMAND FOR JURY TRIAL**

2

In accordance with Fed. R. Civ. Pro. 38(b), Plaintiff Technology Online,

3

LLC, hereby requests a trial by jury on all issues triable by a jury.

4

5

6

Dated this 12th day of May, 2014

7

VJJR Attorney at Law

8

9

By: _/s/ Vincent, James, John Romeo_

10

VINCENT JAMES JOHN ROMEO

11

Nevada Bar Number 9670

3692 Poker Hand Court

12

Las Vegas, NV 89129

13

(702) 530-9242

Attorney for the Plaintiff

14

TECHNOLOGY ONLINE, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

# EXHIBIT A

# COMPLAINT TRANSMITTAL COVERSHEET

Attached is a Complaint that has been filed against you with the World Intellectual Property Organization (**WIPO**) Arbitration and Mediation Center (the **Center**) pursuant to the Uniform Domain Name Dispute Resolution Policy (the **Policy**) approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

The Policy is incorporated by reference into your Registration Agreement with the Registrar(s) of your domain name(s), in accordance with which you are required to submit to a mandatory administrative proceeding in the event that a third party (a **Complainant**) submits a complaint to a dispute resolution service provider, such as the Center, concerning a domain name that you have registered.  You will find the name and contact details of the Complainant, as well as the domain name(s) that is/are the subject of the Complaint in the document that accompanies this Coversheet.

You have no duty to act at this time.  Once the Center has checked the Complaint to determine that it satisfies the formal requirements of the Policy, the Rules and the Supplemental Rules, it will forward an official copy of the Complaint to you.  You will then have 20 calendar days within which to submit a Response to the Complaint in accordance with the Rules and Supplemental Rules to the Center and the Complainant.  You may represent yourself or seek the assistance of legal counsel to represent you in the administrative proceeding.

- The Policy can be found at http://www.wipo.int/amc/en/domains/rules/.

- The Rules can be found at http://www.icann.org/udrp/udrp-rules-24oct99.htm.

- The Supplemental Rules, as well as other information concerning the resolution of domain name disputes can be found at http://www.wipo.int/amc/en/domains/rules/.

- A model Response can be found at http://www.wipo.int/amc/en/domains/respondent/index.html.

Alternatively, you may contact the Center to obtain any of the above documents.  The Center can be contacted in Geneva, Switzerland by telephone at +41 22 338 8247, by fax at +41 22 740 3700 or by e-mail at **domain.disputes@wipo.int**.

You are kindly requested to contact the Center to provide the contact details to which you would like (a) the official version of the Complaint and (b) other communications in the administrative proceeding to be sent.

A copy of this Complaint has also been sent to the Registrar(s) with which the domain name(s) that is/are the subject of the Complaint is/are registered.

By submitting this Complaint to the Center the Complainant hereby agrees to abide and be bound by the provisions of the Policy, Rules and Supplemental Rules.

AM 29158284.1

**BEFORE THE WORLD INTELLECTUAL PROPERTY ORGANIZATION
ARBITRATION AND MEDIATION CENTER**

| | | |
|---|---|---|
| JEFFERS, INC., | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | Disputed Domain Name: |
| -v- | ) | |
| | ) | <jeffers.com> |
| CONTACT PRIVACY INC., and | ) | |
| TECHNOLOGY ONLINE LLC | ) | |
| | ) | |
| Respondents. | ) | |

## AMENDED COMPLAINT IN ACCORDANCE WITH THE
## UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

Complainant Jeffers, Inc. submits the following Amended Complaint against Contact Privacy Inc. and Technology Online LLC and as grounds therefore states:

### I.    Introduction

1.    This Amended Complaint (the "Amended Complaint") is hereby submitted for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (the "Policy"), adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN") on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

### II.    The Parties

2.    Complainant Jeffers, Inc. ("Complainant" or "Jeffers") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 310 West Saunders Road, Dothan, Alabama 36301.  Complainant uses and is the owner of the registered JEFFERS® trademark.

3.    Complainant's contact details are as follows:

> Jeffers, Inc.
> 310 West Saunders Road
> Dothan, Alabama 36301
> 617-239-0484 (telephone)
> 888-325-9046 (facsimile)

- 1 -

4.      Complainant's authorized representative in this administrative proceeding is:

>   Edwards Wildman Palmer LLP
>   111 Huntington Ave
>   Boston, MA 02199
>   Attention:  Lawrence R. Robins
>   617-239-0484 (telephone)
>   888-325-9046 (facsimile)
>   lrobins@edwardswildman.com

5.      Complainant's preferred methods of communications directed to the Complainant in this administrative proceeding are as follows:

>   **Electronic-Only Material**:
>
>   | | |
>   |---|---|
>   | Method: | Email |
>   | Address: | lrobins@edwardswildman.com |
>   | Contact: | Lawrence R. Robins |
>
>   **Material Including Hardcopy:**
>
>   | | |
>   |---|---|
>   | Method: | Facsimile |
>   | Address: | Edwards Wildman Palmer LLP |
>   | | 111 Huntington Ave |
>   | | Boston, MA 02199 |
>   | Facsimile: | 888-325-9046 |
>   | Contact: | Lawrence R. Robins |

6.      According to the WHOIS database of the concerned registrar, TuCows, Inc., "Contact Privacy Inc. Customer 0131106758" was listed as the registrant at the time the Complaint was originally filed.   A copy of a printout of the database search conducted on February 26, 2014, is attached as Annex A. After the Complaint was filed, the identity of the registrant was revealed by the registrar to be Technology Online LLC ("Respondent") and Complainant hereby filed this Amended Complaint.

7.      All information known to Complainant regarding how to contact Respondent is as follows:

>   Contact Information from WHOIS Directory
>
>   Contact Privacy Inc.
>   Customer 0131106758
>   96 Mowat Ave.
>   Toronto, Ontario

M6K 3M1 Canada
Phone: +1 416-538-5457
E-mail: jeffers.com@contactprivacy.com

Technology Online LLC
3430 Cypress Street
Silver Springs, Nevada 89429
Phone: 775-538-2345
E-mail: techonlinellc@gmail.com

### III.   The Domain Name and Registrar

8.      This dispute concerns the domain name (the "Domain Name") identified below:

<jeffers.com>

9.      The registrar with which the Domain Name is registered is:

TuCows, Inc.
96 Mowat Ave.
Toronto, Ontario
M6K 3M1 Canada
Phone: +1 416-535-0123
E-mail: domainabuse@tucows.com

### IV.   Language of Proceeding

10.     To the best of Complainant's knowledge, the language of the Registration Agreement is English, a copy of which is provided as Annex B. As the Registrar's Domain Registration Agreement is in English, under Paragraph 11 of the Rules, the appropriate language for these proceedings is English. Complainant requests that the language of this proceeding shall be English.

### V.   Jurisdictional Basis for the Administrative Proceeding

11.     This dispute is properly within the scope of the Policy and the Administrative Panel has jurisdiction to decide the dispute.  Upon information and belief, the TuCows, Inc., Registration Agreement, pursuant to which the Domain Name is registered, incorporates the Policy.

12.     In addition, in accordance with Paragraph 4(a) of the Policy, Respondent is required to submit to a mandatory administrative proceeding because Complainant asserts that:

(1)     the Domain Name is identical or confusingly similar to trademarks and service marks in which Complainant has rights;

(2)     Respondent has no rights or legitimate interests in respect of the Domain Name; and

(3)     the Domain Name was registered and is being used in bad faith.

## VI.     Factual and Legal Grounds

### A.     Complainant is the Owner of the JEFFERS Trademark

13.     Complainant is a leader in the retail animal health supply industry and has operated since 1975 under the JEFFERS® trademark. Jeffers, Inc. began in the basement of Dr. Keith Jeffers' home in West Plains, Missouri. Dr. Jeffers was an advisor for local livestock owners and identified a need for more cost efficient livestock, animal, and veterinary supplies. Dr. Jeffers began offering door-to-door product sales and soon began distributing product catalogs to his customers. Now, Complainant operates a successful retail website, continues to distribute its catalogs four times a year, and owns a 120,000 square foot distribution warehouse.

14.     Complainant owns exclusive rights in registered and common law trademarks including the JEFFERS® trade name and trademark. Without limiting the foregoing, Complainant owns the following trademark registered with the United States Patent and Trademark Office, namely:

> (i) JEFFERS, U.S. Trademark Reg. No. 2102912 in Class 3 and Class 5, registered on October 7, 1997 with a date of first use of January 15, 1976.

A copy of the registration certificate issued in connection with U.S. Trademark Reg. No. 2102912 is attached as Annex C.

15.     Complainant's trademarks are well known to the consuming public in connection with Complainant's animal health supply business as a result of the extensive use and promotion of Complainant's mark via its retail catalogs and its online retail websites, <jefferspet.com>, <jeffersequine.com>, and <jefferslivestock.com>. Complainant's customers can purchase a wide assortment of JEFFERS™ branded animal supply products via Complainant's websites and cataloges, including equine bridles, reins and saddles, pet grooming products, medical and veterinary supplies, supplements, vaccines, pet carriers, pest control products, fencing, feeders, and incubators, and over 18,000 SKUs of third-party products. Images taken from Complainant's websites are attached as Annex D. As these images demonstrate, Complainant prominently features the JEFFERS® mark on the top of every page of its website.

16.     As determined by Internet Retailer, Complainant is the 440th largest internet retailer. Complainant also sells approximately 12% of all horse de-wormers in the United States.

17.     Complainant mails "Jeffers Pet," "Jeffers Equine" and "Jeffers Livestock" product catalogs to subscribers each quarter. Over 3.46 million total product catalogs are mailed per year, including over 1 million "Jeffers Equine" product catalogs. Images from Complainant's catalogs are attached as Annex E. As these images demonstrate, Complainant prominently features the JEFFERS® mark on the front cover of its product catalogs.

18.     Through its catalogs and website, Complainant has sold more than $50 million worth of products annually for at least the past 15 years, for total sales over that period in excess of $750 million. During that same period, Complainant spent more than $7 million on advertising and promoting its brand. In addition to advertising expenditures, Complainant spends roughly $2.5 million per year to mail its catalogs and advertisements to consumers, totaling almost $34 million over the last fifteen years. Through its website and catalogs, Complainant processes nearly 500,000 customer orders each year.

19.     As a result of this extensive use of the JEFFERS® mark, customers in the United States, and particularly those seeking to purchase pet, equine and livestock products, readily associate the mark JEFFERS® with Complainant.

### B.     The Domain Name is Identical to Complainant's Mark

20.     As the Domain Name is <jeffers.com>, Respondent has registered Complainant's exact trademark and trade name. Thus, it is beyond doubt that the Domain Name is identical to the JEFFERS® trademark in which Complainant has exclusive rights.

### C.     Respondent's Use and Registration of the Domain Name

21.     According to the WHOIS database, the Domain Name was initially registered on March 6, 1996. *See* Annex A.

22.     Respondent is not a licensee of Complainant, nor is it authorized to use JEFFERS® or any of Complainant's other marks, or any marks confusingly similar thereto.

23.     Respondent registered or acquired the Domain Name without the authorization, knowledge or consent of Complainant.

24.     From early 1999 to October 2000, the Domain Name resolved to a website offering e-mail services (the "Site") provided by <mailbank.com>, Inc. From 2001-2005, the Domain Name resolved to a <netidentity.com> website that also offered a personalized e-mail service. In 2008 and 2009, the Site resolved to various third-party websites including <morningstar.org>,

<vallin.org> and <information.com>, each website containing finance, travel, home mortgage, foreclosure and other links not related to Complainant's business. Attached at Annex F are copies of printouts from <www.archive.org> (the "Way Back Machine") showing the websites associated with the Domain Name on these various dates, printed February 26, 2014.

25.    The "Way Back Machine" is unable to display images of the Site from 2010-2011. However, on April 10, 2012 the Site featured the text "Jeffers.com is currently under development, however, we are seeking joint venture and partnership opportunities. You may send your inquiries via e-mail to: inquiry@jeffers.com." By June 7, 2012, Respondent changed the content appearing on the Site so that it appeared to be a "portal site" providing reverse-searching links to third-party websites that compete directly with Complainant by offering information and products relating to equine supplies, horse products, horse veterinary supplies, discount equine supplies, equine veterinary supplies, horse saddlery, veterinary advice, horse supplies, horse veterinary supplies, and veterinary colleges. The Site was also revised to feature images of several horses along the top banner, further evidencing the association to Complainant's well-known JEFFERS® equine products. Attached at Annex G are copies of printouts from the "Way Back Machine" showing use of the website on these various dates, printed February 26, 2014. Copies of current screenshots of the Site printed on February 26, 2014 are attached as Annex H.

### C.    <u>Legal Grounds</u>

26.    Under Paragraph 4(a) of the Policy, a domain name registration may be canceled or transferred upon a showing that:

> (i)     the domain name is identical or confusingly similar to a trademark or service mark in which complainant has rights;
>
> (ii)    the registrant has no rights or legitimate interests in respect of the domain name; and
>
> (iii)   the domain name has been registered and is being used in bad faith.

**(i)    The Domain Name is Confusingly Similar to the JEFFERS mark in Which Complainant Has Well Established Rights.**

27.    As evidenced by the facts and supporting evidence provided above, Complainant owns well established rights in the JEFFERS® trademark.

28.    The Domain Name is identical to Complainant's JEFFERS® trademark, as it encompasses the JEFFERS® mark in its entirety. UDRP panels consistently hold that domain names are confusingly similar to established marks if they incorporate the mark in its entirety in circumstances similar to those presented here. *Parfums Christian Dior v. Javier Garcia Quintas and Christiandior.net*, D2000-0226 (WIPO May 17, 2000) (holding <www.christiandior.com> identical to Complainant's mark and ordering transfer); *Kabushiki Kaisha Toshiba v. Shan Computers*, D2000-0325 (WIPO June 27, 2000) (holding <www.toshiba.net> identical to Complainant's mark and ordering transfer).

29.    It is well established that in comparing a domain name to a trademark, the top level domain suffix is ignored. *Judy Larson v. Judy Larson Club*, Nat. Arb. Forum Case No. FA-96488 (NAF Mar. 13, 2001) (all finding that the addition of the top level domain suffix does not distinguish the domain name from a complainant's trademark).

30.    Respondent's Domain Name incorporated Complainant's JEFFERS® trademark in its entirety. As a result, consumers are likely to be attracted to such a website based on the mistaken belief that it is an authorized website where consumers can enter into transactions with Complainant to purchase horse, pet, and livestock supplies.

31.    For these reasons, the <jeffers.com> domain name is confusingly similar to Complainant's JEFFERS® trademark.

     **(ii)    Respondent Has No Rights or Legitimate Interests in Respect of the Domain Name**

32.    Under Paragraph 4(c) of the Policy, Respondent's rights or legitimate interests to the Domain Name could be established by demonstrating any of the following conditions:

     (i)    before any notice to [Respondent] of the dispute, [Respondent's] use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services; or

     (ii)    [Respondent] (as an individual, business, or other organization) ha[s] been commonly known by the domain name, even if [Respondent has] acquired no trademark or service mark rights; or

     (iii)    [Respondent is] making a legitimate non-commercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

33.    Complainant never authorized Respondent to use the JEFFERS® mark or any mark confusingly similar thereto as a mark or as a domain name.  This fact gives rise to a presumption that Respondent cannot establish that it has rights or any legitimate interest in the Domain Name. *See, e.g., Nilfisk-Advance A/S v. Leong Tak Lang*, Case No. D2000-1299 (WIPO Dec. 27, 2000) (concluding that respondent has no rights or legitimate interest in the domain name based upon the fact that respondent is not an authorized agent or licensee); *Guerlain S.A. v. SL, Blancel Web*, Case No. D2000-1191 (WIPO Nov. 21, 2000) (the lack of authorization or license to use complainant's trademark supports finding that complainant established *prima facie* evidence that respondent has no legitimate rights to the domain name).

<u>Respondent Has Not Engaged in *Bona Fide* Use of the Domain Name</u>

34.    Respondent cannot establish rights in the Domain Name under Paragraph 4(c)(i) of the Policy as it has never made any use of, or demonstrable preparations to use, the Domain Name or any name corresponding to the Domain Name in connection with a *bona fide* offering of goods or services because Respondent is not making a *bona fide* offering of goods.

35.    The Domain Name currently resolves to a portal website, which offers numerous links to third-party sites, some of which are competitors of Complainant that sell the same or similar products as Complainant.  Respondent presumably receives compensation in the form of "click through" or web page impression revenues from the third parties to whom visitors are redirected. Prior panels consistently find that such conduct cannot constitute a *bona fide* offering of goods or services under the Policy.  *See Mpire Corporation v. Michael Frey*, D2009-0258 (WIPO April 17, 2009) ("While the intention to earn click-through-revenue is not in itself illegitimate, the use of a domain name that is deceptively similar to a trademark to obtain click-through-revenue is found to be bad faith use."); *L'Oréal, Biotherm, Lancôme Parfums et Beauté & Cie v. Unasi, Inc.*, D2005-0623 (Aug. 15, 2005) (The "exploitation of the reputation of trademarks to obtain click-through commissions from the diversion of internet users is a common example of use in bad faith"); *Humana Inc. v. Cayman Trademark Trust*, D2006-0073 (WIPO Mar. 7, 2006) ("Using Complainant's mark as a domain name to divert traffic to Respondent's own portal site is not a bona fide offering of goods and services, nor is it a legitimate non-commercial or fair use of the domain name").

36.    It is well established that, in order for the use of a domain name incorporating a third party's trademark to be *bona fide*, the registrant must be using the associated site to sell only the

trademarked goods, otherwise it could be using the trademark to bait Internet users and then switch them to other goods. *Oki Data Americas, Inc. v. ASD, Inc.*, D2001-0903 (WIPO Nov. 6, 2001). Accordingly, a party that uses a domain name containing a trademark to sell or link to the products of the trademark owner and those of its competitors has no legitimate interest in the domain name. *Rockwool Int'l A/S v. Vivalda*, Case No. D2011-1442 (WIPO Oct. 10, 2011) (Respondent "is not using the Domain Name to promote only "Rockpanel" goods and services" and therefore "does not have rights or legitimate interests in respect of the Domain Name").

37.     Moreover, Respondent clearly knew of Complainant's trademark because it registered the Domain Name after Complainant has widely used its trademark and designed its site to provide links to products offered by both Complainant and Complainant's competitors long after Complainant has registered its trademark.  Such a knowing adoption and use of an infringing domain name does not constitute a *bona fide* offering and cannot establish legitimate interests in the domain name. *Miller v. Rheyne*, Case No. D2004-0504 (WIPO Sept. 2, 2004) ("Respondent has indeed used the disputed domain name in connection with an offering of goods, [but] that offering was not bona fide" where a respondent must have known of complainant and its marks prior to registration and use); *U-Haul Int'l, Inc. v. Affordable Web Prod.*, Case No. D2003-0511 (WIPO Aug. 18, 2003) ("respondent's conduct in knowingly adopting confusingly similar and infringing domain names was not, in the Panel's view, bona fide use, and was therefore not capable of conferring a right or legitimate interest in the domain names").

38.     For these reasons, Respondent cannot establish rights in the Domain Name under Paragraph 4(c)(i) of the Policy because it cannot show that it used or demonstrably prepared to use the Domain Name in connection with a *bona fide* offering of goods or services prior to notice of Complainant's trademark rights.

<div align="center">Respondent Has Not Been Commonly Known by the Domain Name</div>

39.     As neither Respondent's WHOIS information nor any other known information suggests that Respondent is commonly known by the Domain Name, it must be presumed that Respondent has never been commonly known by the Domain Name. *PHE, Inc. v. Nadeem Qadir*, D2005-1315 (WIPO Feb. 7, 2006) ("There is no evidence at the website associated with the disputed domain name or in any of the WHOIS information indicating that Respondent is commonly known by the disputed domain name"); *Bioland e.V v. Lee Yi*, Case No. D2002-1147 (WIPO Feb. 4, 2003) (finding respondent was "not commonly known by the domain name,

especially because his name does not include the string BIOLAND, and also because respondent does not prove that he holds a trademark for 'BIOLAND'").

40.     This conclusion evidences that Respondent cannot establish rights or legitimate interests in the Domain Name under Paragraph 4(c)(ii) of the Policy.  *See, e.g., Dell Inc. v. George Dell and Dell Net Solutions*, Case No. D2004-0512 (WIPO Aug. 24, 2004) ("there is no evidence that Respondents have been commonly known by the disputed domain name); *Compagnie de Saint Gobain v. Com-Union Corp.*, Case No. D2000-0020 (WIPO March 14, 2000) (finding no rights or legitimate interest where Respondent was not commonly known by mark and never applied for a license or permission).

41.     Any argument by Respondent that its use of the Domain Name has resulted in it being commonly known as "Jeffers" must be rejected because any such use did not take place prior to the registration of the Domain Name.  To come within the safe harbor of Paragraph 4(c)(ii) of the Policy, a respondent must have been commonly known by the domain name prior to the time of registration.  *See, e.g., Neteller plc v. Prostoprom*, Case No. D2007-1713 (WIPO Jan. 11, 2008) (to hold otherwise would mean "every cybersquatter who registered a domain name in bad faith would be able to 'create' a defense under Paragraph 4(c)(ii) by the simple expedient of adopting the domain name…thereby defeating the intended operation of the Policy").

<u>Respondent is Not Making a Legitimate Non-Commercial or Fair Use of</u>
<u>the Domain Name</u>

42.     As noted above, the Domain Name currently resolves to a portal or pay-per-click website, which offers numerous links to third-party sites, many of which are competitors of Complainant and offer the same or similar products as Complainant. Respondent's use of the Domain Name misdirects potential visitors seeking Complainant's commercial website to Respondent's own website and then to third-party commercial websites offering information and products relating to equine supplies, horse products, horse veterinary supplies, discount equine supplies, equine veterinary supplies, horse saddlery, veterinary advice, horse supplies, horse veterinary supplies, and veterinary colleges. All of these products are similar or identical to those offered by Complainant. Respondent presumably receives compensation each time one of its sponsored links is accessed.  Respondent's use of the Domain Name to misdirect potential visitors to Complainant's portal website is not a *bona fide* offering of goods or services and also does not constitute a legitimate non-commercial or fair use of the Domain Name under the Policy. *See*

*Asian World of Martial Arts Inc. v. Texas International Property Associates*, D2007-1145 (WIPO Dec. 10, 2007) (finding that respondent did not engage in nominative fair use of a domain name where it was used for a pay-per-click landing website that included advertisements for products and services that competed with those of complainant); *Humana Inc. v. Cayman Trademark Trust*, D2006-0073 (WIPO Mar. 7, 2006) ("[u]sing Complainant's mark as a domain name to divert traffic to Respondent's own portal site is not a bona fide offering of goods and services, nor is it a legitimate non-commercial or fair use of the domain name").

43.     For these reasons, Respondent cannot establish that it has any rights or legitimate interests in the Domain Name under Paragraph 4(c)(iii) of the Policy.

### (iii)   The Domain Name Has Been Registered and is Being Used in Bad Faith

44.     Under Paragraph 4(b) of the Policy, the following shall be evidence of the use and registration of a domain name in bad faith:

> (i)     circumstances indicating that the registrant has registered or acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name ....; or
>
> (ii)    the registrant has registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that it has engaged in a pattern of such conduct; or
>
> (iii)   the registrant has registered the domain name primarily for the purpose of disrupting the business of a competitor; or
>
> (iv)    by using the domain name, the registrant has intentionally attempted to attract, for commercial gain, Internet users to the registrant's website or other on-line location, by creating a likelihood of confusion with complainant's mark as to the source, sponsorship, affiliation, or endorsement of its website or location or of a product or service on its website or location.

#### Respondent is Using the Domain Name in an Intentional Attempt to Attract, for Commercial Gain, Internet Users to the &lt;jeffers.com&gt; Website by Creating a Likelihood of Confusion With Complainant's JEFFERS Mark

45.     While Paragraph 4(b) requires Respondent to register and use the Domain Name in bad faith, prior Panels interpret a Respondent's encroaching subsequent use of the Domain Name as sufficient to find bad faith under the Policy. Section 2 of the Policy includes a representation by the registrant at the time of registration that it will not now or in the future use the domain name

in violation of any laws or regulations. Thus, even though a party may register or acquire a domain name in good faith, if it "uses the domain name in the future so as to call into question the party's compliance with the party's representations and warranties, this may be deemed to be retroactive bad faith registration." *Octogen Pharmacal Company, Inc. v. Domains By Proxy, Inc. and Rich Sanders and Octogen e-Solutions,* Case No. D2009-0786 (WIPO August 19, 2009) (holding registrant's change in content on the domain by redirecting the site to his own personal business and away from Complainant's website as an indication of registration and use of the domain in bad faith). Of the four scenarios detailed in Paragraph 4(b) of the Policy of "evidence of registration and use of the domain name in bad faith", only one of these scenarios, namely, Paragraph 4(b)(iv), describes an actual use of the domain name, but does not discuss the registrant's acts at the time of registration. The other three scenarios describe bad faith purposes for which the domain name was registered. The Policy expressly deems Paragraph 4(b)(iv) to be a "registration and use of the domain name in bad faith" even though that scenario makes no mention of the mental state of the registrant at the time of registration of the domain name. Prior Panels have found this fact relevant to whether a bad faith use of a domain name following a non-bad faith registration could satisfy the Paragraph 4(a)(iii) requirement. *See Octogen Pharmacal Company, Inc. v. Domains By Proxy, Inc. and Rich Sanders and Octogen e-Solutions,* Case No. D2009-0786 (WIPO August 19, 2009); *Denver Newspaper Agency v. Jobing.com LLC*, Claim No. 0908001282148 (NAF October 16, 2009); *Ville de Paris v. Jeff Walter*, Case No. D2009-1278 (WIPO November 19, 2009). The scenarios detailed in Paragraph 4(b) are "without limitation." The Policy makes clear that there can be other scenarios that are also evidence of registration and use in bad faith. The Paragraph 4(a)(iii) requirement of bad faith can be satisfied where the respondent has used the domain name in bad faith, even though the respondent was not necessarily acting in bad faith at the time of registration of the domain name. "The fundamental question that arises for determination can be stated simply: does the absence of bad faith intent by the respondent at the time of acquisition of the disputed domain name inevitably preclude complainant from succeeding under the Policy, even though the respondent has subsequently used the domain name in bad faith? In this Panel's view, the answer to that question is provided by the express terms of the Policy itself, and that answer is 'no.'" *Ville de Paris v. Jeff Walter*, Case No. D2009-1278 (WIPO November 19, 2009); ("Respondent's decision to change the intended use of the disputed domain name to a use that could cause

confusion with, and disruption to, Complainant's activities...were actions by which Respondent sought to use its registration of the disputed domain name to derive a benefit from Complainant's trademark").

46.     To the best of Complainant's knowledge, Respondent did not initially feature links to equine products on its Site directly after registration. However, Respondent changed the content on the Site in 2012 to include these links, this establishes Respondent's subsequent bad faith use and intent to create a likelihood of confusion and trade on the goodwill associated with Complainant's well known mark. *Telstra Corporation Limited v. Nuclear Marshmallows*, Case No. D2000-0003 (WIPO February 18, 2000) ("bad faith registration can be deemed to have occurred even without regard to the state of mind of the registrant at the time of registration, if the domain name is subsequently used to trade on the goodwill of the mark holder"); *Denver Newspaper Agency v. Jobing.com LLC*, Claim No. 0908001282148 (NAF October 16, 2009) ("Respondent nevertheless suggests that it cannot be found to have registered and used the domain name in bad faith because it did not have Complainant's trademark in mind at that time it registered the domain name.  This argument is irrelevant").

47.     The only evident reason for Respondent to have registered or acquired the Domain Name for its website was to attract users interested in Complainant's JEFFERS® products, for Respondent's commercial gain, by passing off the content associated with the Domain Name as content originating from Jeffers.   Under Paragraph 4(b)(iv) of the Policy, registration or acquisition and subsequent use of a Domain Name in order to misdirect potential visitors by providing links to third-party commercial websites or to complainant's website is evidence of bad faith. *See, Hanover Communications Ltd., v. Maison Tropicale, S.A.*, D2007-1456 (WIPO Nov. 20, 2007) (bad faith found on the basis that "Respondent is using the Domain Name for one purpose only and that is to earn click-per-view revenue via the sponsored links on Respondent's website..."); *Bank of Nova Scotia v. Domain Admin. Ltd.*, Case No. D2007-0883 (WIPO Aug. 9, 2007) (finding bad faith on the ground that Respondent "has chosen to register Complainant's mark as a domain name in order to divert Internet traffic away from Complainant's website for the purpose of disrupting Complainant's business for monetary gain").

<u>Respondent Registered the Domain Name in Order to Prevent Complainant From</u>
<u>Reflecting the Mark in a Corresponding Domain Name and has Engaged in a</u>
<u>Pattern of Such Conduct under Section 4(b)(ii).</u>

48.     Respondent's registration or acquisition of a domain name that is identical to Complainant's federally registered JEFFERS® trademark amounts to use of the Domain Name in a manner that deliberately prevents Complainant from obtaining the domain name that corresponds with its registered trademark and supports a finding of bad faith under Section 4(b)(ii) of the Policy.  *See, e.g., Henry Ford Health System v. Domain For Sale, Inc.*, Nat. Arbitration Forum FA 105976 (NAF April 30, 2002) (because respondent prevented complainant from reflecting its mark in disputed domain name, respondent registered <henryfordhospital.com> in bad faith); *J. Crew International, Inc. v. crew.com*, D2000-0054 (WIPO Feb. 16, 2000) (finding that registration prevented trademark holder from having domain name that corresponded to its registered mark, when coupled with constructive notice, was sufficient evidence of bad faith).

49.     Respondent demonstrates a track record of registering domain names that are identical or similar to third party marks and using those domain names to deceptively misdirect visitors to other third party websites. On two occasions Panels determined that Respondent engaged in bad faith use and registration of a third party mark, subsequently transferring the domain name to the Complainant. *See, Urban Home v. Technology Online LLC / Whois Privacy Service Pty Ltd.*, Case No. Case No. D2012-2437 (WIPO February 18, 2013); *American Council on Education, GED Testing Service LLC v. Registrant [4065093]: Domain Manager, Technology Online LLC*, Case No. D2012-2287 (WIPO February 4, 2013). Respondent's actions in registering multiple domain names that are identical or confusingly similar to the trademarks of others constitutes a pattern of conduct indicative of bad faith under Paragraph 4(b)(ii) of the Policy. *See Pharmaceutical Product Development, Inc., Pharmaco Investments, Inc. v. Damian Macafee (a.k.a James M. Van Johns)*, D2011-0637 (WIPO June 15, 2011) (history of targeting various third parties shows a pattern of conduct from which an inference of bad faith can be drawn). Prior panels consistently find that two UDRP rulings against Respondent are sufficient to establish a pattern of bad conduct. *Wikimedia Foundation Inc. v. Kevo Ouz a/k/a Online Marketing Realty*, D2009-0798 (WIPO Aug 7, 2009) (pattern shown by five domain names registered that were confusingly similar to a third party's mark and two UDRP rulings against Respondent); *Sport Supply Group, Inc. v. Kendell Lang*, Case No. Nat. Arb. Forum Case No

D2004-0829 (NAF December 10, 2004) (pattern of conduct established by two prior UDRP rulings against Respondent where bad faith use and registration were found and the panel ordered the transfer of the domain name to Complainant).

<div align="center">Other Considerations Support a Finding of Bad Faith</div>

50.     As stated in the Policy, the circumstances which support a finding of bad faith are "without limitation." Thus, other considerations beyond those explicitly stated in the Policy may be used to support a finding that the Domain Name was registered or acquired and subsequently used in bad faith. *See Telstra Corp. Ltd. v. Nuclear Marshmallows*, Case No. D2000-003 (WIPO Feb. 18, 2000) (the "relevant issue is not whether Respondent is undertaking a positive action in bad faith in relation to the domain name, but instead whether, in all the circumstances of the case, it can be said that Respondent is acting in bad faith" and "paragraph 4(b) expressly recognizes that *other* circumstances can be evidence that a domain name was registered and is being used in bad faith").

51.     In light of Complainant's well established rights in the JEFFERS® trademark, and due to the fact that the Domain Name is identical to the name of Complainant's business and registered trademark, there is no conceivable way that Respondent could use the Domain Name in good faith. The record does not indicate that Respondent's surname is "Jeffers" or that Respondent has any connection with the term "Jeffers." *See, Am. Diabetes Ass'n v. Domain Admin. Ltd.*, Case No. D2006-0921 (WIPO Sept. 14, 2006) ("[G]iven that the Domain Name is an exact match for the name of Complainant's organization and trademark and could only relate to Complainant, … it is extremely difficult to conceive of any possible legitimate use that Respondent might have had"); *Cobham Plc. v. Neog Inc.*, Case No. D2005-0503 (WIPO Aug. 9, 2005) ("The domain name is unconnected with the business of Respondent, and intimately connected with that of Complainant. The Panel cannot conceive of a situation in which Respondent could use the name in good faith").

52.     Respondent's selection of the Domain Name in connection with providing links to equine products evidences that, prior to registration or acquisition of the Domain Name, Registrant had knowledge of Complainant's rights in its JEFFERS mark. Further, Complainant's use of the JEFFERS mark since 1975 in connection with retail services for identical equine, pet and livestock products provided Respondent with constructive notice of Complainant's rights in its marks prior to its registration or acquisition of the Domain Name. Respondent's registration

or acquisition of the Domain Name in spite of its actual or constructive knowledge of Complainant's rights shows bad faith under Section 4(b)(iv) of the Policy. *See, e.g., RRI Fin., Inc., v. Ray Chen*, Case No. D2001-1242 (WIPO Dec. 11, 2001) ("Actual or constructive knowledge of Complainant's rights in the Trademarks is a factor supporting bad faith"); *Expedia, Inc. v. European Travel Net*, Case No. D2000-0137 (WIPO Apr. 18, 2000) (finding bad faith when respondent knew or should have known of complainant's trademark and services at the time respondent registered the domain name).

53.     The gap of over twenty years between the initial use of the JEFFERS® mark by Complainant and Respondent's registration or acquisition of the Domain Name is also an indication of bad faith. *See, e.g., TPI Holdings Inc. v. Belle Murshid (Domains by Proxy, Inc.)*, Case No. D2010-0114 (WIPO May 31, 2010) (gap of ten years found to indicate bad faith); *Asian World of Martial Arts Inc. v. Texas Int'l Prop. Assoc.*, Case No. D2007-1415 (WIPO Dec. 10, 2007) (gap of over a decade found to indicate bad faith).

54.     For these reasons, Respondent registered or acquired and is subsequently using the Domain Name in bad faith.

## VII.   Remedies Requested

55.     In accordance with Paragraph 4(b)(i) of the Policy, for the reasons described in Section VI above, Complainant requests that the Administrative Panel appointed in this administrative proceeding issue a decision ordering that the contested Domain Name, namely, <jeffers.com>, be transferred to Complainant Jeffers, Inc.

## VIII.   Administrative Panel

56.     Complainant elects to have the dispute decided by a single-member Administrative Panel.

## IX.   Mutual Jurisdiction

57.     In accordance with Paragraph 3(b)(xiii) of the Policy, Complainant agrees to submit, only with respect to any challenge that may be made by Respondent to a decision by the Administrative Panel to transfer the Domain Name that is the subject of this Amended Complaint, to the jurisdiction of the courts where Respondent is located, as shown by the address given for the domain name holder in the concerned registrar's WHOIS database at the time of the submission of the Amended Complaint to the WIPO Center.

2a334e858e154994

## X.  **Other Legal Proceedings**

58.     No other legal proceedings have been commenced or terminated in connection with this matter.

## XI.  **Communications**

59.     A copy of this Amended Complaint, together with the cover sheet as prescribed by the WIPO Supplemental UDRP Rules and the attached annexes, have been sent to Respondent on March 7, 2014, to the e-mail addresses specified below:

> Contact Privacy Inc.
> Customer 0131106758
> 96 Mowat Ave
> Toronto, Ontario
> M6K 3M1 Canada
> Phone: +1 416-538-5457
> E-mail: jeffers.com@contactprivacy.com
>
> Technology Online LLC
> 3430 Cypress Street
> Silver Springs, Nevada 89429
> Phone: 775-538-2345
> E-mail: techonlinellc@gmail.com

60.     A copy of this Amended Complaint, without annexes, has been sent or transmitted to the concerned registrar on March 7, 2014, by email at **domainabuse@tucows.com**.

## XII.  **Payment**

61.     As required by the Rules and Supplemental Rules, payment in the amount of USD $1,500.00 will be paid to WIPO by deposit account.

> Respectfully submitted,
>
> EDWARDS WILDMAN PALMER LLP
>
> By:   Lawrence R. Robins
>       Edwards Wildman Palmer LLP
>       111 Huntington Ave
>       Boston, MA 02199
>       617-239-0484 (telephone)

888-325-9046 (facsimile)
lrobins@edwardswildman.com
trademark@edwardswildman.com

Attorney for Jeffers, Inc.

Dated: March 7, 2014

## XIII.   Certification

Complainant agrees that its claims and remedies concerning the registration of the domain name, the dispute, or the dispute's resolution shall be solely against the domain name holder and waives all such claims and remedies against (a) the dispute resolution provider and panelist, except in the case of deliberate wrongdoing, (b) the concerned registrar, (c) the registry administrator, and (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

Complainant certifies that the information contained in this Amended Complaint is to the best of its knowledge complete and accurate, that this Amended Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Amended Complaint are warranted under the Rules for Uniform Domain Name Dispute Resolution Policy, the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy and under applicable law, as it now exists or as it may be extended by a good faith and reasonable argument.

Jeffers, Inc.

By: _____

Lawrence R. Robins
Counsel for Complainant

Date: March 7, 2014

# ANNEX A



What do you need help w



# Whois Lookup

## WhoIs Lookup

Please enter your domair



```
Domain Name: JEFFERS.COM
Registry Domain ID: 2163496_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.tucows.com
Registrar URL: http://tucowsdomains.com
Updated Date: 2013-05-02 18:53:19
Creation Date: 1996-06-03 04:00:00
Registrar Registration Expiration Date: 2015-06-02 04:00:00
Registrar: TUCOWS, INC.
Registrar IANA ID: 69
Registrar Abuse Contact Email: domainabuse@tucows.com
Registrar Abuse Contact Phone: +1.4165350123
Reseller: Hover
Reseller: help@hover.com
Reseller: 416.538.5498
Reseller: http://help.hover.com
Domain Status: clientTransferProhibited
Domain Status: clientUpdateProhibited
Registry Registrant ID:
Registrant Name: Contact Privacy Inc. Customer 0131106758
Registrant Organization: Contact Privacy Inc. Customer 0131106758
Registrant Street: 96 Mowat Ave
Registrant City: Toronto
Registrant State/Province: ON
Registrant Postal Code: M6K 3M1
Registrant Country: CA
Registrant Phone: +1.4165385457
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email: jeffers.com@contactprivacy.com
Registry Admin ID:
Admin Name: Contact Privacy Inc. Customer 0131106758
Admin Organization: Contact Privacy Inc. Customer 0131106758
Admin Street: 96 Mowat Ave
Admin City: Toronto
Admin State/Province: ON
Admin Postal Code: M6K 3M1
Admin Country: CA
Admin Phone: +1.4165385457
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
```

Admin Email: jeffers.com@contactprivacy.com
Registry Tech ID:
Tech Name: Contact Privacy Inc. Customer 0131106758
Tech Organization: Contact Privacy Inc. Customer 0131106758
Tech Street: 96 Mowat Ave
Tech City: Toronto
Tech State/Province: ON
Tech Postal Code: M6K 3M1
Tech Country: CA
Tech Phone: +1.4165385457
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: jeffers.com@contactprivacy.com
Name Server: BUY.INTERNETTRAFFIC.COM
Name Server: SELL.INTERNETTRAFFIC.COM
DNSSEC: Unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of WHOIS database: 2013-05-02 18:53:19 <<<

Registration Service Provider:
    Hover, help@hover.com
    416.538.5498
    http://help.hover.com


This domain's privacy is protected by contactprivacy.com. To reach the domain contacts,
please go to http://www.contactprivacy.com and follow the instructions.

The Data in the Tucows Registrar WHOIS database is provided to you by Tucows
for information purposes only, and may be used to assist you in obtaining
information about or related to a domain name's registration record.

Tucows makes this information available "as is," and does not guarantee its
accuracy.

By submitting a WHOIS query, you agree that you will use this data only for
lawful purposes and that, under no circumstances will you use this data to:
a) allow, enable, or otherwise support the transmission by e-mail,
telephone, or facsimile of mass, unsolicited, commercial advertising or
solicitations to entities other than the data recipient's own existing
customers; or (b) enable high volume, automated, electronic processes that
send queries or data to the systems of any Registry Operator or
ICANN-Accredited registrar, except as reasonably necessary to register
domain names or modify existing registrations.

The compilation, repackaging, dissemination or other use of this Data is
expressly prohibited without the prior written consent of Tucows.

Tucows reserves the right to terminate your access to the Tucows WHOIS
database in its sole discretion, including without limitation, for excessive
querying of the WHOIS database or for failure to otherwise abide by this
policy.

Tucows reserves the right to modify these terms at any time.

By submitting this query, you agree to abide by these terms.

NOTE: THE WHOIS DATABASE IS A CONTACT DATABASE ONLY.  LACK OF A DOMAIN
RECORD DOES NOT SIGNIFY DOMAIN AVAILABILITY.


http://www.tucowsdomains.com/whois                                    2/26/2014

## Help Categories

- Abuse and Legal
- Company and Officer Information
- Correspondence Information
- Disputes and Complaints
- Domain Specific Information
- Glossary of Terms
- ICANN Registrant Rights
- Internationalized Domain Names (IDN)
- Management and Passwords
- Name Server (DNS) Changes
- Registrant Support
- Renewal and Expiration
- Transfer of Domain Registration
- WHOIS use and information
- Why is my domain not working?

.BIZ . .CA . .CC . .CN . .COM/NET . .DE . .INFO . .NAME . .ORG . .TV . .UK

- Domain Help
- Find Your Domain Provider
- WhoIs Lookup
- Tucows Domain Promise

© 2012 Tucows.com Co.
Tucows has been ICANN accredited since 1999.
96 Mowat Avenue, Toronto, Ontario, M6K 3M1, Canada



# ANNEX B

1/1   SALE | ME, IO, and four more hipster domains are on sale! (Ironic eye-wear not included) Details   ✕



Blog   Webmail   Our Story   Help Center   1-866-731-6556

Transfer to Hover   Renew your Domain   Google Apps                    Sign In

# We have a simple Terms of Service so you can understand your rights.

collapse all

## Overview

collapse

This is an Agreement between You and Tucows.com Co. ("Tucows"), the company that provides domain registration and other services via the website at http://www.hover.com. We've tried really hard to keep this Agreement as readable and straightforward as possible. If you have suggestions that can help us improve it, please let us know.

Hover is a service provided by Tucows.

This Agreement explains our obligations to you, and your obligations to us. Combined with the Third-Party Terms identified below, this Agreement is the entire Agreement between us.

## General Terms

collapse

Your use of the services provided by Hover serves as your consent to the terms of this Agreement.

Tucows will update this Agreement from time to time, usually to reflect new obligations and policies arising from the introduction of new services. It might also be updated to modify or clarify existing obligations and policies.

You should visit this page from time to time to review any changes. We may notify you if this Agreement changes, or we may not. Any notification of any changes would be purely a courtesy and are not required by this Agreement.

## Hover Privacy Policy

collapse

Your agreement with us concerning the treatment of information we collect about you under this Agreement detailed in the terms of Hover's privacy policy which can be found here: https://www.hover.com/privacy

## Email Acceptable Use Policy                                    collapse

If you use our email services, you agree to abide by our Email Acceptable Use Policy, which can be found here: https://www.hover.com/aup

## Term of Agreement and Renewals                                collapse

The Term of this Agreement is twelve (12) months. When you renew your services with us, this Agreement will be renewed for additional 12 month periods, coincident with the term of your services.

On the day prior to the renewal date of your domain name or email services (or both), we will attempt to renew your services for an additional year. If our renewal is successful, this Agreement will be extended for an additional 12 months.

If you do not wish to continue service for a domain name or email address beyond its current period, you must explicitly cancel the service. Easy instructions for cancelling a domain name or email service can be found at http://about.hover.com/cancel

Renewal fees are non-refundable.

ICANN requires that we send notices, via email, about 30 days prior to expiry, and again within about seven days prior to expiry. An additional email must be sent within seven days after expiry of the domain (if applicable). You can choose when to receive these emails at https://www.hover.com/settings.

## Billing & Contact Information                                 collapse

Maintaining accurate and current billing information is a mandatory condition of maintaining your Hover account. If you do not maintain current credit card information in your Hover account, we may cancel your services without further notice.

If your billing information is not current, we will not renew your services, and this Agreement will terminate on the last day of the then current term.

Your right and title to your domain name also allows you to transfer your domain name to another party or hold the registration in the name of a third-party.

Regardless of the identity of the registrant or any other contact information in your domain name records, any domain name registered through Tucows using your Hover account is covered by the terms of this Agreement. You are responsible for ensuring that the terms of this Agreement are met, even if you have registered a domain name in the name of a third-party.

Tucows needs to be able to contact you easily and quickly. You are responsible for ensuring that Tucows has accurate and current contact and billing information for you, including your full and real name, postal address, e-mail address, and voice and facsimile telephone numbers. You also must provide similar accurate and current contact information for all contacts in each field of your domain name registration record.

Similarly, if you need to reach Tucows, you may contact us at;

Hover, a service of Tucows
96 Mowat Avenue
Toronto, Ontario
M6K 3M1
CANADA
(Attention: Office of the General Manager)

Telephone: +1 (416) 538-5498
Facsimile: +1 (416) 531-5584
E-Mail to help@hover.com.

## Timely Payment                                    collapse

Your right and title to your domain name is for a finite period of time, measured by the
term of your registration. If you do not pay your fees within thirty (30) days of the due date,
we will close your account and terminate this Agreement.

If your account is closed for non-payment, right and title to any domain name previously in
your account will transfer to Tucows and a cancellation surcharge of $175 per domain
name cancelled plus applicable renewal fees may be levied on your account.

## Recovering a domain name after expiry              collapse

It may be possible to recover a domain name after it has expired. Renewal of a domain
name after its expiry is subject to a Redemption Recovery fee of $175 plus any applicable
renewal fees and taxes. It may not always be possible to renew a domain name after its
expiry and Tucows has the sole and final word in determining when a domain name can
be renewed post-expiry and what fees will be applicable.

If you forfeit a domain name for non-payment, Tucows will have the right, in its sole
discretion, to (a) register and use the domain name for its own purposes; (b) sell or
transfer the domain name to a third-party; or (c) delete the domain name and allow any
new registrant anywhere in the world to register the domain name anew. Further, you
agree that Tucows may charge the credit card you have on file with Hover to recover any
amounts outstanding on your account.

## Cancelling & Termination                          collapse

You may end this Agreement at any time and for any reason by cancelling your Hover
services (instructions can be found here: http://about.hover.com/cancelling). You may
cancel your account by cancelling all of your services, which will cause this Agreement to
terminate and Tucows will delete your account.

Tucows can also end this Agreement at any time and for any reason.

If you terminate this Agreement, you will not receive a refund for any fees already paid. If
Tucows terminates this Agreement, Tucows will provide you with written notice, either via
postal service, or email.

Tucows may, in its sole discretion, refund any unused portion of your subscription fee, and
if applicable, assist you in transferring your domain name to another registrar.

## Third Party Terms

collapse

Tucows is permitted by the Internet Corporation for Assigned Names and Numbers ("ICANN") and many domain name registries to register domain names on your behalf only on the condition that Tucows requires you to agree to certain additional terms, conditions and fees.

These additional terms, conditions, and fees are listed in the "Tucows Registrant Agreement - Exhibit A" ("Third-Party Terms") and are not nearly as easy to read as this Agreement. We are sorry for that.

The Third-Party terms are part of this Agreement, and you are bound by them just as if they were included here. In the event that this Agreement is inconsistent with any provision of the Third-Party Terms, the Third-Party Terms shall prevail.

Tucows is permitted by the Canadian Internet Registration Authority ("CIRA") to register domain names on your behalf on the condition that Tucows requires you to agree to certain additional terms and conditions. These additional terms and conditions are listed in the CIRA Registrant Agreement (PDF) ("CIRA Terms"), and you are bound by them just as if they were included here. In the event that this Agreement is inconsistent with any provision of the CIRA Terms, the CIRA Terms shall prevail.

## Complaints & Legal Challenges

collapse

Sometimes domain name registrations become the subject of a legal challenge. If Tucows is made a party to any legal action by virtue of one of your domain name registrations, you agree to be responsible for all of Tucows' costs and legal fees and to indemnify and hold Tucows harmless from any action.

If Tucows is notified that a complaint has been filed with a judicial or administrative body regarding your domain name, Tucows may, at its sole discretion, (a) suspend your ability to use, make modifications to, or transfer your registration records and/or (b) deposit control of your registration record with the appropriate judicial entity by supplying a registrar certificate from us.

## Right to Limit Quantities Purchased

collapse

We reserve the right to limit quantities purchased to normal retail purchases. From time to time we may limit the number of domain names, email addresses and other services you may purchase from us at the published price. You agree that we may do so in our sole discretion and that our decision concerning any limitations is solely ours.

## Jurisdiction

collapse

This Agreement is governed by and will be enforced in accord with the laws of the Province of Ontario, Canada and the federal laws of Canada.

Any action brought against Tucows arising out of or relating to this Agreement must be brought in the courts of Toronto, Ontario, and you consent to the exclusive jurisdiction of such courts.

## Limitation of Liability                                              collapse

You agree that our entire liability, and your exclusive remedy, with respect to any services provided under this Agreement and any breach of this Agreement is solely limited to the amounts you have paid us.

Tucows and its directors, employees, affiliates, subsidiaries, agents and third party providers, ICANN and the applicable registries shall not be liable for any direct, indirect, incidental, special or consequential damages resulting from the use or inability to use any of the services or for the cost of procurement of substitute services. Because some states do not allow the exclusion or limitation of liability for consequential or incidental damages, in such states, our liability is limited to the extent permitted by law.

We disclaim any and all loss or liability resulting from, but not limited to: (1) loss or liability resulting from access delays or access interruptions; (2) loss or liability resulting from data non-delivery or data mis-delivery; (3) loss or liability resulting from acts of God; (4) loss or liability resulting from the unauthorized use or misuse of your account identifier or password; (5) loss or liability resulting from errors, omissions, or misstatements in any and all information or services(s) provided under this Agreement; (6) loss or liability resulting from the interruption of your service.

You agree that we will not be liable for any loss of registration and use of your domain name, or for interruption of business, or any indirect, special, incidental, or consequential damages of any kind (including lost profits) regardless of the form of action whether in contract, tort (including negligence), or otherwise, even if we have been advised of the possibility of such damages.

## Disclaimer of Warranties                                            collapse

You agree that your use of our services is solely at your own risk. You agree that such services are provided on an "as is," "as available" basis.

We expressly disclaim all warranties of any kind, whether express or implied, including but not limited to the implied warranties of merchantability, fitness for a particular purpose and non-infringement.

We make no warranty that the services will meet your requirements, or that the services will be uninterrupted, timely, secure, or error free; nor do we make any warranty as to the results that may be obtained from the use of the service or as to the accuracy or reliability of any information obtained through the service or that defects in the service will be corrected.

You understand and agree that any material and/or data downloaded or otherwise obtained through the use of service is done at your own discretion and risk and that you will be solely responsible for any damage to your computer system or loss of data that results from the download of such material and/or data.

We make no warranty regarding any goods or services purchased or obtained through the service or any transactions entered into through the service. No advice or information, whether oral or written, obtained by you from us or through the service shall create any warranty not expressly made herein.

## Service Agreements

**Our Terms of Service**

Our Privacy Policy

Our Mass Mailing Policy

## Meet our award winning help team.

The team at Hover has received a tremendous amount of praise from our customers and we couldn't be more proud of the customer service our team delivers.



## Need Help? Give our team a call at 1-866-731-6556

### Whois Hover?

Hover is a service of Tucows Inc., an ICANN accredited, publicly-traded internet company serving thousands of businesses and millions of internet users worldwide since 1994.

Learn More

Copyright © 2014 Hover.  |  Hover Terms of Service and Other Legal Stuff

# Exhibit A

## Registration Agreement

1. **IN THIS REGISTRATION AGREEMENT** ("Agreement"), "Registrant", "you" and "your" refers to the Registrant of each domain name registration, "we", "us" and "our" refers to Tucows Domains Inc., and "Services" refers to the domain name registration services provided by us as offered through _____, the Registration Service Provider ("Reseller"). Any reference to a "registry," "Registry" or "Registry Operator" shall refer to the registry administrator of the applicable top-level domain ("TLD"). This Agreement explains our obligations to you, and explains your obligations to us for the Services. By agreeing to the terms and conditions set forth in this Agreement, you are also agreeing to be bound by the rules and regulations set forth by a registry for that particular registry only.
2. **SELECTION OF A DOMAIN NAME.** You acknowledge and agree that we cannot guarantee that you will obtain a desired domain name, even if an inquiry indicates that a domain name is available at the time of your application. You represent that, to the best of the your knowledge and belief, neither the registration of the domain name nor the manner in which you intend to use it, infringes upon the legal rights of a third party and further, that the domain name is not being registered for, nor shall it at any time whatsoever be used for, any unlawful purpose. During the period following registration of a domain name and the appointment of active name servers, we may post a stagnant web page and any revenues generated from same shall be for our own account.
3. **FEES.** As consideration for the Services, you agree to pay Reseller the applicable service(s) fees prior to the effectiveness of a desired domain name registration or any renewal thereof. All fees payable hereunder are non-refundable even if your domain name registration is suspended, cancelled or transferred prior to the end of your current registration term. As further consideration for the Services, you agree to: (1) provide certain current, complete and accurate information about you as required by the registration process, and (2) maintain and update this information as needed to keep it current, complete and accurate. All such information shall be referred to as account information ("Account Information"). You represent that the Account Information and all other statements put forth in your application are true, complete and accurate. Both Tucows and each registry reserves the right to terminate your domain name registration if: (i) information provided by you or your agent is false, inaccurate, incomplete, unreliable, misleading or otherwise secretive; or (ii) you have failed to maintain, update and keep your Account Information true, current, complete, accurate and reliable. You acknowledge that a breach of this Section 3 will constitute a material breach of our Agreement, which will entitle either us or a registry to terminate this Agreement immediately upon such breach without any refund and without notice to you.
4. **TERM.** This Agreement will remain in effect during the term of your domain name registration as selected, recorded and paid for at the time of registration or any renewal thereof. Should the domain name be transferred to another registrar, the terms and conditions of this Agreement shall cease.
5. **MODIFICATIONS TO AGREEMENT.** You acknowledge that the practice of registering and administering domain names is constantly evolving; therefore, you agree that Tucows may modify this Agreement, or any other related and/or applicable agreement, as is necessary to comply with its agreements with ICANN, a registry or any other entity or individual, as well as to adjust to changing circumstances. All amendments to this Agreement will be posted on our website. Your continued use of the domain name registered to you will constitute your acceptance of this Agreement with any revisions. If you do not agree to any change, you may request that your domain name registration be cancelled or transferred to a different accredited registrar. You agree that such cancellation or request for transfer will be your exclusive remedy if you do not wish to abide by any change to this Agreement, or any other related and/or applicable agreement.
6. **MODIFICATIONS TO YOUR ACCOUNT.** In order to change any of your account information with us, you must use the Account Identifier and Password that you selected when you opened your account with us. You agree to safeguard your Account Identifier and Password from any unauthorized use. In no event shall we be liable for the unauthorized use or misuse of your Account Identifier or Password.
7. **NO GUARANTEE.** You acknowledge that registration or reservation of your chosen domain name does not confer immunity from objection to the registration, reservation or use of the domain name.
8. **DOMAIN NAME DISPUTES.** You agree that, if the registration or reservation of your domain name is challenged by a third party, you will be subject to the provisions specified in the dispute policy adopted by the applicable registry. You agree that in the event a domain name dispute arises with any third party, you will indemnify and hold us harmless pursuant to the terms and conditions contained in the applicable policy. If Tucows is notified that a complaint has been filed with a judicial or administrative body regarding your domain name, Tucows may, at its sole discretion, suspend your ability to use your domain name or to make modifications to your registration records until (i) Tucows is directed to do so by the judicial or administrative body, or (ii) Tucows receives notification by you and the other party contesting your domain that the dispute has been settled. Furthermore, you agree that if you are subject to litigation regarding your registration or use of your domain name, Tucows may deposit control of your registration record into the registry of the judicial body by supplying a party with a registrar certificate from us.
9. **POLICY.** You agree that your registration of the domain name shall be subject to suspension, cancellation, or transfer pursuant to a Tucows, registry, ICANN or government-adopted policy, or pursuant to any registrar or registry procedure not inconsistent with a Tucows, registry, ICANN or government-adopted policy, (1) to correct mistakes by us or a registry in registering the name or (2) for the resolution of disputes concerning the domain name.
10. **AGENCY.** Should you intend to license use of a domain name to a third party you shall nonetheless be the domain name holder of record and are therefore responsible for providing your own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the domain name. You shall accept liability for harm caused by wrongful use of the domain name, unless you promptly disclose the current contact information provided by the licensee and the identity of the licensee to a party providing the Registered Name Holder reasonable evidence of actionable harm. You represent that you will secure the agreement of any third party to the terms and conditions in this Agreement.
11. **ANNOUNCEMENTS.** We reserve the right to distribute information to you that is pertinent to the quality or operation of our services and those of our service partners. These announcements will be predominately informative in nature and may include notices describing changes, upgrades, new products or other information to add security or to enhance your identity on the Internet.

12. **LIMITATION OF LIABILITY.** You agree that our entire liability, and your exclusive remedy, with respect to any Services(s) provided under this Agreement and any breach of this Agreement is solely limited to the amount you paid for the initial registration of your domain name. Tucows and its directors, employees, affiliates, subsidiaries, agents and third party providers, ICANN and the applicable registries shall not be liable for any direct, indirect, incidental, special or consequential damages resulting from the use or inability to use any of the Services or for the cost of procurement of substitute services. Because some states do not allow the exclusion or limitation of liability for consequential or incidental damages, in such states, our liability is limited to the extent permitted by law. We disclaim any and all loss or liability resulting from, but not limited to: (1) loss or liability resulting from access delays or access interruptions; (2) loss or liability resulting from data non-delivery or data mis-delivery; (3) loss or liability resulting from acts of God; (4) loss or liability resulting from the unauthorized use or misuse of your account identifier or password; (5) loss or liability resulting from errors, omissions, or misstatements in any and all information or services(s) provided under this Agreement; (6) loss or liability resulting from the interruption of your Service. You agree that we will not be liable for any loss of registration and use of your domain name, or for interruption of business, or any indirect, special, incidental, or consequential damages of any kind (including lost profits) regardless of the form of action whether in contract, tort (including negligence), or otherwise, even if we have been advised of the possibility of such damages.

13. **INDEMNITY.** You agree to release, indemnify, and hold Tucows, its contractors, agents, employees, officers, directors and affiliates, ICANN, the applicable registries and their respective directors, officers, employees, agents and affiliates harmless from all liabilities, claims and expenses, including attorney's fees, of third parties arising out of or relating to the registration or use of the domain name registered in your name, whether used by yourself, licensed to a third party or pursuant to the Whois Privacy Service, including without limitation infringement by you or a third party with access to your Account Identifier and Password. You also agree to release, indemnify and hold us harmless pursuant to the terms and conditions contained in the applicable Dispute Policy. When we are threatened with suit by a third party, we may seek written assurances from you concerning your promise to indemnify us; your failure to provide those assurances may be considered by us to be a breach of your Agreement and may result in the suspension or cancellation of your domain name. This indemnification obligation will survive the termination or expiration of this Agreement.

14. **TRANSFER OF OWNERSHIP.** The person named as Registrant on the Whois shall be the registered name holder. The person named as administrative contact at the time the controlling account identifier and password are secured shall be deemed the designate of the Registrant with the authority to manage the domain name. You agree that prior to transferring ownership of your domain name to another person (the "Transferee") you shall require the Transferee to agree, in writing to be bound by all the terms and conditions of this Agreement. If the Transferee fails to be bound in a reasonable fashion (as determine by us in our sole discretion) to the terms and conditions in this Agreement, any such transfer will be null and void.

15. **RENEWALS AND FORFEITURE.** Domain names are registered for a finite period of time. You will receive reminders immediately prior to the expiration of your registration inviting you to renew your domain name and specifying the amount of time you have to renew your domain name. In the event that you fail to renew your domain name in a timely fashion, your registration will expire and we may, at our discretion, elect to assume the registration and may hold it for our own account, delete it or we may sell it to a third party. You acknowledge and agree that your right and interest in a domain name ceases upon its expiration and that any expired domain name may be made available for registration by a third party.

If you fail to renew your registration, your domain name may cease to resolve and visitors to your site may be redirected to a default page informing them that the site is no longer in service. This parked or default page may feature advertisements posted by us for our own account.

If we, in our sole discretion, have elected to renew the registration, you will be entitled to a grace period of forty (40) days during which you may re-register the domain name from us. Additional costs for the redemption and re-registration will apply. During this grace period, we may post a parked page and/or may revise that "Whois" registration records to include either our information or that of your Reseller. The domain name also may be listed for auction and promoted as being available for auction. If the name is sold during any such auction, it will be acquired by a third party and will not remain available for re-registration by you after our stated grace period. If you do not re-register the domain name during the grace period, the auction sale will be concluded and ownership of the domain transferred to a third party.

If you fail to renew your domain name registration during the grace period, you acknowledge that you have abandoned the domain name and that it is available for sale and registration by any third party.

16. **BREACH.** You agree that failure to abide by any provision of this Agreement, any operating rule or policy or the Dispute Policy provided by us, may be considered by us to be a material breach and that we may provide a written notice, describing the breach, to you. If within fifteen (15) calendar days of the date of such notice, you fail to provide evidence, which is reasonably satisfactory to us, that you have not breached your obligations under the Agreement, then we may delete the registration or reservation of your domain name. Any such breach by you shall not be deemed to be excused simply because we did not act earlier in response to that, or any other breach by you.

17. **DISCLAIMER OF WARRANTIES.** You acknowledge that your use of our Services is solely at your own risk. You agree that such Service(s) is provided on an "as is," "as available" basis. We expressly disclaim all warranties of any kind, whether express or implied, including but not limited to the implied warranties of merchantability, fitness for a particular purpose and non-infringement. We make no warranty that the Services will meet your requirements, or that the Service(s) will be uninterrupted, timely, secure, or error free; nor do we make any warranty as to the results that may be obtained from the use of the Service(s) or as to the accuracy or reliability of any information obtained through the Service or that defects in the Service will be corrected. You understand and agree that any material and/or data downloaded or otherwise obtained through the use of Service is done at your own discretion and risk and that you will be solely responsible for any damage to your computer system or loss of data that results from the download of such material and/or data. We make no warranty regarding any goods or services purchased or obtained through the Service or any transactions entered into through the Service. No advice or information, whether oral or written, obtained by you from us or through the Service shall create any warranty not expressly made herein.

18. **INFORMATION.** As part of the registration process, you are required to provide us certain information and to update us promptly as such information changes such that our records are current, complete and accurate. You are obliged to provide us the following information: (a) your name, postal address, e-mail address, and voice and fax (if available) telephone numbers; (b) the domain name being registered; (c) the name, postal address, e-mail address, and voice and fax (if available) telephone numbers of the administrative contact for the domain name; (d) the name, postal address, e-mail address, and voice and fax (if available) telephone numbers of the billing contact for the domain name; and (e) the name, postal address, e-mail address, and voice and fax (if available) telephone numbers of the

technical contact for the domain name. Any voluntary information we request is collected in order that we can continue to improve the products and services offered to you through your Reseller.

19. **DISCLOSURE AND USE OF REGISTRATION INFORMATION.** You agree and acknowledge that we will make domain name registration information you provide available to ICANN, to the registry administrators, law enforcement agencies and to other third parties as applicable. You further agree and acknowledge that we may make publicly available, or directly available to third party vendors, some or all, of the domain name registration information you provide, for purposes of inspection (such as through our Whois service) or other purposes as required or permitted by ICANN and applicable laws. (a) You hereby consent to any and all such disclosures and use of, and guidelines, limits and restrictions on disclosure or use of, information provided by you in connection with the registration of a domain name (including any updates to such information), whether during or after the term of your registration of the domain name. You hereby irrevocably waive any and all claims and causes of action you may have arising from such disclosure or use of your domain name registration information by us. (b) You may access your domain name registration information in our possession to review, modify or update such information, by accessing our domain manager service, or similar service, made available by us through your Reseller. (c) We will not process or maintain data about any identified or identifiable natural person that we obtain from you in a way incompatible with the purposes and other limitations which we describe in this Agreement. (d) We will take reasonable precautions to protect the information we obtain from you from our loss, misuse, unauthorized disclosure, alteration or destruction of that information.

20. **OBLIGATION TO MAINTAIN WHOIS.** Your wilful provision of inaccurate or unreliable information, your wilful failure promptly to update information provided to us, or any failure to respond to inquiries by us addressed to the email address of the registrant, the administrative, billing or technical contact appearing in the Whois directory with respect to a domain name concerning the accuracy of contact details associated with the registration shall constitute a material breach of this Agreement and be a basis for cancellation of the domain name registration. Any information collected by us concerning an identified or identifiable natural person ("Personal Data") will be used in connection with the registration of your domain name(s) and for the purposes of this Agreement and as required or permitted by ICANN or an applicable registry policy.

21. **REVOCATION.** We, in our sole discretion, reserve the right to deny, cancel, suspend, transfer or modify any domain name registration to correct a mistake, protect the integrity and stability of the company and any applicable registry, to comply with any applicable laws, government rules, or requirements, requests of law enforcement, in compliance with any dispute resolution process, or to avoid any liability, civil or criminal. You agree that we shall not be liable to you for loss or damages that may result from our refusal to register or cancel, suspend, transfer or modify your domain name registration.

22. **INCONSISTENCIES WITH REGISTRY POLICIES.** In the event that this Agreement may be inconsistent with any term, condition, policy or procedure of an applicable registry, the term, condition, policy or procedure of the applicable registry shall prevail.

23. **NON-WAIVER.** Our failure to require performance by you of any provision hereof shall not affect the full right to require such performance at any time thereafter; nor shall the waiver by us of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

24. **NOTICES.** Any notice, direction or other communication given under this Agreement shall be in writing and given by sending it via e-mail or via regular mail. In the case of e-mail, valid notice shall only have been deemed to be given when an electronic confirmation of delivery has been obtained by the sender. E-mail notification to Tucows must be sent to lhutz@tucows.com. Any notice to you will be sent to the e-mail address provided by you in your Whois record. Any e-mail communication shall be deemed to have been validly and effectively given on the date of such communication, if such date is a business day and such delivery was made prior to 4:00 p.m. EST, otherwise it will be deemed to have been delivered on the next business day. In the case of regular mail notice, valid notice shall be deemed to have been validly and effectively given five (5) business days after the date of mailing Postal notices to Tucows shall be sent to:
Tucows Domains Inc.
Registrant Affairs Office
96 Mowat Avenue
Toronto, Ontario M6K 3M1
CANADA
Attention: Legal Affairs
and in the case of notification to you shall be sent to the address specified in the "Administrative Contact" in your Whois record.

25. **ENTIRETY.** You agree that this Agreement, the applicable dispute policy and the rules and policies published by Tucows and any applicable registry or other governing authority, are the complete and exclusive agreement between you and us regarding our Services.

26. **NO THIRD PARTY BENEFICIARIES.** This Agreement shall not be construed to create any obligation by either Tucows or Registrant to any non-party to this Agreement. Enforcement of this Agreement, included any provisions incorporated by reference, is a matter solely for the parties to this Agreement.

27. **GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN WITHOUT REFERENCE TO RULES GOVERNING CHOICE OF LAWS. ANY ACTION RELATING TO THIS AGREEMENT MUST BE BROUGHT IN ONTARIO AND YOU IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS.

28. **INFANCY.** You attest that you are of legal age to enter into this Agreement.

29. **FORCE MAJEURE.** You acknowledge and agree that neither we nor the applicable registry shall be responsible for any failures or delays in performing our respective obligations hereunder arising from any cause beyond our reasonable control, including but not limited to, acts of God, acts of civil or military authority, fires, wars, riots, earthquakes, storms, typhoons and floods.

30. **PRIVACY.** Information collected about you is subject to the terms of Tucows' privacy policy, the terms of which are hereby incorporated by reference. Tucows' privacy policy can be found at: http://www.opensrs.com/privacy

31. **CONTROLLING LANGUAGE.** In the event that you are reading this Agreement in a language other than the English language, you acknowledge and agree that the English language version hereof shall prevail in case of inconsistency or contradiction in interpretation or translation.

32. **TLD'S.** The following additional provisions apply to any domain names that you register through Tucows with the various registries:
    a. **.com/net Domains:** In the case of a ".com" or ".net" registration, the following terms and conditions will apply:

    i. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry; these policies are subject to modification;

    ii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

b. .org Domains: In the case of a ".org" registration, the following terms and conditions will apply:

    i. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Dom ain Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry. These policies are subject to modification;

    ii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

c. .info Domains: In the case of a ".info" registration, the following terms and conditions will apply:

    i. Registrant's Personal Data. You consent to the use, copying, distribution, publication, modification, and other processing of Registrant's personal data by Afilias, the .INFO registry, and its designees and agents, in a manner consistent with the purposes specified pursuant to its contract;

    ii. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry. These policies are subject to modification;

    iii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario;

    iv. Reservation of Rights. Tucows and Afilias expressly reserve the right to deny, cancel, transfer, or modify any registration that either registrar or Afilias deems necessary, at its discretion, to protect the integrity and stability of the registry, to comply with any applicable law, any government rule or requirement, any request of law enforcement, any dispute resolution process, or to avoid any liability, civil or criminal, on the part of the registrar and/or Afilias, as well as their affiliates, subsidiaries, executives, directors, officers, managers, employees, consultants, and agents. The registrar and Afilias also reserve the right to suspend a domain name or its registration data during resolution of a dispute.

d. .biz Domains. In the case of a ".biz" registration, the following terms and conditions will apply:

    i. .biz Restrictions. Registrations in the .biz top-level domain must be used or intended to be used primarily for bona fide business or commercial purposes. For the purposes of the .biz registration restrictions, "bona fide business or commercial use" shall mean the bona fide use or bona fide intent to use the domain name or any content, software, materials, graphics or other information thereon, to permit Internet users to access one or more host computers through the DNS: (A) to exchange goods, services, or property of any kind; (B) in the ordinary course of business; or (C) to facilitate (i) the exchange of goods, services, information or property of any kind; or (ii) the ordinary course of trade or business.

For more information on the .biz restrictions, which are incorporated herein by reference, please see: http://www.icann.org/tlds/agreements/biz/registry-agmt-appl-18apr01.htm.

    ii. Selection of a Domain Name. You represent that: (A) the data provided in the domain name registration application is true, correct, up to date and complete, and that you will continue to keep all of the information provided correct, up-to-date and complete; (B) to the best of the your knowledge and belief, neither this registration of a domain name nor the manner in which it is directly or indirectly to be used infringes upon the legal rights of a third party; (C) that the domain name is not being registered for nor shall it at any time whatsoever be used for any unlawful purpose whatsoever; (D) the registered domain name will be used primarily for bona fide business or commercial purposes and not (a) exclusively for personal use, or (b) solely for the purposes of (1) selling, trading or leasing the domain name for compensation, or (2) the unsolicited offering to sell, trade or lease the domain name for compensation; (E) you have the authority to enter into this Registration Agreement; and (F) the registered domain name is reasonably related to your business or intended commercial purpose at the time of registration.

    iii. Provision of Registration Data. As part of the registration process, you are required to provide us with certain information and to keep the information true, current, complete, and accurate at all times. The information includes the following: (A) your full name; (B) your postal address; (C) your e-mail address; (D) your voice telephone number; (E) your fax number (if applicable); (F) the name of an authorized person for contact purposes in the case of a registrant that is an organization, association, or corporation; (G) the IP addresses of the primary nameserver and any secondary nameserver for the domain name; (H) the corresponding names of the primary and secondary nameservers; (I) the full name, postal address, e-mail address, voice telephone number, and, when available, fax number of the administrative, technical, and billing contacts; and the name holder for the domain name; and (J) any remark concerning the domain name that should appear in the Whois directory. (K) You agree and understand that the foregoing registration data will be publicly available and accessible on the Whois directory as required by ICANN and/or registry policies, and may be sold in bulk in accordance with the ICANN agreement.

    iv. Domain Name Disputes. You acknowledge having read and understood and agree to be bound by the terms and conditions of the following documents, as they may be amended from time to time, which are hereby incorporated and made an integral part of this Agreement: (A) The Uniform Domain Name Dispute Resolution Policy ("Dispute Policy), available at: http://www.icann.org/dndr/udrp/policy.htm; (B) The Restrictions Dispute Resolution Criteria and Rules ("RDRP"), available at: http://www.icann.org/tlds/agreements/biz/registry-agmt-rdrm-27apr01.htm; (collectively, the "Dispute Policies").

    v. The Dispute Policy sets forth the terms and conditions in connection with a dispute between a Registrant and any party other than the Registry or Registrar over the registration and use of an Internet domain name registered by Registrant.

    vi. The RDRP sets forth the terms under which any allegation that a domain name is not used primarily for business or commercial purposes shall be endorsed on a case-by-case, fact specific basis by an independent ICANN-accredited dispute provider.

vii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

e. .name Domains. In the case of a ".name" registration, the following terms and conditions will apply:

i. .name Restrictions. Registrations in the .name top-level domain must constitute an individual's "Personal Name". For purposes of the .name restrictions (the "Restrictions"), a "Personal Name" is a person's legal name, or a name by which the person is commonly known. A "name by which a person is commonly known" includes, without limitation, a pseudonym used by an author or painter, or a stage name used by a singer or actor.

ii. .name Representations. As a .name domain name registrant, you hereby represent that: (A) the registered domain name or second level domain ("SLD") e-mail address is your Personal Name. (B) the data provided in the domain name registration application is true, correct, up to date and complete and that you will continue to keep all of the information provided correct, current and complete, (C) to the best of the your knowledge and belief, neither this registration of a domain name nor the manner in which it is directly or indirectly to be used infringes upon the legal rights of a third party; (D) that the domain name is not being registered for nor shall it at any time whatsoever be used for any unlawful purpose whatsoever; (E) the registration satisfies the Eligibility Requirements found at: http://www.icann.org/cn/about/agreements/registries/name/appendix-11-25mar11-en.htm; and (F) you have the authority to enter into this Registration Agreement.

iii. E-mail Forwarding Services. The Services for which you have registered may, at your option, include e-mail forwarding. To the extent you opt to use e-mail forwarding, you are obliged to do so in accordance with all applicable legislation and are responsible for all use of e-mail forwarding, including the content of messages sent through e-mail forwarding. You undertake to familiarize yourself with the content of and to comply with the generally accepted rules for Internet and e-mail usage. Without prejudice to the foregoing, you undertake not to use e-mail forwarding: (A) to encourage, allow or participate in any form of illegal or unsuitable activity, including but not restricted to the exchange of threatening, obscene or offensive messages, spreading computer viruses, breach of copyright and/or proprietary rights or publishing defamatory material; (B) to gain illegal access to systems or networks by unauthorized access to or use of the data in systems or networks, including all attempts at guessing passwords, checking or testing the vulnerability of a system or network or breaching the security or access control without the sufficient approval of the owner of the system or network; (C) to interrupt data traffic to other users, servers or networks, including, but not restricted to, mail bombing, flooding, Denial of Service (DoS) attacks, wilful attempts to overload another system or other forms of harassment; or (D) for spamming, which includes, but is not restricted to, the mass mailing of unsolicited e-mail, junk mail, the use of distribution lists (mailing lists) which include persons who have not specifically given their consent to such distribution list. Users are not permitted to provide false names or in any other way to pose as somebody else when using e-mail forwarding.

iv. Registry reserves the right to implement additional anti-spam measures, to block spam or mail from systems with a history of abuse from entering Registry's e-mail forwarding. However, due to the nature of such systems, which actively block messages, Registry shall make public any decision to implement such systems a reasonable time in advance, so as to allow you or us to give feedback on the decision.

v. You understand and agree that Registry may delete material that does not conform to clause (c) above or that in some other way constitutes a misuse of e-mail forwarding. You further understand and agree that Registry is at liberty to block your access to e-mail forwarding if you use e-mail forwarding in a way that contravenes this Agreement. You will be given prior warning of discontinuation of the e-mail forwarding unless it would damage the reputation of Registry or jeopardize the security of Registry or others to do so. Registry reserves the right to immediately discontinue e-mail forwarding without notice if the technical stability of e-mail forwarding is threatened in any way, or if you are in breach of this Agreement. On discontinuing e-mail forwarding, Registry is not obliged to store any contents or to forward unsent e-mail to you or a third party.

vi. You understand and agree that to the extent either we and/or Registry is required by law to disclose certain information or material in connection with your e-mail forwarding, either we and/or Registry will do so in accordance with such requirement and without notice to you.

vii. Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the dispute policy that is incorporated herein and made a part of this Agreement by reference. You hereby acknowledge that you have read and understood and agree to be bound by the terms and conditions of the following documents, as they may be amended from time to time, which are hereby incorporated and made an integral part of this Agreement. (A) the Eligibility Requirements (the "Eligibility Requirements"), available at: http://www.icann.org/tlds/agreements/name/registry-agmt-appl-8aug03.htm; (B) the Eligibility Requirements Dispute Resolution Policy (the "ERDRP"), available at: http://www.icann.org/tlds/agreements/name/registry-agmt-appm-8aug03.htm; and (C) the Uniform Domain Name Dispute Resolution Policy (the "UDRP"), available at: http://www.icann.org/dndr/udrp/policy.htm

viii. The Eligibility Requirements dictate that Personal Name domain names and Personal Name SLD e-mail addresses will be granted on a first-come, first-served basis. The following categories of Personal Name Registrations may be registered: (i) the Personal Name of an individual; (ii) the Personal Name of a fictional character, if you have trademark or service make rights in that character's Personal Name; (iii) in addition to a Personal Name registration, you may add numeric characters to the beginning or the end of the Personal Name so as to differentiate it from other Personal Names.

ix. The ERDRP applies to challenges to (i) registered domain names and SLD e-mail address registrations within .name on the grounds that a Registrant does not meet the Eligibility Requirements, and (ii) to Defensive Registrations (as defined by the Registry) within .name.

x. The UDRP sets forth the terms and conditions in connection with a dispute between a Registrant and party other than the Registry or Tucows over the registration and use of an Internet domain name registered by a Registrant.

xi. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

f.  **.at Domains.** In the case of a ".at" registration, the following terms and conditions will apply:
  i.  Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.nic.at/en/service/legal_information/terms_conditions/. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

g.  **.be Domains.** In the case of a ".be" registration, the following terms and conditions will apply:
  i.  Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.dns.be/en/legal/domain_name_disputes/general_principle.
  You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.
  ii.  Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the .be Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.dns.be/en/legal/domain_name_disputes/general_principle.

h.  **.ca Domains.** In the case of a ".ca" registration, the following terms and conditions will apply:
  i.  Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the Dispute Policy, which is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://cira.ca/assets/Documents/CDRPpolicy.pdf. Please take the time to familiarize yourself with this policy.
  ii.  Registry Policy. You agree that your registration of the domain name shall be subject to suspension, cancellation, or transfer pursuant to any Registry-adopted policy, or pursuant to any registrar or registry procedure not inconsistent with a Registry adopted policy, (1) to correct mistakes by Tucows or the Registry in registering the name or (2) for the resolution of disputes concerning the domain name.
  iii.  Transfer of Ownership. Any transfer of ownership in and to a domain name registration shall be affected in accordance with registry policies and procedures.
  iv.  Registry Agreement and Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by the Registry's Registrant Agreement, the Registry's policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.cira.ca/assets/Documents/Legal/Registrants/registrantagreement.pdf. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry agreement or policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.
  v.  You acknowledge and agree that the Registry shall not be liable to you for any loss, damage, or expense arising out of the Registry's failure or refusal to register a domain name, it's failure or refusal to renew a domain name registration, it's registration of a domain name, it's failure or refusal to renew a domain name registration, it's renewal of a domain name registration, it's failure or refusal to transfer a domain name registration, it's transfer of a domain name registration, it's failure or refusal to maintain or modify a domain name registration, it's maintenance of a domain name registration, it's modification of a domain name registration, it's failure to cancel a domain name registration or it's cancellation of a domain name registration from the Registry;

i.  **.cc Domains.** In the case of a ".cc" registration, the following terms and conditions will apply:
  i.  Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.verisign.com/information-services/naming-services/cctlds/page_042130.html. Please take the time to familiarize yourself with this policy.
  ii.  Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at: http://www.verisign.com/information-services/naming-services/cctlds/page_042130.html.
  You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

j.  **.ch Domains.** In the case of a ".ch" registration, the following terms and conditions shall apply:
  i.  Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.switch.ch/id/terms. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.
  ii.  Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the .ch Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.switch.ch/id/disputes/rules. Please take the time to familiarize yourself with this policy.

k.  **.cn Domains.** In the case of a ".cn" registration, the following terms and conditions shall apply:
  i.  "Registry" means the China Internet Network Information Center, which is the authority responsible for the administration of the national top-level domain of the People's Republic of China and the Chinese domain name system;
  ii.  "Registry Gateway" means the service provided by the Registry Operator that facilitates the registration of .cn domain names by registrars operating outside of the People's Republic of China;

    iii. "Registry Operator" means Neustar, Inc., the company authorized to facilitate the registration of .cn domain names by registrars operating outside of the People's Republic of China.

    iv. Restrictions. You agree that you shall not register or use a domain name that is deemed by CNNIC to: (A) be against the basic principles prescribed in the Constitution of the Peoples Republic of China ("PRC"); (B) jeopardize national security, leak state secrets, intend to overturn the government or disrupt the integrity of the PRC; (C) harm national honour and national interests of the PRC; (D) instigate hostility or discrimination between different nationalities or disrupt the national solidarity of the PRC; (E) spread rumours, disturb public order or disrupt social stability of the PRC; (F) spread pornography, obscenity, gambling, violence, homicide, terror or instigate crimes in the PRC; (G) insult, libel against others and infringe other people's legal rights and interests in the PRC; or (H) take any other action prohibited in laws, rules and administrative regulations of the PRC.

    v. Business or Organization Representation. .cn domain name registrations are intended for businesses and organizations and not for individual use. By registering a .cn name, you acknowledge represent that you have registered the domain name on behalf or a business or organization. It should be noted that, although .cn policy is permissive in terms of registration, and enforcement is generally in reaction to a complaint (as opposed to proactive review), registrations that are not associated with an organization or business may be subject to deletion. The foregoing prevents an individual from registering a .cn domain name for a business operating as a sole proprietorship.

    vi. Domain Name Disputes. You acknowledge having read and understood and agree to be bound by the terms and conditions of the CNNIC Domain Name Dispute Policy & Rules for CNNIC Dispute Resolution Policy ("Dispute Policy"), as they may be amended from time to time, which are hereby incorporated and made an integral part of this Agreement. The Dispute Policy is currently found at: http://www1.cnnic.cn/PublieS/fwzxsgzcfp/201208/t20120830_35737.htm.

    vii. You acknowledge that, pursuant to the Dispute Policy, Registrars must comply with all reasonable requests from the applicable domain name dispute resolution institutions including the provision of all relevant evidence in any domain name disputes in the specified time frames.

    viii. If we are notified that a complaint has been filed with a judicial or administrative body regarding your use of our domain name registration services, you agree not to make any changes to your domain name record without our prior approval. We may not allow you to make changes to such domain name record until (i) we are directed to do so by the judicial or administrative body, or (ii) we receive notification by you and the other party contesting your registration and use of our domain name registration services that the dispute has been settled. Furthermore, you agree that if you are subject to litigation regarding your registration and use of our domain name registration services, we may deposit control of your domain name record into the registry of the judicial body by supplying a party with a registrar certificate from us.

    ix. Adherence to Policies. You agree to comply with all applicable laws, regulations and policies of the Peoples Republic of China's governmental agencies and the China Internet Network Information Centre ("CNNIC"), including but not limited to the following rules and regulations: (A) Provisional Administrative Rules for Registration of Domain Names in China (currently at http://www1.cnnic.cn/PublieS/fwzxsgzcfp/201208/t20120830_35734.htm); (B) Detailed Implementation Rules for Registration of Domain Names in China (currently at a http://www1.cnnic.cn/PublieS/fwzxsgzcfp/201208/t20120830_35735.htm); (C) Chinese Domain Names Dispute Resolution Policy (currently at http://www1.cnnic.cn/PublieS/fwzxsgzcfp/201208/t20120830_35737.htm); and (D) CNNIC Implementing Rules of Domain Name Registration (currently at http://www1.cnnic.cn/PublieS/fwzxsgzcfp/201208/t20120830_35735.htm).
You acknowledge that you have read and understood and agree to be bound by the terms and conditions of the policies of the CNNIC, as they may be amended from time to time.

    x. Suspension and Cancellation. You agree that your registration of the domain name shall be subject to suspension, cancellation, or transfer pursuant to any Tucows, Registry Operator, CNNIC or government-adopted policy, or pursuant to any registrar or registry procedure not inconsistent with a CNNIC or government-adopted policy, (1) to correct mistakes by a party in registering the name, (2) for the resolution of disputes concerning the domain name, (3) to protect the integrity and stability of the registry, (4) to comply with any applicable laws, government rules or requirements, requests of aw enforcement, (5) to avoid any liability, civil or criminal, on the part of Tucows, Registry Operator or CNNIC, as well as their affiliates, subsidiaries, directors, representatives, employees and stockholders or (6) for violations of this Agreement. Tucows, Registry Operator and CNNIC also reserve the right to "freeze" a domain name during the resolution of a dispute.

    xi. Jurisdiction. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, (2) where Tucows is located, and (3) the People's Republic of China.

    xii. Governing Law. For the adjudication of a dispute concerning or arising from use of a .cn domain, such dispute will be governed under the Laws of the Peoples Republic of China.

l. .de Domains. In the case of a ".de" registration, the following terms and conditions will apply:

    i. Selection of a Domain Name. You represent that: (A) you have reviewed and have accepted the Registry's Terms and Conditions and the Registry's Guidelines and have provided your Reseller with written confirmation of same; you have reviewed and have accepted the Registry's Terms and Conditions and the Registry's Guidelines and have provided your Reseller with written confirmation of same; (B) either you, or the person designated as the administrative contact for the domain name, shall be resident or shall have a branch in Germany; (C) to the best of the your knowledge and belief, neither this registration of a domain name nor the manner in which it is directly or indirectly to be used infringes upon the legal rights of a third party and, further, that the domain name is not being registered for nor shall it at any time whatsoever be used for any unlawful purpose whatsoever.

    ii. Domain Name Disputes. You agree that, if the registration or reservation of your domain name is challenged by a third party, you will be subject to the provisions specified by the Registry or any court of law. You agree that in the event a domain name dispute arises with any third party, you will indemnify and hold us harmless pursuant to the terms and conditions specified by the Registry or any court of law.

    iii. Registry Policies. You agree to be bound by the Registry's Registration Terms and Conditions and the Registration Guidelines. English language translations of the Registry's documents are provided for convenience; in the event of a

discrepancy between the English and the German language agreements, the terms of the German agreement will prevail. The Registry documents may be found at: English: (A) Registration Terms and Conditions http://www.denic.de/en/bedingungen.html; (B) Registration Guidelines http://www.denic.de/en/denic-domain-guidelines.html; German: (C) DENIC-Registrierungsbedingungen http://www.denic.de/de/bedingungen.html (D) DENIC-Registrierungsrichtlinien http://www.denic.de/de/richtlinien.html

m. **.eu domains.** In the case of a ".eu" registration, the following terms and conditions will apply:

  i. **Eligibility Criteria.** .eu domain names are available for registration to companies and persons who fulfill the following criteria. As a condition of registration, you accordingly represent that you are: (A) an undertaking having its registered office, central administration or principal place of business within the European Community; (B) an organization established within the European Community without prejudice to the application of national law, or (C) a natural person resident within the European Community.

  ii. **Registry Policy.** You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website. Registration policies of the Registry and the terms and conditions applicable to your .eu registration may be found at: http://www.eurid.eu/files/trm_con_EN.pdf. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

  iii. **Domain Name Disputes.** You agree that, if the registration or reservation of your domain name is challenged by a third party, you will be subject to the provisions specified by the Registry or any court of law.

n. **.fr Domains.** In the case of a ".fr" registration, the following terms and conditions will apply:

  i. **Representation of Registrant.** .fr domain names are available for registration to companies and persons who fulfill the following criteria. As a condition of registration, you accordingly represent that you are: (A) A legal entity: (I) whose head office is in France; (or), (II) which possess an address in France which is expressly listed in the public electronic databases of the registrars of the commercial courts or the National Statistical and Economic Studies Institute (INSEE), (or), (III) State institutions or departments, local authorities or associated establishments, (or), (IV) which own a trademark registered with the National Intellectual Property Institute or own a registered EU or international trademark which expressly includes French territory.

  ii. **Administrative Contact.** Each registrant must designate an administrative contact to act as a coordinator between the registrant and the Registry. In the case of .fr registrations, the administrative contact must be based in France where it can receive legal and other documents.

  iii. **Registry Policies.** You agree to be bound by the Registry's Naming Charter, its registration rules for .fr. English language translations of the Registry's documents are provided for convenience. The Registry documents may be found at: http://www.afnic.fr/obtenir/chartes/nommage-fr.

  iv. **Domain Name Disputes.** You agree that, if the registration or reservation of your domain name is challenged by a third party, you will be subject to the provisions specified by the Registry or any court of law. The current .fr dispute resolution policy and procedures can be found at http://www.afnic.fr/doc/ref/juridique/parl. You agree that in the event a domain name dispute arises with any third party, you will indemnify and hold us harmless pursuant to the terms and conditions specified by the Registry or any court of law.

o. **.it Domains.** In the case of a "it" registration, the following terms and conditions shall apply:

  i. **Registration Criteria.** Registration of an .it name is restricted to subjects belonging to a member state of the European Union. Individuals and associations operating without a VAT number or a fiscal code are limited to a single domain name registration.

  ii. **Registry Policy.** You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.nic.it/create-and-change.it/regulations-and-guidelines. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation. Additional policies, including transfer procedures and "netiquette" rules may be found at http://www.nic.it/everything-on.it/naming-authority/?searchterm=naming%20authority.

p. **.nl Domains.** In the case of a ".nl" registration, the following terms and conditions shall apply:

  i. **Registration Criteria.** Registration of a .nl domain name is unrestricted save and except that applicants who are not based in the Netherlands or who do not have a registered address in the Netherlands must provide an address in the Netherlands where written documents can be sent to the applicant and where legal summonses can be served.

  ii. **Registry Policies.** You agree to be bound by the policies of the Registry including but not limited to the Registry's Registration Regulations. English language translations of the Registry's documents are provided for convenience and may be found at: https://www.sidn.nl/fileadmin/downloads_en/Terms_and_Conditions/General_Terms_and_Conditions_for_.nl_Registrants.pdf. You agree that, if the registration or reservation of your domain name is challenged by a third party, you will be subject to the provisions specified by the Registry or any court of law. The current .nl dispute resolution policy and procedures can be found at https://www.sidn.nl/en/about-nl/disputes-and-complaints/.
  You agree that in the event a domain name dispute arises with any third party, you will indemnify and hold us harmless pursuant to the terms and conditions specified by the Registry or any court of law.

q. **.tv Domains.** In the case of a ".tv" registration, the following terms and conditions will apply:

  i. **Domain Name Dispute Policy.** If you reserved or registered a domain name through us, or transferred a domain name to us from another Registrar, you agree to be bound by the Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.icann.org/dndr/udrp/policy.htm. Please take the time to familiarize yourself with this policy.

  ii. **Policy.** You agree that your registration of the .tv domain name shall be subject to suspension, cancellation, or transfer pursuant to any ICANN or government adopted policy, or pursuant to any Registrar or registry procedure not inconsistent

with an ICANN or government-adopted policy, (1) to correct mistakes by us or the applicable Registry in registering the name or (2) for the resolution of disputes concerning the domain name. You acknowledge that you have reviewed the .tv General Terms of Service which may be found at http://www.verisign.com/information-services/naming-services/ectlds/index.html" and expressly agree to the terms outlined therein.

r. .uk Domains. In the case of a .uk registration, the following terms and conditions will apply:
   i. "Nominet UK" means the entity granted the exclusive right to administer the registry for .uk domain name registrations.
   ii. Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the Dispute Policy which is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at: http://www.nominet.org.uk/disputes/. Please take the time to familiarize yourself with this policy.
   Nominet UK Policy. You agree that your registration of the domain name shall be subject to suspension, cancellation, or transfer pursuant to any Nominet UK-adopted policy, term or condition, or pursuant to any registrar or registry procedure not inconsistent with an Nominet UK-adopted policy, (1) to correct mistakes by a registrar or the registry in registering the name, or (2) for the resolution of disputes concerning the domain name. The current Nominet UK terms and conditions can be found at: http://www.nominet.org.uk/disputes/terms/
   When you submit a request for a domain name registration with Tucows and/or Reseller, you will be entering into two contracts - one contract with Tucows and/or Reseller and one contract with Nominet UK.
   Tucows and your Reseller will act as agents on your behalf by submitting your application to Nominet for you, however, you will still be entering into a direct contract between you and Nominet UK. This is a separate contract from this agreement; may be found at http://www.nominet.org.uk/nominet-terms. Tucows and Reseller must also make you aware that by accepting Nominet's terms and conditions you are consenting to Nominet using your personal data for a variety of reasons. In particular, your name and address may be published as part of Nominet's Whois look-up service.
   iii. Transfer of Ownership. Any transfer of ownership in and to a domain name registration shall be affected in accordance with Nominet UK policies and procedures.

s. .us Domains. In the case of a ".us" registration, the following terms and conditions will apply:
   i. "DOC" means the United States of America Department of Commerce.
   ii. ".us Nexus Requirement". Only those individuals or organizations that have a substantive lawful connection in the United States are permitted to register for .usTLD domain names. Registrants in the .usTLD must satisfy the nexus requirement ("Nexus" or "Nexus Requirements") set out at: http://www.neustar.us/the-ustld-nexus-requirements/.
   iii. Selection of a Domain Name. You certify and represent that: (A) You have and shall continue to have, a bona fide presence in the United States on the basis of real and substantial lawful contacts with, or lawful activities in, the United States as defined in Section (ii) hereinabove; (B) The listed name servers are located within the United States; (C) The data provided in the domain name registration application is true, correct, up to date and complete, and that you will continue to keep all of the information provided correct, up-to-date and complete; (D) To the best of the your knowledge and belief, neither this registration of a domain name nor the manner in which it is directly or indirectly to be used infringes upon the legal rights of a third party; (E) That the domain name is not being registered for nor shall it at any time whatsoever be used for any unlawful purpose whatsoever; (F) You have the authority to enter into this Registration Agreement.
   iv. Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the Dispute Policy and the usDRP, as defined below, that is incorporated herein and made a part of this Agreement by reference. Please take the time to familiarize yourself with these policies.
   v. Domain Name Disputes. You acknowledge having read and understood and agree to be bound by the terms and conditions of the following documents, as they may be amended from time to time, which are hereby incorporated and made an integral part of this Agreement: (A) The Nexus Dispute Policy ("Dispute Policy), available at: http://www.neustar.us/nexus-dispute-policy/. The Dispute Policy will provide interested parties with an opportunity to challenge a registration not complying with the Nexus Requirements. (B) The usTLD Dispute Resolution Policy ("usDRP") available at: http://www.neustar.us/ustld-dispute-resolution-policy/. The usDRP is intended to provide interested parties with an opportunity to challenge a registration based on alleged trademark infringement. (C) In addition to the foregoing, you agree that, for the adjudication of disputes concerning or arising from use of the Registered Name, you shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (i) of your domicile, (ii) where Tucows is located, and (iii) the United States.
   vi. Policy. You agree that your registration of the domain name shall be subject to suspension, cancellation, or transfer pursuant to any Tucows, Registry Operator, the DOC or government-adopted policy, or pursuant to any registrar or registry procedure not inconsistent with a DOC or government-adopted policy, (1) to correct mistakes by us or the applicable Registry in registering the name or (2) for the resolution of disputes concerning the domain name. The Registry Operator's policies can be found at http://www.neustar.us/policies.
   vii. Indemnity. The DOC shall be added to the parties you have agreed to indemnify in Section 13 hereinabove.
   viii. Information. As part of the registration process, you are required to provide us certain information and to update us promptly as such information changes such that our records are current, complete and accurate. You are obliged to provide us the following information: (A) Your full name, postal address, e-mail address and telephone number and fax number (if available) (or, if different, that of the domain name holder); (B) The domain name being registered; (C) The name, postal address, e-mail address, and telephone number and fax number (if available) telephone numbers of the administrative contact, the technical contact and the billing contact for the domain name; (D) The IP addresses and names of the primary nameserver and any secondary nameserver(s) for the domain name;
   ix. In addition to the foregoing, you will be required to provide additional Nexus Information. The Nexus Information requirements are set out at http://www.neustar.us/the-ustld-nexus-requirements/. Any other information, which we request from you at registration, is voluntary. Any voluntary information we request is collected for the purpose of improving the products and services offered to you through your Reseller.
   x. Disclosure and Use of the Registration Information. You agree and acknowledge that we will make domain name registration information you provide available to the DOC, to the Registry Operator, and to other third parties as applicable. You further agree and acknowledge that we may make publicly available, or directly available to third party vendors, some, or all, of the

domain name registration information you provide, for purposes of inspection (such as through our Whois service) or other purposes as required or permitted by the DOC and applicable laws.

You hereby consent to any and all such disclosures and use of information provided by you in connection with the registration of a domain name (including any updates to such information), whether during or after the term of your registration of the domain name. You hereby irrevocably waive any and all claims and causes of action you may have arising from such disclosure or use of your domain name registration information by us.

You may access your domain name registration information in our possession to review, modify or update such information, by accessing our domain manager service, or similar service, made available by us through your Reseller.

We will not process data about any identified or identifiable natural person that we obtain from you in a way incompatible with the purposes and other limitations which we describe in this Agreement.

We will take reasonable precautions to protect the information we obtain from you from our loss, misuse, unauthorized accessor disclosure, alteration or destruction of that information.

t.  .asia Domains. In the case of a .asia registration, the following terms apply:

   i.  The Registered Name Holder/Registrant consents to the use, copying, distribution, publication, modification and other processing of its Personal Data by DotAsia Organisation Limited and its designees and agents in a manner consistent with the purposes specified pursuant to the Registry-Registrar Agreement and with relevant mandatory local data protection, laws and privacy.

   ii.  The Registered Name Holder/Registrant agrees to correct and update the registration information for the Registered Name immediately during the registration term for the Registered Name.

   iii.  In addition to the complying with the Registrar's policies, the Registered Name Holder/Registrant* agrees to comply with those ICANN requirements, standards, policies, procedures, and practices for which the Registry Operator DotAsia Organisation Limited has monitoring responsibility in accordance with the Registry Agreement or with other arrangements with ICANN.

   iv.  The Registered Name Holder/Registrant agrees to comply with all the operational standards, policies, procedures, and practices for the .ASIA Registry as established from time to time in a non-arbitrary manner by DotAsia Organisation Limited (".ASIA Registry Policies"). The Registered Name Holder/Registrant acknowledges that .ASIA Registry Policies are applicable to all registrars and/or registered name holders/registrants. Any changes of the .ASIA Registry Policies by the DotAsia Organisation Limited that are consistent with the Registry Agreement shall be effective upon thirty (30) days' notice by DotAsia Organisation Limited to Registrar. The Registered Name Holder/Registrant further agrees to be bound by the terms and conditions as set down by DotAsia Organisation Limited during the initial launch and the general operations of the .ASIA TLD, including without limitation its Start-Up Policies where such terms and conditions include the submission to a binding arbitration for disputes arising from the Start-Up process or any allocation of domain names.

   v.  The Registered Name Holder/Registrant agrees to submit to proceedings commenced under ICANN's Uniform Domain Name Dispute Resolution Policy ("UDRP") and to proceedings commenced under ICANN's Charter Eligibility Dispute Resolution Policy ("CEDRP"). The Registered Name Holder/Registrant agrees to submit to proceedings commenced under other dispute resolution policies as set forth by DotAsia Organisation Limited from time to time in the Registry Policies, including but not limited to expedited processes for suspension of a domain name by claims sought by intellectual property right holders, Internet engineering and security experts or other competent claimants in the purpose of upholding the stability, security and integrity of the .ASIA Registry.

   vi.  The Registered Name Holder/Registrant acknowledges and agrees to comply with the .ASIA Charter Eligibility Requirement. The Registered Name Holder/Registrant* acting as Registrant Contact represents and warrants that it has made known to the Charter Eligibility Declaration Contact (the "CED Contact"), and the CED Contact has agreed, that the Registrant Contact and the CED Contact will jointly be defined as the Registered Name Holder, and that it shall be jointly responsible for the Registered Name in the event of a dispute or a challenge over the Registered Name Holder/Registrant's* legal entitlement to or the ownership of the Registered Name. The CED Contact shall be bound by the provisions in the DotAsia Organisation Limited's .ASIA Charter Eligibility Requirement Policy published from time to time. Registered Name Holder/Registrant acting as Registrant Contact agrees that it has obtained an agreement from the CED Contact that the Registrant Contact shall remain the Operating Contact for all operations of the domain, including but not limited to domain transfer and updates.

   vii.  The Registered Name Holder/Registrant agrees to indemnify, to the maximum extent permitted by law, defend and hold harmless the Registry Operator DotAsia Organisation Limited and its directors, officers, employees and agents from and against any and all claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, arising out of or relating to the Registered Name Holder's domain name registration and or use. Notwithstanding the other provisions in this Agreement, the Registered Name Holder agrees that this indemnification obligation shall survive the termination or expiration of this registration agreement.

   viii.  The Registered Name Holder/Registrant acknowledges and agrees that DotAsia Organisation Limited and Registry Services Provider, acting in consent with DotAsia Organisation Limited, reserves the right to deny, cancel or transfer any registration that it deems necessary, in its sole discretion (i) to protect the integrity security, and stability of the registry; (ii) to comply with all appropriate laws, government rules or requirements, requests of law enforcement, in compliance with any dispute resolution process; (iii) to avoid any liability, civil or criminal, on the part of DotAsia Organisation Limited as well as its affiliates, subsidiaries, officers, directors, representatives, employees, and stockholders; (iv) for violations of the terms and conditions herein: or (v) to correct mistakes made by DotAsia Organisation Limited, the Registry Services Provider or any registrar in connection with a domain name registration. DotAsia Organisation Limited also reserves the right to freeze a Registered Name such as placing a domain name on hold, lock, or other status during the resolution of a dispute.

   ix.  Notwithstanding anything in this Agreement to the contrary, DotAsia Organisation Limited, the Registry Operator of the .ASIA TLD, is and shall be an intended third party beneficiary of this Agreement. As such, the parties to this Agreement acknowledge and agree that the third party beneficiary rights of DotAsia Organisation Limited have vested and that it has relied on its third party beneficiary rights under this Agreement in agreeing to Tucows being a registrar for the .ASIA TLD. Additionally, the third party beneficiary rights of DotAsia Organisation Limited shall survive any termination or expiration of this Agreement.

x. The Registered Name Holder/Registrant acknowledges that in the event of conflict between this section of the Agreement and other sections of the same, this section shall prevail.

xi. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

u. .li Domains. In the case of a .li registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.switch.ch/id/terms. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ii. Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the .ch Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.switch.ch/id/disputes/rules. Please take the time to familiarize yourself with this policy.

v. .me Domains. In the case of a .me registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.nic.me/policies. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ii. Domain Name Dispute Policy. If you reserved or registered a domain name through us, or transferred a domain name to us from another registrar, you agree to be bound by the .me Dispute Policy that is incorporated herein and made a part of this Agreement by reference. The current version of the Dispute Policy may be found at http://www.nic.me/policies. Please take the time to familiarize yourself with this policy.

w. .tel Domains. In the case of a .tel registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://telnic.com/downloads/AUP.pdf. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ii. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry. These policies are subject to modification;

iii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

x. .mobi Domains. In the case of a .mobi registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://dotmobi.com/. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ii. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry. These policies are subject to modification;

iii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

y. .in Domains. In the case of a ".in" registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at https://registry.in/Policies. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

z. .bz Domains. In the case of a ".bz" registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.afilias-grs.info/bz-belize. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

aa. .ws Domains. In the case of a ".ws" registration, the following terms and conditions shall apply:

i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.worldsite.ws/legal/index.dhtml?url=worldsite. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ab. .co and .com.co, .net.co, .nom.co Domains. In the case of a ".com.co" or ".net.co" or ".nom.co" registration, the following terms and conditions shall apply:

    i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.cointernet.co/domain/policies-procedures. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

ac. .com.au, .net.au, .org.au, .asn.au, .id.au Domains. In the case of a .com.au, .net.au, .org.au, .asn.au, .id.au registration, the following terms and conditions shall apply:

    i. auDA AND REGISTRAR'S AGENCY: (1) In this agreement, auDA means .au Domain Administration Limited ACN079 009 340, the .au domain names administrator.

The Registrar acts as agent for auDA for the sole purpose, but only to the extent necessary to enable auDA to receive the benefit of rights and covenants conferred to it under this agreement. auDA is an intended third party beneficiary of this agreement.

33. auDA PUBLISHED POLICY: (1) In this clause, auDA Published Policies means those specifications and policies established and published by auDA from time to time at http://www.auda.org.au/ (2) Registrant must comply with all auDA Published Policies, as if they were incorporated into, and form part of, this agreement. In the event of any inconsistency between any auDA Published Policy and this agreement, then the auDA Published Policy will prevail to the extent of such inconsistency.

34. Registrant acknowledges that under the auDA Published Policies: (1) there are mandatory terms and conditions that apply to all domain names licences, and such terms and conditions are incorporated into, and form part of, this agreement; and (2) Registrant is bound by, and must submit to, the .au Dispute Resolution Policy; and (3) auDA may delete or cancel the registration of a .au domain name.

35. auDA'S LIABILITIES AND INDEMNITY: (1) To the fullest extent permitted by law, auDA will not be liable to Registrant for any direct, indirect, consequential, special, punitive or exemplary losses or damages of any kind (including, without limitation, loss of use, loss or profit, loss or corruption of data, business interruption or indirect costs) suffered by Registrant arising from, as a result of, or otherwise in connection with, any act or omission whatsoever of auDA, its employees, agents or contractors. (2) Registrant agrees to indemnify, keep indemnified and hold auDA, its employees, agents and contractors harmless from all and any claims or liabilities, arising from, as a result of, or otherwise in connection with, Registrant's registration or use of its .au domain name. (3) Nothing in this document is intended to exclude the operation of Trade Practices Act 1974.

36. .xxx Domains. In the case of a .xxx. registration, the following terms and conditions shall apply:

    i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://icmregistry.com/policies/registry-registrant-agreement/ You are responsible for monitoring the Registry.s site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

    ii. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Name Dispute Policy ("UDRP") (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry. These policies are subject to modification;

    iii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant's domicile, and (2) where Tucows is located, presently Toronto, Ontario.

37. .pro Domains. In the case of a .pro registration, the following terms and conditions shall apply:

    i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at http://www.registry.pro/legal/user-terms

You are responsible for monitoring the Registry.s site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

    ii. Submission to UDRP. Registrant agrees to submit to proceedings under ICANN's Uniform Domain Dispute Policy (.UDRP.) (http://www.icann.org/dndr/udrp/policy.htm) and comply with the requirements set forth by the Registry; these policies are subject to modification;

    iii. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant.s domicile, and (2) where Tucows is located, presently Toronto, Ontario.

38. .dk Domains. In the case of a .dk registration, the following terms and conditions shall apply:

    i. Registry Policy. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are posted on the Registry website at https://www.dk-hostmaster.dk/english/laws-conditions/

    ii. You are responsible for monitoring the Registry's site on a regular basis. In the event that you do not wish to be bound by a revision or modification to any Registry policy, your sole remedy is to cancel your domain name registration by following the appropriate Registry policy regarding such cancellation.

    iii. Information submitted by you is registered by the registry operator DK Hostmaster and will be used for administering the .dk top-level domain.

    iv. Your personal data is not publicly available in the whois database, but the operating registry, DK Hostmaster, shall release hidden personal details on request where a legal interest is demonstrated.

    v. You agree to allow Tucows to make a payment for a domain registration/renewal/transfer on your behalf.

    vi. You have the right to change the billing contact or proxy and to pay the registry, DK Hostmaster, directly.

    vii. The registration of a .DK domain name takes place with the registry operator, DK Hostmaster and you must agree to DIFO's rules available at https://www.dk-hostmaster.dk/english/laws-conditions/.

    viii. You have the right to, at any time, change your Registrar, DNS and Zone Contact.

ix. Your e-mail address must not be related to the Domain Name to be Registered and must be an e-mail address that is under your control. It is your responsibility to ensure that the e-mail address stated is valid.

x. For the adjudication of disputes concerning or arising from use of the domain name, the Registrant shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registrant.s domicile, and (2) where Tucows is located, presently Toronto, Ontario.

39. **Additional ccTLD Policies.** Additional registry policies may apply for ccTLDs. You acknowledge and understand that by accepting the terms and conditions of this agreement you shall be bound by Registry policies and any pertinent rules or policies that exist now or in the future and which are referenced at http://www.tucowsdomains.com/domaininfo/cctld-registry-policies

40. .VENTURES, .HOLDINGS, .SINGLES, .CLOTHING, .GURU, .BIKE, .PLUMBING, .CAMERA, .LIGHTING, .EQUIPMENT, .ESTATE, .GRAPHICS, .GALLERY, .PHOTOGRAPHY, .LAND, .TODAY, .TECHNOLOGY, .CONTRACTORS, .DIRECTORY, .KITCHEN, .CONSTRUCTION, .DIAMONDS, .ENTERPRISES, .TIPS, .VOYAGE, .CAREERS, .PHOTOS, .RECIPES, .SHOES, .LIMO, .DOMAINS, .CAB, .COMPANY, .COMPUTER, .SYSTEMS, .ACADEMY, .MANAGEMENT, .CENTER, .BUILDERS, .EMAIL, .SOLUTIONS, .SUPPORT, .TRAINING, .CAMP, .EDUCATION, .GLASS, .INSTITUTE, .REPAIR, .COFFEE, .HOUSE, .FLORIST, .INTERNATIONAL, .SOLAR, .HOLIDAY, .MARKETING, .CODES, .FARM, .VIAJES, .AGENCY, .BARGAINS, .BOUTIQUE, .CHEAP, .ZONE, .COOL, .WATCH domains. In the case of a .VENTURES, .HOLDINGS, .SINGLES, .CLOTHING, .GURU, .BIKE, .PLUMBING, .CAMERA, .LIGHTING, .EQUIPMENT, .ESTATE, .GRAPHICS, .GALLERY, .PHOTOGRAPHY, .LAND, .TODAY, .TECHNOLOGY, .CONTRACTORS, .DIRECTORY, .KITCHEN, .CONSTRUCTION, .DIAMONDS, .ENTERPRISES, .TIPS, .VOYAGE, .CAREERS, .PHOTOS, .RECIPES, .SHOES, .LIMO, .DOMAINS, .CAB, .COMPANY, .COMPUTER, .SYSTEMS, .ACADEMY, .MANAGEMENT, .CENTER, .BUILDERS, .EMAIL, .SOLUTIONS, .SUPPORT, .TRAINING, .CAMP, .EDUCATION, .GLASS, .INSTITUTE, .REPAIR, .COFFEE, .HOUSE, .FLORIST, .INTERNATIONAL, .SOLAR, .HOLIDAY, .MARKETING, .CODES, .FARM, .VIAJES, .AGENCY, .BARGAINS, .BOUTIQUE, .CHEAP, .ZONE, .COOL, .WATCH registration, the following conditions apply:

i. You agree to the Donuts Inc. Acceptable Use and Anti-Abuse Policy, located at http://www.donuts.co/policies/acceptable-use/

ii. You acknowledge that TLDs offered by Donuts Inc. will have non-uniform renewal registration pricing, such that the fee for a domain name registration renewal may differ from other domain names in the same or other Donuts TLDs.

41. **WHOIS PRIVACY SERVICE.** The following terms and conditions will apply if you subscribe to the Whois Privacy Service:

a. Subscribers to the Whois Privacy Service have elected to include the following information in the publicly available Whois Registry:

i. Contact Privacy Inc. Customer ####, where #### is an individual customer identification number which is unique per domain name, shall appear as the Registrant and Contacts name(s); (ii) Tucows' postal address and a Tucows assigned email address and telephone number shall appear on behalf of the Registrant and the Contact(s); (iii) The primary and secondary nameservers shall be those designated by the Registrant; (iv) The original date of registration and the expiration of each domain name; (v) Tucows will be identified as the registrar of record.

b. You understand and agree that the Registrant and Contact Information that you have provided will be kept on file. You further agree and warrant that you will ensure that the Whois Information is true, accurate and up to date.

c. You will will retain complete control over the domain name and its registration records and may suspend and reinstate the Whois Privacy Service at your discretion.

d. The Whois Privacy Service may be used with both new and existing domain name registrations. You may use the Whois Privacy Service with respect to a domain name that has been transferred but it will only commence after the transfer has been completed. If you wish to transfer the domain name to a different registrar, the Whois Privacy Service must be disabled in order to initiate the transfer.

e. We will send all obligatory renewal and transfer related messages to the Contacts you have designated.

f. Communications Forwarding. Communications received with respect to a particular domain name registration will be handled as follows: (i) We will forward to you or a Contact all correspondence received by registered mail or traceable courier. This information may be opened, scanned and emailed to you or your Contact.. Regular postal mail will be discarded or returned to sender at our discretion. (ii) Email correspondence will be forwarded, only if submitted via the contactprivacy.com website, to the address as it appears in Tucows records. (iii) A voice mail message will advise all callers that inbound messages will not be accepted; calls will be directed to the contactprivacy.com web site where written messages will be forwarded according to your instructions. (iv) We will only be responsible for forwarding communications where our details have appeared in the whois and when your Whois Information is accurate, complete and up to date.

g. Right to Suspend and Disable. We shall have the right, at our sole discretion and without liability to you or any of your Contacts, suspend or cancel your domain name and to reveal Registrant and Contact Whois Information in certain circumstances, including but not limited to the following: (i) when required by law; (ii) in the good faith belief that disclosure is necessary to further determination of an alleged breach of a law; (iii) to comply with a legal process served upon Tucows; (iv) to resolve any and all third party claims including but not limited to ICANN's or a Registry's dispute resolution policy; (v) to avoid financial loss or legal liability (v) to avoid financial loss or legal liability; (vi) if we believe that you or one of your Contacts is using the Whois Privacy Service to conceal involvement with illegal, illicit, objectionable or harmful activities; or (vii) to transmit SPAM, viruses, worms or other harmful computer programs.

h. You understand and agree that, in the event that we receive a formal complaint, notice of claim or UDRP, that we will have the right to disable the Whois Privacy Service pending final disposition of the matter.

42. **Expired Registration Recovery Policy**

- Domain expiration notices for gTLDs will be sent via email 30 days and 5 days prior to your domain expiration date and 3 days after your domain expires.

- The following renewal, post-expiration renewal fees and redemption fees apply to each of these gTLDs:

  - gTLD: .com - Price: $50 / $50 / $100
  - gTLD: .net - Price: $50 / $50 / $100
  - gTLD: .org - Price: $50 / $50 / $100
  - gTLD: .biz - Price: $50 / $50 / $100
  - gTLD: .info - Price: $50 / $50 / $100

- ■ gTLD: .mobi - Price: $50 / $50 / $100
- ■ gTLD: .pro - Price: $50 / $50 / $100
- ■ gTLD: .name - Price: $50 / $50 / $100
- ■ gTLD: .asia - Price: $50 / $50 / $100
- ■ gTLD: .tel - Price: $50 / $50 / $100
- *Registration service provider fees may differ.

43. **Trademark Clearinghouse (TMCH)**
   - ○ You agree to abide by the terms and conditions set forth by the Tucows and Trademark Clearinghouse agreement available at http://opensrs.com/site/resources/agreements#tmch

ACCEPTANCE OF AGREEMENT. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND AGREE TO ALL ITS TERMS AND CONDITIONS. YOU HAVE INDEPENDENTLY EVALUATED THE DESIRABILITY OF THE SERVICE AND ARE NOT RELYING ON ANY REPRESENTATION AGREEMENT, GUARANTEE OR STATEMENT OTHER THAN AS SET FORTH IN THIS AGREEMENT.

# ANNEX C

**Int. Cls.: 3 and 5**

**Prior U.S. Cls.: 1, 4, 6, 18, 44, 46, 50, 51 and 52**

**United States Patent and Trademark Office**

Reg. No. 2,102,912

Registered Oct. 7, 1997

## TRADEMARK
### PRINCIPAL REGISTER

## JEFFERS

JEFFERS VET SUPPLY (MISSOURI CORPORA-
TION)
P.O. BOX 100
DOTHAN, AL 36302

FOR: NON-MEDICATED GROOMING PREP-
ARATIONS FOR PETS, CATS, DOGS, HORSES,
LIVESTOCK, NAMELY, TOPICAL SHAMPOOS,
CONDITIONERS, SPRAYS, CREAMS, BALMS,
OINTMENTS, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50,
51 AND 52).
FIRST USE 1-15-1976; IN COMMERCE
1-15-1976.
FOR: MEDICATED GROOMING AND
CLEANING PREPARATIONS FOR PETS,

CATS, DOGS, HORSES, LIVESTOCK,
NAMELY, MEDICATED TOPICAL SHAMPOOS,
CONDITIONERS, SPRAYS, CREAMS, BALMS,
OINTMENTS, TREATMENTS, IN CLASS 5 (U.S.
CLS. 6, 18, 44, 46, 51 AND 52).
FIRST USE 1-15-1976; IN COMMERCE
1-15-1976.
SEC. 2(F).

SER. NO. 75-112,032, FILED 5-31-1996.

DIANE B. MELNICK, EXAMINING ATTOR-
NEY

# ANNEX D









**Henri De Rivel Fancy Raised Snaffle Bridle**
★★★★★
$44.99
BUY NOW

**Jump Blocks**
24½" x 15¼" x 9"
No assembly required.
★★★★★
$55.99
BUY NOW

**Polo Wraps**
Set of 4
★★★★★
$29.65
BUY NOW

**VenTECH All Purpose Girth**
Additional Colors Available
As low As
$64.99
BUY NOW

**Open Front Protective Boots**
$9.99
BUY NOW

**On Course Ashby Show Coat**
Additional Colors/Sizes Available
★★★★★
As low As
$51.99
BUY NOW

**Jeffers Cotton Lunge Line**
★★★★·
$15.95
BUY NOW

**On Course Pull-On Knee Patch Breeches**
95% Cotton, 5% Lycra
★★★★·
~~$42.49~~ $33.95
List Price : $49.99
BUY NOW

Sort By:  Best Selling | A - Z | Price | Top Rated          View Page: ‹PREV 1 2 3 4 5 6 7 8 9 10 NEXT›  (Of 24)  View All

Quick Order · Printable Order Form · Free Catalog · E-Mail Sign-Up · Affiliate Program · Return Policy · Help

**Quick Links**
View Cart
Jeffers Pet
Jeffers Equine
Jeffers Livestock
Site Map

**Customer Service**
FAQ
Contact Us
About Jeffers
Privacy Policy
Terms of Use

**Shopping**
Your Account
Quick Order Form
Printable Order Form
Free Catalog
Wholesale Program

**Social**
E-Mail Sign-Up
Affiliate Program
Articles & Tips
Facebook/Social
Blog

©1999-2014 www.jeffersequine.com • Jeffers Equine • Jeffers, Inc. All Rights Reserved



# ANNEX E

Late Winter/Early Spring 2014

**Quality Products for Beef and Dairy Cattle, Sheep and Goats, Swine, Poultry, Llamas, and Rabbits.**

VISA

# If Animals Could Talk, They'd Say "Jeffers."

**ALL-AMERICAN® EAR TAGS**



Buy 2 packs of Y-Tex(25) Identification Ear Tags and Get a Y-Tex Ultra Tagger (Y2-T2) Free!

# 1-800-JEFFERS
www.jefferslivestock.com 1-800-533-3377

# JEFFERS

P.O. Box 100, Dothan, Alabama 36302-0100

PRSRT STD
U.S. Postage
PAID
Jeffers

1960

**Prices and Promotions valid through 04/07/2014**

**Buy The Vetgun (A2-AX) and a 30 pack of the Aim-L™ (A2-AZ) and Get a Mail in Rebate for a Free 30 Pack of Aim-L Capsules!**



# NEW!

## Start Your Calves Rite!

### SEE INSIDE FOR SAVINGS!

Buy 6 Probios Bovine One Oral Gel, 300 cc (PN-P2) or Buy 6 Probios Natural E Bovine One Oral Gel, 300 cc (PN-PC) and get an applicator gun (PN-P3) Free!



**PN-P2,** 300 g tube   $20.49
**PN-PC,** 300 g   $24.59
See Page 23.

# NO
CONFINING
# NO
HANDLING
# NO
STRESS

## Gun™
*Work Smarter, Not Harder*

Visit AgriLabs.com/VetGun to learn more



**See Inside for Introductory Promotion Page 68.**

# 1-800-JEFFERS
1-800-533-3377
©2013 Jeffers. All rights reserved.

# Multi-Species Newborn

## NEW! Advance Arrest®
(Manna Pro) Unique non-medicated nutritional energy supplement developed specifically for young animals. It's electrolytes allow rapid rehydration, while ProVance Microbials help overcome unbalanced digestive tracts. Arrest's gelling agent will slow the loss of fluids. Mix 1 pkt with 2 qts warm water. Multi-species product for calves, foals, lambs, kids pigs, llamas, and alpacas.

**CA-2A**, 3.5 oz pkt   **$2.25**

## NEW! Advance Arrest®
Mix 3.5 oz (100 g) with 2 qts warm water. For smaller quantities provide 1 oz per 20 fl oz of water.

**CA-2B**, 1.5 lb pouch   **$10.49**

## Ultra Start® Multi Colostrum Supplement (Milk Products)
A versatile multispecies colostrum supplement that is nutritionally complete for calves, foals, goat kids, lambs, crias, piglets, fawns, elk calves, puppies, and kittens. Provides 30 g of essential globulin protein as well as highly digestible proteins, fats, vitamins and minerals and complex sugars. Mixes easily with 1.5 quarts of warm water. Feed as soon as possible after birth. Not available for sale in SD or NM.

**T5-U1**, 16 oz resealable pkt, **$11.59**



## Colostrum Oral Gel
for Goats, Sheep or Calves
Source of probiotics, dried colostrum, Vitamins A, D3, E and B12, and trace minerals. Supplies a source of maternal antibodies and protein. Lactobacillus organisms assist in the establishment of beneficial microflora in the newborn. Administer 10 mL to newborn goats, sheep or calves as soon as possible after birth. Administer 10 mL on the second day and third day.

**KK-G6**, 3 dose gel tube   **$5.95**



## Grade A® Ultra 24 Multi-Species Milk Replacer
(Milk Products) A high-quality, nutritionally complete nursing formula labeled for calves, lambs, kids, foals, piglets, llama and crias, fawns, elk calves, puppies, and a supplement for kittens. Mixes easily, contains 24% protein, 24% fat with balanced levels of vitamins and minerals.

**T5-G1**, 8 lb resealable bag, Freight 8 lb **$24.95**
**T5-GA**, 25 lb bag, Freight 25 lb   **$67.95**



## Unimilk® (Manna Pro)
Multi-specie non-medicated milk replacer for beef and dairy calves, kid goats, pigs, foals, and puppies. Contains the most purified & highly digestible form of soy protein isolate, milk protein and natural acidifiers. Mixes easily with warm water and contains 22% protein and 15% fat. Fortified with essential vitamins and minerals. Not for use in lambs or kittens. 1 oz scoop enclosed.

**CA-U0**, Freight 4 lb **$12.39**
**CA-U1**, Freight 9 lb **$24.95**



## Bovi-Sera Serum Antibodies
(Colorado Serum)
For prevention and treatment of A. pyogenes, Pasteurella multocida, E. coli, Salmonella typhimurium, and Mannheimia haemolytica in cattle and sheep. Inject IM or SQ. For prevention, give calves 20-40 mL as soon as possible after birth; give cattle 50-75 mL; give sheep 10-15 mL. For treatment, give calves 40-100 mL; give cattle 75-150 mL; give sheep 20-40 mL. Administer every 12 to 24 hours until improvement is noted.

**C8-B4**, 20 mL   **$6.95**
**C8-B5**, 250 mL   **$34.95**
**C8-B6**, 1000 mL   **$114.95**

## C & D Antitoxin
Cl. Perfringens, Types C & D (Boehringer Ingelheim) For prevention and treatment of enterotoxemia in lambs, sheep, cattle, calves, and baby pigs. Give baby pigs orally or SQ at birth. Inject others IM or SQ. Dosage: sucking lambs - 3 mL, sheep - 10 mL, calves - 10 mL, cattle - 30 mL, baby pigs - 2 mL.

**A9-C3**, 250 mL   **$34.95**

## 9 Second Digital Thermometer
Fast, 9 second read out! The waterproof feature allows for easy cleaning. Memory recall of last reading. Large easy-to-read display. Peak temperature tone and auto shut-off.

**M7-A1**, each   **$5.00**

## Band Castrating Tool
(Jeffers) Nylon plastic construction with aluminum prongs. Can be used for lambs, calves, or goats. Castrating bands sold separately. Band opens to 1¼" x 1¼" x 1½" x 1¾".

**IA-M1**, each   **$9.95**

## Castrator Bands
Rubber rings for use with band castrators.
**IA-M2**, pkg of 100   **$1.95**
12 or more, ea   **$1.85**



## Pelouze Portable Scale and Calf Sling Kit, JEF-Z4   $84.90

## Pelouze® Portable Hanging Scale
Portable hanging scale has 220 lb capacity marked in 2 lb increments.
**O3-SE**, Freight 5 lb **$59.95**

## Digital Scale and Calf Sling Kit, JEF Z3   $54.95

## Digital Hanging Scale
Electronic weight scale displays kilograms, pounds, or ounces. Weighs up to 110 pounds. Also features a 36 inch retractable measuring tape.
**AP-AA**, **$29.99**

## Calf Sling
(Ozark Mtn Mfg)
Calf weighing sling slips around calf's belly. Measures 19½" x 12". For newborn calves, baby lambs and other small animals.
**VJ-A1**, each   **$34.95**

See page 63 for scales and sling.

## Super 7+ Navel Dip
(Innovacyn) An umbilical cord dry-out and protective solution for newborn cattle, swine, goats, sheep, horses and dogs. Formulated with ingredients that are safe, non flammable, non toxic and environmentally safe. Super 7+ is an effective alternative to 7% tincture of iodine, does not contain alcohol and can be applied with a non return dip cup.

**LAN-AA**, Gallon, Freight 10 lb **$58.99**
**New! LAN-AB**, Pint,   **$12.99**

## Stainless Steel Pails
All-purpose pails are rust resistant, durable non-toxic and dishwasher safe.
**G3-P4**, 2 qt   $5.99 **$3.99**
**G3-P5**, 6 qt   $9.99 **$7.99**
**G3-P2**, 13 qt, Freight 3 lb   **$16.95**

## Pig Paste with Oral Iron (Star Labs)
To promote microbial balance in the intestinal tract of newborn pigs. Contains chelated iron. Stimulates appetite and improves digestion. 1 mL dose.
**S8-S1**, 30 mL   $5.95   12 or more, ea **$4.95**

## Rigid Heat Pads
(Stanfield) Stanfield heat pads provide safe, reliable heat for farms, kennels, zoos, serious hobbyists, and commercial breeders of reptiles, amphibians and other animals. They are the safest, most economical way to promote good health and growth. Rigid, non porus hygenic surface. Provides uniform warm surface 30-35 degrees above air temperature. Heat controls are also available for setting and maintaining specific temperature levels.

**Small Pad**-100 watt, 18" x 24"
**O2-H3**, Freight 8 lb   **$114.95**
**Medium Pad**-160 watt, 24" x 36"
**O2-H1**, Freight 14 lb   **$139.95**
**Large Pad**-200 watt, 24" x 48"
**O2-H2**, Freight 17 lb   **$169.95**

## Heating Pad Power Control Model F911
For use with Stanfield Heating Pads only. Light signals when in operation. 2 Power controlled outlets. Manual set not thermostatic.
**O2-C1**, each   **$69.95**
**O2-C3**, Model F300, (control temperature on one pad only)   **$24.95**

## NEW! Lectro Warming Pad
Breeders, pet owners, and veterinarians have been using Lectro Warming Pads to warm newborns for more than 40 years. Constructed of rugged ABS plastic with a 5 ⅝ foot steel wrapped cord, the pad can lie flat on the floor or be attached to the wall. An internal thermostat keeps the temperature of the pad warmed to normal body temperature One year warranty.

**PC-K1**, 40 watts, 12½" x 18½" **$52.99**
**PC-K2**, 60 watts, 16½" x 22½" **$65.99**
**PC-K3**, 80 watts, 22½" x 28½" **$81.99**

**PC-U1**, Temp Control Module   **$25.95**



# Newborn Kid and Lamb

**Pritchard Teat**
Shaped like a ewe's nipple. Fits a plastic pop bottle.
M6-P1, each   $1.99   12 or more, ea   $1.89

**NEW! Soft Nipple**
(Rhinehart) Fits standard pop bottle.
Tan gum rubber with x-cut.
R5-N2, each   $1.49

**Lamb Bottle (TDL Agritech)**
Bottle has a screw on cap, with replacement
pull through teat, durable polyurethane teats
are made to last.
FIL-A1, 900 ml, Approx 1 qt   $5.99
FIL-A2, replacement teat,   $2.99

**Weak Kid Syringe**
60 ml, clear syringe with a long,
flexible feeding tube.
S7-W6, each   $2.99

**Pull-Eze Lamb/Kid Puller**
(Hergerts) Helps with difficult deliveries with-
out harm to lamb or ewe, kid or doe.
H4-P1, each   $11.95

**Lamb's Choice Total**
(Saskatoon Colostrum Co)
Colostrum replacer for lambs.
Contains 23% colostral fat and 4.4
g of globulin proteins per kg of body
weight per feeding to maintain body temperature, build
immunity, and prevent infection. 20 lamb feedings per 700g
tub.
AGI-L1, 700 g tub   $36.95

**Achieve® PRO with Cryptex Kids &**
**Lamb Paste**

Aid against the
causes of scours in newborn kids or lambs... Scientifically
formulated blend of nutrients, beneficial microorgan-
isms, and specific targeted proteins, along with  matrix of
polysaccharides and yeast extract to help calves through
periods of stress, particularly during the first 14 days of
life when they are most vulnerable to disease. Feeding
Instructions for Kids & Lambs: Newborns (24 hrs after
birth) newborns 2 to 3g , up to 10 lb 5 to 8g , Over 10 lb
10 to 15g. Repeat as needed.
A2-AW, 15 g   $7.95

**Kid's Choice Total**
(Saskatoon Colostrum Co)
Colostrum replacer for kid goats.
Contains 23% colostral fat and pro-
vides 4.4 g of globulin proteins per kg
of body weight per feeding to maintain
body temperature, build immunity, and
prevent infection. 20 kid goat feedings per 700 g tub.
AGI-K1, 700 g tub   $36.95

**Kid Colostrum Supplement**
(Manna Pro) Provides essential
nutrients that foster natural immu-
nity in the first few days of life. Rich
source of essential amino acids for
a fast start and fortified with vita-
mins and minerals. Mix 2 oz with
warm water. Bottle feed ¼ to ½ cup
every 4 hours for the first 24 hours
of life.
CA-G3, 8 oz   $6.99

**Sav-A-Lam® Milk Replacer**
**(Milk Products)**
High quality, non-medicated lamb
milk replacer. Made with 100% milk
proteins. Specially formulated for
flexibility in feeding. Contains 23%
protein, 30% fat with balanced levels
of vitamins and minerals. Mix 1 scoop
with 1 pt of warm water.
T5-S3, 8 lb resealable bag, Freight 8 lb   $24.95
1097, 25 lb bag, Freight 25 lb   $62.39

**Sav-A-Kid® Milk**
**Replacer (Milk Products)**
High quality, non-medicated kid milk
replacer designed to closely match doe's
milk. Made with 100% milk proteins.
Mixes easily, contains 26% protein, 20%
fat with balanced levels of vitamins and
minerals. Mix 4 oz (scoop included) with 3
cups of warm water. Do NOT feed to sheep.
T5-S2, 8 lb resealable bag, Freight 8 lb   $24.95
1094, 25 lb bag, Freight 25 lb   $66.25

**Sav-A-Kid® Milk Replacer with**
**Deccox® (Milk Products)**
Contains beneficial direct-fed microbials to improve health
and feed conversion, and Deccox® to prevent scours. wean-
ing period. Do NOT feed to sheep.
1098, 25 lb bag, Freight 25 lb   $67.89

## Colostrum

Buy one Rite Star Complete (CA-AV) and
Get 2 Free Arrest 3.5 oz pkt (CA-2A)

**NEW! Rite Start**
**Complete**
(Manna Pro) Calf colostrum replace-
ment. Provides 100g of globulin protein
per feeding. Replaces Cow's natural colos-
trum for essential globulin proteins. Mix 1
pkt with 2 qts warm water and feed within
24 hours after birth.
CA-AV, 16 oz pkt,   $24.95

Buy one Rite Star Supplement 1lb (CA-AU)
and Get 2 Free Arrest 3.5 oz pkt (CA-2A)

**NEW! Rite Start Supplement**
(Manna Pro) Formulated
specifically for calves! Calf colostrum
supplement, provides newborn calves
with essential 400 g of natural globulin
proteins, assisting the calf during the
first 24 hours of life. It may also be fed
to the calf during later periods of nutri-
tional stress. 40 g of globulin protein per
feeding. Mix 1 pkt with 2 qts warm water
and feed within 24 hours after birth.
CA-AU, 16 oz pkt,   $11.98

**Calf Blanket**
Protect young calves from the
winter weather. Water resistant; denier outer, quilted inside.
Hook and loop fastener in front with adjustable hind
leg straps. Colors:
Royal Blue and
Orange (for higher visibility).
I2-G1,   $19.99
5 or more   $18.99
10 or more   $17.99

# Newborn Calf

**J-Lube Powder** (Jorgensen)
Makes 6-8 gallons of lubricant.
J3-D1, 10 oz   $11.99

**Shoulder Length OB Gloves**
Disposable, plastic OB sleeve and glove combination.
36"L. Non-sterile.
AP-G1, pkg of 10   $1.99
AP-G2, box of 100   $10.95

**Jeffers® Double**
**Ratchet Calf Puller**
Ratchet type dual action calf puller. Handle moves two separ-
ate hooks alternately. Allowing one leg to be pulled and
then the other leg with next pull of the handle. This motion
helps to avoid locking of calf's shoulders in pelvic opening. A
center hook is provided for single-pull option when needed. A
75" long grooved rods fasten into the breechen. Chains sold
separately below.
JI-D3, Freight 21 lb   $179.95

**OB Chains**
(Jeffers)
JI-C1, 30"L   $3.69
JI-C2, 60"L   $4.95

**First Defense®** Antibodies
against E. coli & Coronavirus
(ImmuCell) Protects against scours
caused by K99 E. Coli and coronavirus in
calves. Give 1 capsule to each newborn calf
within 12 hours of birth. Each package contains
5 single dose capsules.
WV-F1, box of 5   $34.95
Now in an easy to use single
dose gel!
WV-F2, 30 mL   $8.95   NEW!

**Last Stand™ with ImmWave™**
When your calf's life is
threatened by severe
scours, Last Stand
paste is a powerful lifesaver that
helps jump-start recovery. Targets harmful pathogens in
the gut, delivers key components directly into the blood-
stream to strengthen immune response, and helps estab-
lish intestinal balance. Contains ImmWave™, potent select
milk proteins give an immediate boost to the immune
system. Also Encrypt® micro-encapsulated lactic acid bac-
teria (12.8 million CFU/g), vitamins B and D, Administer
entire tube orally. Repeat as needed for a max of 3 days.
No withdrawal.
DBC-L1, 60 g, each   $13.50

Buy 3 of the Last Stand (DBC-L1) and Get
a Free Calf Bottle and Nipple (CA-B1)

**2 Qt. Calf Bottles**
**and Nipples**
(Manna Pro)
CA-B1, bottle and nipple   $5.75
CA-N1, nipple only   $2.25

**Peach Teat** (TDL Agritech)

Designed to function like a real cow's teat, moving all the
time while calf is sucking. Micro-thin soft but durable.
Teats feel natural and comfortable to the calf, almost
as nipple does not collapse and is leak resistant,
unique flap holds milk in the nipple. Will work with
tube (⅛") or gravity (⅝" hole). Especially helpful
for very young calves. Choose from Peach and Black
(has extra UV protection).
FIL-P4, Peach, (screw on),   $4.95
FIL-P5, Black, (screw on)   $4.95
*Replacement peach teat with cap (FIL-P3) will fit most threaded
bottles.

**Roll Tube Type**
**Oral Calf Feeder**
Roll tube type oral calf feeder with
durable plastic esophageal probe.
M1-F1, each   $9.95



*Satisfaction Guaranteed!*

Late Winter/Early Spring 2014

# JEFFERS PET

**1-800-JEFFERS   www.JeffersPet.com**
(1-800-533-3377)  Se habla Español.

POLY RIPSTOP
## DOG BLANKETS
**SEE PAGE 9**

*SOLID COLOR*
## KNIT PET SWEATERS
**SEE PAGE 8**

# STAY

*This* Winter

½
**OFF!**
**PawTectors'**
**Dog Boots**
Choose From: Pink or Red
See pg 10

SALE!

# JEFFERS PET

P.O. Box 100, Dothan, Alabama 36302-0100

PRSRT STD
U.S. Postage
PAID
JEFFERS

---

All prices and promotions expire 3-31-2014.

**FREE Shipping** on qualifying orders over $60.
See page 142 for more details.



## Oster

**Oster® Power Max**
*TWO-SPEED Clipper*

**SALE!**

O3-5C  FOB 3 lb  Reg $129.99  **Now Only $89.95**
See page 95 for more details.

$3.49
Value FREE!

**FREE** 2.3 oz
**Carnivore Cookies™**
with the purchase of either a
4 lb or 7 lb K9 ShowStopper.
See page 117 for details.

**FREE** 30-ct Natural Stride
**Hip & Joint Chews** with the purchase
of a 90 ct. Choose from Regular Strength or Vet
Strength. See page 119 for more details.



**NEW**

**Natural Stride Chews** - for dogs
**REGULAR STRENGTH**
YV-AB 30 chews  $17.99    YV-AC 90 chews $49.95
**VET STRENGTH**
YV-AD 30 chews  $22.49    YV-AE 90 chews $59.95

**TRI-LEVEL** Cat Tree
Size: 29.5"L x 17.7"W x 5'3.5"H.
IK-T2  FOB 70 lbs  $199.99
**ONLY $99.95**

**SALE!**



## All-Natural CHICKEN or TURKEY Feet

| CHICKEN Feet | TURKEY Feet |
|---|---|
| Approx 4-6" | Approx 6-9" |
| TDT-NA Each 99¢ | TDT-NC Each $3.95 |
| TDT-NB 100 pk $74.99 | TDT-ND 12 pk $42.95 |

...worthies

**NEW**

See pg 49 for more Barkworthies treats.

---

Se habla Español.

   

# 1-800-JEFFERS

24 hour fax (334) 793 5179
Phone hours (Central Time)
Mon - Fri, 5:30 am - 10:30 pm
Sat - Sun, 6 am - 10:30 pm
Walk-in hours, 7 days a week, 6 am - 7 pm

## www.JeffersPet.com

**SALE!**

**PoochPads**
*Reusable Floor Protection Pads*
**Buy 1, Get 1  50% OFF!**
See pg 32 for more details.

$39.99

**FREE**
**Nail Grinder**
with the purchase of
any Andis® AGC Super 2-Speed
Clipper.  See page 92 for more details.



andis

©2013 Jeffers  All rights reserved.

# $2 Value Items!

**All items on this page are only $2 (unless otherwise marked). While supplies last.**

## Dog $2 • Natural Chews $2 • Natural Chews $2 • Natural Chews $2 • Natural Chews $2 • Natural Chews $2

    

**ber Bone**
L $2

**Beef Center Bone**
4G-C1  4"  $2

**"L" Bone**
Beef bone.
4G-L2  $2

**Windees**
Beef trachea tubes.
4G-W1  6"L  $2 each

**Lamb Bone**
For small to med sized dogs.
4G-M1  5"-7"L  $2

**ChewMax®**
**Natural Chew Box**
(Voice Box). Made in the USA.
CMP-AC  Approx 3-3½"  $2

## Dog $2 • Natural Chews $2 • Natural Chews $2 • Natural Chews $2 • Natural Chews $2 • Natural

   

**NEW**

**Munchy Shish Kebob with Twist Stick**
ZO-AU  5 pack  $2

**Dingo® Munchy Stix**
LP-D8  10 pack  $2

**Piggy Ropes**
Twisted & knotted pork skin.
O9-P4  5"  $2

**STANDARD Bully Sticks**
TDT-B6  6"L  $2

**Chewy Buns**

**Dingo® Chewy Buns**
EL-DF  2 pk  $2

## Dog $2 • Miscellaneous $2 • Miscellaneous $2 • Miscellaneous $2 • Miscellaneous $2 • Miscellaneous $2

    

**S Plush jehog**
prox 4"  $2

**Patriotic Pet Bandannas**
22" squares.
DAV-AC  Large Flags  $2
DAV-AD  Flags & Stars on White  $2

**2-Ply Nylon Dog Collars**
1"W x 18"L (adjustable).
LEW-A2  Blue  $2
LEW-A3  Black  $2

**JEFFERS® Fashion Pet Charms**
ZI-CE  Cat  $2   ZI-D7  Dog  $2
ZI-DD  Doggie Diploma  $2

**Key Chain**
K9-1B  1¼"H  $2

## g Toys $2 • Miscellaneous $2 • Cat Supplies $2 • Cat Supplies $2 • Cat Supplies $2 • Cat Toys $2

  

**queaks. s. Assorted.**
$1.40 each

**Oxi Advantage™ Pet Odor Fabric Refresher**
LEW-A1  8 oz  $2

**Zoom Around the Room® Organic Catnip**
Strongest catnip your cat will ever have. 100% pure with only the choicest parts of the catnip plant.
KH-Z1  ½ oz pouch  $2

**Break-Away Paw Print Cat Collar**
Adjustable collar with shiny paw prints. Break-away feature. Assorted colors.
WMP-R1  8-12"  $2

**JEFFERS® Jingle Balls**
Assorted colors.
IB-J1  4 ct  $2

## g Toys $2 • Cat Toys $2 • Cat Toys $2 • Cat Toys $2 • Cat Toys $2 • Cat Toys $2

      

**eakyl Assorted. 49 each**

**Go! Cat Go! Zig-N-Zag Ball**
V6-G2  $2

**Go! Cat Go! Darn Yarn Balls,**
V5-G6  2 pack  $2

**Go! Cat Go! Spring Time**
Approx 10"H.
V5-05  $2

**Go! Cat Go! Catnip Flippers**
3-pack.
V5-G4  2¼"L  $2

**Pawbreakers®**
Candy for cats! Fresh USA grown catnip.
EAT-P1  $2

**Catnip Bag with Bell**
1S-C2  3½"  $2

# $2 Value Items!

**All items on this page are only $2 (unless otherwise marked). While supplies last.**

### Medium Dog $2 • Medium Dog $2 • Medium Dog $2 • Medium Dog $2 • Medium Dog $2





**Giggling Treat Balls**
HTP-G1  3"D  $2    HTP-G2  4"D  $2

**Multicolored Rope Bone with Ball**
Rope sizes will vary slightly.
17-RH  12"L  $2

**JEFFERS Rubber Tug**
IA-3G  13"L  $2

**JEFFERS Rubber Bone**
IA-3E  6½"L  $2

### Medium Dog $2 • Medium Dog $2 • Medium Dog $2 • Medium Dog $2





**Corduroy Toys**
17-A7  Ring, 6½"  $2
17-A8  Bone, 7"  $2

**8" Fleecy Red Heart**
Show your dog your love!
17-FB

**Plush Hotdog**
17-H5  Approx 5½"  $2

**Fringe Antiball Toys**
Squeaky. Assorted frog, dog, pig & chick.
MR-ZA  5"  $2 each

### Small Dog $2 • Small Dog $2 • Small Dog $2 • Small Dog $2 • Small Dog $2 • Small Dog $2







**Buddy Glow Ball Jr.**
For small dogs. Glows in the dark.
LEW-AA  3"  $2

**Small Squeaky Fleecy Octopus**
17-F4  Approx 3"  $2

**Plush Hamburger**
17-H4  Approx 4½"  $2

**5" Plush Cars**
PAW-P4  Assorted colors  $2 each

**JEFFERS Plush Hedgehog**
17-JB  Approx 4"  $2

### Waste Bags $2 • Latex Dog Toys $2 • Latex Dog Toys $2 • Latex Dog Toys $2 • Latex Dog Toys $2






**JEFFERS Bag 'n Go Waste Bag Dispensers**
SS-W1  Orange  $2    SS-W2  Blue  $2
SS-W3  Pink  $2    SS-W4  Refill pack, 60 bags  $2

**Latex Sports Balls**
Assorted colors & Styles.
IL-S1  Approx 2"-3"  $2 each

**Squeaky Latex Dragon**
1S-L4  Approx 4.5"  $2

**Assorted Latex Pip Squeaks**
Perfect for puppies & small dogs. Assorted.
1S-7C  $2 each    10 or more  $1.49 each

### Latex Dog Toys $2 • Latex Dog Toys $2 • Latex Dog Toys $2 • Latex Dog Toys $2






**Assorted Latex Piggies**
Perfect for puppies & small dogs. Squeaky! Assorted.
1S-7B  $2 each    10 or more  $1.49 each

**Assorted Latex Squeakies**
Perfect for puppies & small dogs. Squeaky! Assorted.
1S-7A  $2 each    10 or more  $1.49 each

**Assorted Latex Space Pets**
Perfect for puppies & small dogs. Squeaky! Assorted.
1S-7D  $2 each    10 or more  $1.49 each

2    www.JeffersPet.com

Late Winter/Early Spring 2014

Quality Products for Beef and Dairy Cattle, Sheep and Goats,
Swine, Poultry, Llamas, and Rabbits.



# If Animals Could Talk, They'd Say "Jeffers."



## ALL-AMERICAN® EAR TAGS

Buy 2 packs of Y-Tex(25) Identification
Ear Tags and Get a Y-Tex Ultra Tagger
(Y2-T2) Free!

# 1-800-JEFFERS

www.jefferslivestock.com 1-800-533-3377

# JEFFERS

P.O. Box 100, Dothan, Alabama 36302-0100

PRSRT STD
U.S. Postage
PAID
Jeffers

196D

**Prices and Promotions valid through 04/07/2014**



**NEW!**

## Start Your Calves Rite!

**SEE INSIDE FOR SAVINGS!**

Buy 6 Probios Bovine One Oral Gel, 300 cc (PN-P2) or Buy 6 Probios Natural E Bovine One Oral Gel, 300 cc (PN-PC) and get an applicator gun (PN-P3) Free!



**PN-P2**, 300 g tube   $20.49
**PN-PC**, 300 g  $24.59
See Page 23.

**Buy The Vetgun (A2-AX) and a 30 pack of the Aim-L™ (A2-AZ) and Get a Mail in Rebate for a Free 30 Pack of Aim-L Capsules!**



# NO
CONFINING
# NO
HANDLING
# NO
STRESS

**Gun**

Visit AgriLabs.com/VetGun to learn more

See Inside for Introductory Promotion Page 68.

## 1-800-JEFFERS  1-800-533-3377

©2013 Jeffers. All rights reserved.

# Multi-Species Newborn



Buy the 3 lb Unimilk (CA-UI) and Get a Free
Arrest (CA-2A). See page 25.
Buy one Ultra Start Supplement 3lb (CA-AU...
Get a Free Arrest 3.5 oz pkt (CA-2A).
Buy one Rite Start Complete (CA-AV) and Get
2 Free Arrest 3.5 oz pkt (CA-2A).

**NEW! Advance Arrest®**
(Manna Pro) Unique non-medicated
nutritional energy supplement developed
specifically for young animals. It's elec-
trolytes allow rapid rehydration, while
ProVance Microbials help overcome
unbalanced digestive tracts. Arrest's gell-
ing agent will slow the loss of fluids. Mix 1 pkt with 2 qts
warm water. Multi-species product for calves, foals, lambs,
kids,pigs, llamas, and alpacas.
CA-2A, 3.5 oz pkt      $2.25
**NEW! Advance Arrest®** Mix 3.5 oz (100 g)
with 2 qts warm water. For smaller quantities provide 1 g
per 20 fl oz of water.
CA-2B, 1.5 lb pouch      $10.49

## Ultra Start® Multi Colostrum Supplement (Milk Products)
A versatile multispecies colostrum supplement that is
nutritionally complete for calves, foals,
goats, kids, lambs, crias, piglets, fawns,
elk calves, puppies, and kittens. Provides
30 g of essential globulin protein as
well as highly digestible proteins, fats,
vitamins and minerals and complex sug-
ars. Mixes easily with 1.5 quarts of warm
water. Feed as soon as possible after
birth.  Not available for sale in SD or NM.
T5-U1, 16 oz resealable pkt, $11.59

## Colostrum Oral Gel
for Goats, Sheep or Calves
Source
of pro-
biotics, dried
colostrum, Vitamins A, D3, E and B12, and trace minerals.
Supplies a source of maternal antibodies and protein.
Lactobacillus organisms assist in the establishment of
beneficial microflora in the newborn. Administer 10 mL to
newborn goats, sheep or calves as soon as possible after
birth. Administer 10 mL on the second day and third day.
KK-G6, 3 dose gel tube      $5.95

## Grade A® Ultra 24 Multi-Species Milk Replacer
(Milk Products) A high-quality,
nutritionally complete nursing
formula labeled for calves, lambs,
kids, foals, piglets, llama and crias,
fawns, elk calves, puppies, and a
supplement for kittens. Mixes eas-
ily, contains 24% protein, 24% fat
with balanced levels of vitamins and
minerals.
T5-G1, 8 lb resealable bag, Freight 8 lb $24.95
T5-GA, 25 lb bag, Freight 25 lb      $67.95

## Unimilk® (Manna Pro)
Multi-species non-medicated milk
replacer for beef and dairy calves,
kid goats, pigs, foals, and puppies.
Contains the most purified & highly
digestible form of soy protein isolate,
milk protein and natural acidifiers.
Mixes easily with warm water and
contains 22% protein and 15% fat. Fortified with essential
vitamins and minerals. Not for use in lambs or kittens. 1 oz
scoop enclosed.
CA-UØ,  Freight 4 lb  $12.39
CA-U1, Freight 9 lb  $24.95

## Bovi-Sera Serum Antibodies
(Colorado Serum)
For prevention and treatment of A. pyogenes,
Pasteurella multocida, E. coli, Salmonella
typhimurium, and Mannheimia haemolytica in
cattle and sheep. Inject IM or SQ. For prevention,
give calves 20-40 mL as soon as possible after
birth; give cattle 30-70 mL; give sheep 10-15 mL.
For treatment, give calves 40-100 mL; give cattle
75-150 mL; give sheep 20-40 mL. Administer every
12 to 24 hours until improvement is noted.
C8-B4, 20 mL      $6.95
C8-B5, 250 mL      $34.95
C8-B6, 1000 mL      $114.95

**C & D Antitoxin** Cl. Perfringens, Types
C & D (Boehringer Ingelheim) For pre-
vention and treatment of enterotoxemia in lambs,
sheep, cattle, calves, and baby pigs. Give baby
pigs orally or SQ at birth. Inject others IM or SQ.
Dosage: sucking lambs - 3 mL, sheep - 10 mL, calves -
10 mL, cattle - 30 mL, baby pigs - 2 mL.
A9-C3, 250 mL      $34.95

## 9 Second Digital Thermometer
Fast, 9 second
read out! The
waterproof feature allows for easy
cleaning. Memory recall of last reading. Large easy-to-read
digital. Peak temperature tone and auto shut-off.
M7-A1, each   $5.00

## Band Castrating Tool
(Jeffers) Nylon plastic construction with aluminum
prongs. Can be used
for lambs, calves,
or goats. Castrating
bands sold sepa-
rately. Band opens to
1¾" x 1¼" x 1½" x 1¾".
IA-M1, each   $9.95

## Castrator Bands
Rubber rings for use with band castrators.
IA-M2, pkg of 100   $1.95
      12 or more, ea   $1.85


Pelouze Portable Scale and Calf
Sling Kit  JEF 24        $84.90

## Pelouze® Portable Hanging Scale
Portable hanging scale has 220 lb capacity,
marked in 2 lb increments.
O3-SE, Freight 5 lb $59.95

Digital Scale and Calf Sling Kit
JEF 23      $54.95

## Digital Hanging Scale
Electronic weight scale displays kilograms,
pounds, or ounces. Weighs up to
110 pounds. Also features a
36 inch retractable measuring tape.
AP-AA,   $29.99

## Calf Sling
(Ozark Mtn Mfg)
Calf weighing sling slips
around calf's belly. Measures
19¾" x 12". For newborn
calves, baby lambs and other
small animals.
VJ-A1, each   $34.95

See page 63 for scales and sling.

## Super 7+ Navel Dip
(Innovacyn) An umbilical cord dry-out and
protective solution for newborn cattle,
swine, goats, sheep, horses and dogs. Formulated
with ingredients that are safe, non flammable,
non toxic and environmentally safe. Super 7+
is an effective alternative to 7% tincture of
iodine, does not contain alcohol and can be
applied with a non return dip cup.
LAN-A, Gallon, Freight 10 lb  $58.99
New! LAN-AB, Pint,  $12.99



## Stainless Steel Pails
All-purpose pails are rust
resistant, durable non-toxic
and dishwasher safe.
G3-P4, 2 qt   $5.99  $3.99
G3-P5, 6 qt   $9.99  $7.99
G3-P2, 13 qt,  Freight 3 lb, $16.95



## Pig Paste with Oral Iron (Star Labs)
To promote
microbial bal-
ance in the intestinal tract of newborn
pigs. Contains chelated iron. Stimulates appetite and
improves digestion. 1 mL dose.
SØ-S1, 30 mL   $5.95   12 or more, ea   $4.95



## Rigid Heat Pads
(Stanfield) Stanfield heat
pads provide safe, reliable
heat for farms, kennels,
zoos, serious hobbyists, and
commercial breeders of rep-
tiles, amphibians and other
animals. They are the safest,
most economical way to
promote good health and growth. Rigid, non porus hygen-
ic surface. Provides uniform warm surface 30-35 degrees
above air temperature. Heat controls are also available for
setting and maintaining specific temperature levels.
Small Pad-100 watt, 18" x 24"
O2-H3, Freight 8 lb  $114.95
Medium Pad-160 watt, 24" x 36"
O2-H1, Freight 14 lb  $139.95
Large Pad-200 watt, 24" x 48"
O2-H2, Freight 17 lb  $169.95

## Heating Pad Power Control Model F911
For use with Stanfield Heating Pads only. Light signals when
in operation. 2 Power controlled outlets. Manual set not
thermostatic.
O2-C1, each   $69.95
O2-C3, Model F300, (control temperature on
one pad only)   $24.95

## NEW! Lectro Warming Pad
Breeders, pet owners, and veterinarians
have been using Lectro Warming Pads
to warm newborns for more than 40
years. Constructed of rugged ABS
plastic with a 5 ½ foot steel wrapped
cord, the pad can lie flat on the floor or
be attached to the wall. An internal ther-
mostat keeps the temperature of the pad
warmed to normal body temperature. One year warranty.
PC-K1, 40 watts, 12½" x 18½"  $52.99
PC-K2, 60 watts, 16½" x 22½"  $65.99
PC-K3, 80 watts, 22½" x 28½"  $81.99



PC-U1,  Temp Control Module  $25.95


Call 1-800-JEFFERS (1-800-533-3377) or visit our website at JEFFERSLivestock.com   **3**

# Newborn Kid and Lamb

**Pritchard Teat**
Shaped like a ewe's nipple. Fits a plastic pop bottle.
M6-P1, each   $1.99   12 or more, ea   $1.89

**NEW! Soft Nipple**
**(Rhinehart)** Fits standard pop bottle.
Tan gum rubber with x-cut.
R5-N2, each   $1.49

**Lamb Bottle (TDL Agritech)**
Bottle has a screw on cap, with replacement pull through teat, durable polyurethane teats are made to last.
FIL-A1, 900 mL, Approx 1 qt,   $5.99
FIL-A2, replacement teat,   $2.99

**Weak Lamb Kid Syringe**
60 mL poly syringe with a long, flexible feeding tube.
S7-W6, each   $2.99

**Pull-Eze Lamb/Kid Puller**
(Hergerts) Helps with difficult deliveries without harm to lamb or ewe, kid or doe.
N4-P1, each   $11.95

**Lamb's Choice Total**
**(Saskatoon Colostrum Co)**
Colostrum replacer for lambs.
Contains 23% colostral fat and 4.4 g of globulin proteins per kg of body weight per feeding to maintain body temperature, build immunity, and prevent infection. 20 lamb feedings per 700g tub.
AGI-L1, 700 g tub,   $36.95

**Colostrum**

Buy one Rite Star Complete (CA-AV) and Get 2 Free Arrest (5 oz pkt CA-2A)

**NEW! Rite Start Complete**
**(Manna Pro)** Calf colostrum replacement. Provides 100g of globulin protein per feeding. Replaces Cow's natural colostrum for essential globulin proteins. Mix 1 pkt with 2 qts warm water and feed within 24 hours after birth.
CA-AV, 16 oz pkt,   $24.95

Buy one Rite Star Supplement 1lb (CA-AU) and Get a Free Arrest (5 oz pkt CA-2A)

**NEW! Rite Start Supplement**
**(Manna Pro)** Formulated specifically for calves! Calf colostrum supplement, provides newborn calves with essential 400 g of natural globulin proteins, assisting the calf during the first 24 hours of life. It may also be fed to the calf during later periods of nutritional stress. 40 g of globulin protein per feeding. Mix 1 pkt with 2 qts warm water and feed within 24 hours after birth.
CA-AU, 16 oz pkt,   $11.98

**Calf Blanket**
Protect young calves from the winter weather. Water resistant; denier outer, quilted inside. Hook and loop fastener in front with adjustable hind leg straps. Colors:
Royal Blue and
Orange (for higher visibility).
I2-G1,   $19.99
5 or more,   $18.99
10 or more,   $17.99

**Achieve® PRO with Cryptex** Kids & Lamb Paste
Aid against the causes of scours in newborn kids or lambs... Scientifically formulated blend of nutrients, beneficial microorganisms, and specific targeted proteins, along with matrix of polysaccharides and yeast extract to help calves through periods of stress, particularly during the first 14 days of life when they are most vulnerable to disease.. Feeding instructions for Kids & Lambs: Newborns (24 hrs after birth) newborns 2 to 3g , up to 10 lb 5 to 8g . Over 10 lb 10 to 15g. Repeat as needed.
A2-AW, 15 g   $7.95

**Kid's Choice Total**
**(Saskatoon Colostrum Co)**
Colostrum replacer for kid goats. Contains 23% colostral fat and provides 4.4 g of globulin proteins per kg of body weight per feeding to maintain body temperature, build immunity, and prevent infection. 20 kid goat feedings per 700 g tub.
AGI-K1, 700 g tub,   $36.95

**Kid Colostrum Supplement**
**(Manna Pro)** Provides essential nutrients that foster natural immunity in the first few days of life. Rich source of essential amino acids for a fast start and fortified with vitamins and minerals. Mix 2 oz with warm water. Bottle feed ¼ to ½ cup every 4 hours for the first 24 hours of life.
CA-G3, 8 oz   $6.99

# Newborn Calf

**J-Lube Powder (Jorgensen)**
Makes 6-8 gallons of lubricant.
J3-D1, 10 oz   $11.99

**Shoulder Length OB Gloves**
Disposable, plastic OB sleeve and glove combination. 36"L Non-sterile.
AP-G1, pkg of 10   $1.99
AP-G2, box of 100   $10.95

**Jeffers' Double Ratchet Calf Puller**
Ratchet type dual action calf puller. Handle moves two separate hooks alternately. Allowing one leg to be pulled and then the other leg with next pull of the handle. This motion helps to avoid locking of calf's shoulders in pelvic opening. A center hook is provided for single-pull option when needed. 75" long grooved rods fasten into the breechen. Chains sold separately below.
JI-D3, Freight 21 lb   $179.95

**OB Chains**
(Jeffers)
JI-C1, 30"L   $3.69
JI-C2, 60"L   $4.95

**First Defense™ Antibodies**
against E. coli & Coronavirus (immuCell) Protects against scours caused by K99 E. Coli and coronavirus in calves. Give 1 capsule to each newborn calf within 12 hours of birth. Each package contains 5 single dose capsules.
WV-F1, box of 5   $34.95
**Now in an easy to use single dose gel!**
WV-F2, 30 mL,   $8.95

**Sav-A-Lam® Milk Replacer (Milk Products)**
High quality, non-medicated lamb milk replacer. Made with 100% milk proteins. Specially formulated for flexibility in feeding. Contains 23% protein, 30% fat with balanced levels of vitamins and minerals. Mix 1 scoop with 1 pt of warm water.
T5-S3, 8 lb resealable bag, Freight 8 lb   $24.95
1097, 25 lb bag, Freight 25 lb   $62.39

**Sav-A-Kid® Milk Replacer (Milk Products)**
High quality, non-medicated kid milk replacer designed to closely match doe's milk. Made with 100% milk proteins. Mixes easily, contains 26% protein, 20% fat with balanced levels of vitamins and minerals. Mix 4 oz (scoop included) with 3 cups of warm water. Do NOT feed to sheep.
T5-S2, 8 lb resealable bag, Freight 8 lb   $24.95
1094, 25 lb bag, Freight 25 lb   $66.25

**Sav-A-Kid® Milk Replacer with Deccox® (Milk Products)**
Contains beneficial direct-fed microbials to improve health and feed conversion, and Deccox® to prevent scours, weaning period. Do NOT feed to sheep.
1098, 25 lb bag, Freight 25 lb   $67.89

**Last Stand™ with ImmWave™**
When your calf's life is threatened by severe scours, Last Stand paste is a powerful lifesaver that helps jump-start recovery. Targets harmful pathogens in the gut, delivers key components directly into the bloodstream to strengthen immune response, and reestablish intestinal balance. Contains ImmWave™, potent select milk proteins give an immediate boost to the immune system. Also Encrypt® micro-encapsulated lactic acid bacteria (12.8 million CFU/g), vitamins B and D. Administer entire tube orally. Repeat as needed for a max of 3 days. No withdrawal.
DBC-L1, 60 g, each   $13.50

Buy 1 of the Last Stand (DBC-L1) and Get a Free of Bottle and Nipple (CA-B1)

**2 Qt. Calf Bottles and Nipples**
**(Manna Pro)**
CA-B1, bottle and nipple   $5.75
CA-N1, nipple only   $2.25

**Peach Teat (TDL Agritech)**
Designed to function like a real cow's teat, moving all the time while calf is sucking. Micro-thin soft but durable. Teats feel natural and comfortable to the calf, almost identical to mothers. Has an opening on each side so nipple does not collapse and is leak resistant, unique flap holds milk in the nipple. Will work with valve (1/8") or gravity (7/8" hole). Especially helpful for very young calves. Choose from Peach and Black (has extra UV protection).
FIL-P4, Peach, (screw on),   $4.95
FIL-P5, Black, (screw on),   $4.95
*Replacement peach teat with cap (FIL-P3) will fit most threaded bottles.

**Roll Tube Type Oral Calf Feeder**
Roll tube type oral calf feeder with durable plastic esophageal probe.
M1-F1, each   $9.95

# ANNEX F





INTERNET ARCHIVE

**WayBackMachine**

Loading...

> http://www.jeffers.com:80/ | 20:28:39 May 2
> 5,
> 2002

> Got an HTTP 302 response at crawl time

Redirecting to...

> http://www.netidentity.com/jumppage.asp?mp=
> DomainRedirect&d=jeffers.com&ef=NA

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

INTERNET ARCHIVE
WayBackMachine
http://www.netidentity.com/jumppage.asp?mp=DomainRedirect&d=jeffers.com&e   Go
10 captures
17 May 01 - 1 Jul 03

APR | MAY | JUL   Close ✕
◄ | 17 | ►
2000 | 2001 | 2002   Help ?

*"My First Name"* @ jeffers.com



# Wait! Is this you?
# It can be.

Get your personalized, easy to remember email and website address.

 

Be somebody online.

**INTERNET ARCHIVE**

**WayBackMachine**

```
Loading...

    http://www.jeffers.com:80/ | 6:09:53 Jun 1
    9,
    2003

    Got an HTTP 302 response at crawl time

Redirecting to...

    http://www.netidentity.com/jumppage.asp?mp=
    DomainRedirect&d=jeffers.com&ef=NA
```

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

INTERNET ARCHIVE
WayBackMachine

http://www.netidentity.com/jumppage.asp?d=jeffers.com&ef=NA&mp=DomainRer [Go]

10 captures
17 May 01 - 1 Jul 03

FEB | MAY | JAN    Close ✕
◀ | 24 | ▶
2001 | 2002 | 2003    Help ?

*"My First Name" @ jeffers.com*



# Wait! Is this you?
# It can be.

Get your personalized, easy to remember email and website address.

 

Be somebody online.



Have an online Business?
*Want to promote it for free?*



BannerNetwork
Microsoft®
bCentral

LinkExchange

INTERNET ARCHIVE

# WayBackMachine

Loading...

http://jeffers.com:80/ | 21:29:47 May 17, 2
001

Got an HTTP 302 response at crawl time

Redirecting to...

http://www.netidentity.com/jumppage.asp?mp=
DomainRedirect&d=jeffers.com&ef=NA

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.



INTERNET ARCHIVE

# WayBackMachine

Loading...

http://searchportal.information.com/?o_id=6
4439&domainname=referer_detect | 13:13:05 M
ay 14, 2008

Got an HTTP 302 response at crawl time

Redirecting to...

http://searchportal.information.com/index.m
as?epl=01040004UVsPWVALXVUMVV8OVxcIWg9TFUMC
RxkOElITTFFZWAtSaw1RXTpSXQVvDgxXDhNDXARIB1c
DAllTBQOOCQwAUwEEVB5YOlpQXAFaWw1Q

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit,
building a digital library of Internet sites and other cultural artifacts in digital form.
Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.



1/1   · | Now available' photography  gallery  camera and more.. ·ee the full list

INTERNET ARCHIVE

http://searchportal.information.com/?domainname=morningstar.org&a_id=18855   | Go |

**18 captures**
31 Jan 09 - 10 Aug 11

# Morningstar.org

**What you need when you need it**

April 13, 2011

Bookmark this page   Make this your homepage

**Related Searches**
mutual funds  doral golf resort  401k  christian book store  bible studies

- Related Searches
- 
    - mutual funds
    - doral golf resort
    - 
    - 401k
    - christian book store
    - 
    - bible studies
    - job openings
    - 
    - stock market investing
    - bible study
    - 
    - romantic getaways
    - stock prices

- Popular Categories
- security
    - antivirus
    - free antivirus software
    - spyware removal
    - anti virus software

INTERNET ARCHIVE
**WayBackMachine**

Loading...

http://searchportal.information.com/?o_id=6
4439&domainname=referer_detect | 10:10:10 J
an 16, 2009

Got an HTTP 302 response at crawl time

Redirecting to...

http://searchportal.information.com/index.m
as?epl=00600026UVsPWVALXVUMVV8VWQkKWg8aBVgO
E1kOFWpXVFdXWgBRCVMeWDpaUFwIUFCO

Impatient?

 The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit,
building a digital library of Internet sites and other cultural artifacts in digital form.
Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.



# INTERNET ARCHIVE
# WayBackMachine

Loading...

    http://searchportal.information.com:80/?o_i
    d=64439&domainname=referer_detect | 1:09:23
    Dec 16, 2008

    Got an HTTP 302 response at crawl time

Redirecting to...

    http://searchportal.information.com/index.m
    as?epl=00670065UVsPWVALXVUMVV8KVgMJQQxVEl4M
    WxkCDlgTVldAbgdZWwFTXAEOBUdRPQpCWF4BVQI

                                                    Impatient?



The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit,
building a digital library of Internet sites and other cultural artifacts in digital form.
Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.



http://searchportal.information.com/index.mas?epl=00670065UVsPWVALXVUMV\ [Go]

**27 captures**
30 Jul 08 - 17 Dec 08



# information.com
*What you need, when you need it*

| Online Insurance Quotes | Car Insurance | Reverse Mortgage | Free Credit Reports | Online Casino | Poker Online | Airline Tickets/ |

**Related Searches**

Online Insurance Quotes

Car Insurance

Reverse Mortgage

Free Credit Reports

Online Casino

## Related Searches

| Online Insurance Quotes | Reverse Mortgage | Retirement Information |
| Car Insurance | Poker Online | 55rv Resorts |
| Free Credit Reports | Airline Tickets/ | Aarp |
| Online Casino | | |

## Popular Categories

| Finance | Travel | Home |
| Free credit report | Airline tickets | Foreclosure |
| Online Payment | Hotels | Houses For |
| Credit Card Application | Car rental | Mortgage |
| Car Insurance | Flights | People Sea |
| Health insurance | South Beach Hotels | Real Estate |

INTERNET ARCHIVE
WayBackMachine

http://searchportal.information.com/index.mas?epl=00670065UVsPWVALXVUMV\ Go

**27 captures**
30 Jul 08 - 17 Dec 08

[                                        ]  Search

# ANNEX G

http://jeffers.com/   Go

98 captures
25 Jan 99 - 9 Jan 14

DEC  APR  JUN  Close ✖
◀   **10**  ▶
2011  2012  2013   Help ?

jeffers.com is currently under development, however, we are seeking joint venture and partnership opportunities. You may send your inquiries via email to: inquiry@jeffers.com

**INTERNET ARCHIVE**

**WayBackMachine**

```
Loading...

    http://jeffers.com/search.php?uid=jeffers4f
    d04975dde883.55157039 | 16:53:47 Feb 17, 20
    14

    Got an HTTP 302 response at crawl time

Redirecting to...

    http://jeffers.com/search_caf.php?uid=jeffe
    rs4fd04975dde883.55157039
```

Impatient?



The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

**INTERNET ARCHIVE**
**WayBackMachine**   http://jeffers.com/tg.php?uid=jeffers4fd04975dde883.55157039   [Go]

2 captures
17 Feb 14 - 20 Feb 14

Jeffers.com: The Leading Jeffers Site on the Net Page 1 of 1



# EXHIBIT B

# Internet Corporation for Assigned Names and Numbers

HELP (/EN/HELP) › DOMAIN NAME DISPUTE RESOLUTION (/EN/HELP/DNDR)

## Uniform Domain Name Dispute Resolution Policy

1K

Deutsch (/de/help/dndr/udrp/policy) | Español (/es/help/dndr/udrp/policy) | Français (/fr/help/dndr/udrp/policy)

Italiano (/it/help/dndr/udrp/policy) | 日本語 (/ja/help/dndr/udrp/policy) | 한국어 (/ko/help/dndr/udrp/policy)

Português (/pt/help/dndr/udrp/policy) | Русский (/ru/help/dndr/udrp/policy) | 简体中文 (/zh/help/dndr/udrp/policy)

العربية (/ar/help/dndr/udrp/policy)

Policy Adopted: August 26, 1999

Implementation Documents Approved: October 24, 1999

> **Notes:**
>
> **1. This policy is now in effect. See www.icann.org/udrp/udrp-schedule.htm (/udrp/udrp-schedule.htm) for the implementation schedule.**
>
> **2. This policy has been adopted by all ICANN-accredited registrars. It has also been adopted by certain managers of country-code top-level domains (e.g., .nu, .tv, .ws).**
>
> **3. The policy is between the registrar (or other registration authority in the case of a country-code top-level domain) and its customer (the domain-name holder or registrant). Thus, the policy uses "we" and "our" to refer to the registrar and it uses "you" and "your" to refer to the domain-name holder.**

Uniform Domain Name Dispute Resolution Policy

(As Approved by ICANN (Internet Corporation for Assigned Names and Numbers) on October 24, 1999)

**1. Purpose.** This Uniform Domain Name Dispute Resolution Policy (the "Policy") has been adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN (Internet Corporation for Assigned Names and Numbers)"), is incorporated by reference into your Registration Agreement, and sets forth the terms and conditions in connection with a dispute between you and any party other than us (the registrar) over the registration and use of an Internet domain name registered by you. Proceedings under Paragraph 4 of this Policy will be conducted according to the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules of Procedure"), which are available at http://www.icann.org/en/dndr/udrp/uniform-rules.htm (/dndr/udrp/uniform-rules.htm), and the selected administrative-dispute-resolution service provider's supplemental rules.

**2. Your Representations.** By applying to register a domain name, or by asking us to maintain or renew a domain name registration, you hereby represent and warrant to us that (a) the statements that you made in your Registration Agreement are complete and accurate; (b) to your knowledge, the registration of the domain name will not infringe upon or otherwise violate the rights of any third party; (c) you are not registering the domain name for an unlawful purpose; and (d) you will not knowingly use the domain name in violation of any applicable laws or regulations. It is

your responsibility to determine whether your domain name registration infringes or violates someone else's rights.

**3. <u>Cancellations, Transfers, and Changes.</u>** We will cancel, transfer or otherwise make changes to domain name registrations under the following circumstances:

> a. subject to the provisions of Paragraph 8, our receipt of written or appropriate electronic instructions from you or your authorized agent to take such action;
>
> b. our receipt of an order from a court or arbitral tribunal, in each case of competent jurisdiction, requiring such action; and/or
>
> c. our receipt of a decision of an Administrative Panel requiring such action in any administrative proceeding to which you were a party and which was conducted under this Policy or a later version of this Policy adopted by ICANN (Internet Corporation for Assigned Names and Numbers). (See Paragraph 4(i) and (k) below.)

We may also cancel, transfer or otherwise make changes to a domain name registration in accordance with the terms of your Registration Agreement or other legal requirements.

**4. <u>Mandatory Administrative Proceeding.</u>**

This Paragraph sets forth the type of disputes for which you are required to submit to a mandatory administrative proceeding. These proceedings will be conducted before one of the administrative-dispute-resolution service providers listed at www.icann.org/en/dndr/udrp/approved-providers.htm (/en/dndr/udrp/approved-providers.htm) (each, a "Provider").

> **a. Applicable Disputes.** You are required to submit to a mandatory administrative proceeding in the event that a third party (a "complainant") asserts to the applicable Provider, in compliance with the Rules of Procedure, that
>
> > (i) your domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and
> >
> > (ii) you have no rights or legitimate interests in respect of the domain name; and
> >
> > (iii) your domain name has been registered and is being used in bad faith.
>
> In the administrative proceeding, the complainant must prove that each of these three elements are present.
>
> **b. Evidence of Registration and Use in Bad Faith.** For the purposes of Paragraph 4(a)(iii), the following circumstances, in particular but without limitation, if found by the Panel to be present, shall be evidence of the registration and use of a domain name in bad faith:
>
> > (i) circumstances indicating that you have registered or you have acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in

or service mark or to a competitor of that complainant, for valuable consideration in excess of your documented out-of-pocket costs directly related to the domain name; or

(ii) you have registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that you have engaged in a pattern of such conduct; or

(iii) you have registered the domain name primarily for the purpose of disrupting the business of a competitor; or

(iv) by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location.

**c. How to Demonstrate Your Rights to and Legitimate Interests in the Domain Name in Responding to a Complaint.** When you receive a complaint, you should refer to Paragraph 5 (/dndr/udrp/uniform-rules.htm#5) of the Rules of Procedure in determining how your response should be prepared. Any of the following circumstances, in particular but without limitation, if found by the Panel to be proved based on its evaluation of all evidence presented, shall demonstrate your rights or legitimate interests to the domain name for purposes of Paragraph 4(a)(ii):

(i) before any notice to you of the dispute, your use of, or demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services; or

(ii) you (as an individual, business, or other organization) have been commonly known by the domain name, even if you have acquired no trademark or service mark rights; or

(iii) you are making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

**d. Selection of Provider.** The complainant shall select the Provider from among those approved by ICANN (Internet Corporation for Assigned Names and Numbers) by submitting the complaint to that Provider. The selected Provider will administer the proceeding, except in cases of consolidation as described in Paragraph 4(f).

**e. Initiation of Proceeding and Process and Appointment of Administrative Panel.** The Rules of Procedure state the process for initiating and conducting a proceeding and for appointing the panel that will decide the dispute (the "Administrative Panel").

**f. Consolidation.** In the event of multiple disputes between you and a complainant, either you or the complainant may petition to consolidate the disputes before a single Administrative Panel. This petition shall be made to the first Administrative Panel appointed to hear a pending dispute between

the parties. This Administrative Panel may consolidate before it any or all such disputes in its sole discretion, provided that the disputes being consolidated are governed by this Policy or a later version of this Policy adopted by ICANN (Internet Corporation for Assigned Names and Numbers).

**g. Fees.** All fees charged by a Provider in connection with any dispute before an Administrative Panel pursuant to this Policy shall be paid by the complainant, except in cases where you elect to expand

the Administrative Panel from one to three panelists as provided in Paragraph 5(b)(iv)

Case 2:14-cv-00784-GW-VGW   Document 1   Filed 05/12/14   Page 104 of 133
(/dndr/udrp/uniform-rules.htm#5biv) of the Rules of Procedure, in which case all fees will be split
evenly by you and the complainant.

**h. Our Involvement in Administrative Proceedings.** We do not, and will not, participate in the administration or conduct of any proceeding before an Administrative Panel. In addition, we will not be liable as a result of any decisions rendered by the Administrative Panel.

**i. Remedies.** The remedies available to a complainant pursuant to any proceeding before an Administrative Panel shall be limited to requiring the cancellation of your domain name or the transfer of your domain name registration to the complainant.

**j. Notification and Publication.** The Provider shall notify us of any decision made by an Administrative Panel with respect to a domain name you have registered with us. All decisions under this Policy will be published in full over the Internet, except when an Administrative Panel determines in an exceptional case to redact portions of its decision.

**k. Availability of Court Proceedings.** The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded. If an Administrative Panel decides that your domain name registration should be canceled or transferred, we will wait ten (10) business days (as observed in the location of our principal office) after we are informed by the applicable Provider of the Administrative Panel's decision before implementing that decision. We will then implement the decision unless we have received from you during that ten (10) business day period official documentation (such as a copy of a complaint, file-stamped by the clerk of the court) that you have commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) (/dndr/udrp/uniform-rules.htm#3bxiii) of the Rules of Procedure. (In general, that jurisdiction is either the location of our principal office or of your address as shown in our Whois database. See Paragraphs 1 (/dndr/udrp/uniform-rules.htm#1MutualJurisdiction) and 3(b) (xiii) (/dndr/udrp/uniform-rules.htm#3bxiii) of the Rules of Procedure for details.) If we receive such documentation within the ten (10) business day period, we will not implement the Administrative Panel's decision, and we will take no further action, until we receive (i) evidence satisfactory to us of a resolution between the parties; (ii) evidence satisfactory to us that your lawsuit has been dismissed or withdrawn; or (iii) a copy of an order from such court dismissing your lawsuit or ordering that you do not have the right to continue to use your domain name.

**5. All Other Disputes and Litigation.** All other disputes between you and any party other than us regarding your domain name registration that are not brought pursuant to the mandatory administrative proceeding provisions of Paragraph 4 shall be resolved between you and such other party through any court, arbitration or other proceeding that may be available.

**6. Our Involvement in Disputes.** We will not participate in any way in any dispute between you and any party other than us regarding the registration and use of your domain name. You shall not name us as a party or otherwise include us in any such proceeding. In the event that we are named as a party in any such proceeding, we reserve the

right to raise any and all defenses deemed appropriate, and to take any other action necessary to defend ourselves.

**7. Maintaining the Status Quo.** We will not cancel, transfer, activate, deactivate, or otherwise change the status of any domain name registration under this Policy except as provided in Paragraph 3 above.

**8. Transfers During a Dispute.**

**a. Transfers of a Domain Name to a New Holder.** You may not transfer your domain name registration to another holder (i) during a pending administrative proceeding brought pursuant to

Paragraph 4 or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded; or (ii) during a pending court proceeding or arbitration commenced regarding your domain name unless the party to whom the domain name registration is being transferred agrees, in writing, to be bound by the decision of the court or arbitrator. We reserve the right to cancel any transfer of a domain name registration to another holder that is made in violation of this subparagraph.

**b. Changing Registrars.** You may not transfer your domain name registration to another registrar during a pending administrative proceeding brought pursuant to Paragraph 4 or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded. You may transfer administration of your domain name registration to another registrar during a pending court action or arbitration, provided that the domain name you have registered with us shall continue to be subject to the proceedings commenced against you in accordance with the terms of this Policy. In the event that you transfer a domain name registration to us during the pendency of a court action or arbitration, such dispute shall remain subject to the domain name dispute policy of the registrar from which the domain name registration was transferred.

**9. Policy Modifications.** We reserve the right to modify this Policy at any time with the permission of ICANN (Internet Corporation for Assigned Names and Numbers). We will post our revised Policy at <URL (Uniform Resource Locator)> at least thirty (30) calendar days before it becomes effective. Unless this Policy has already been invoked by the submission of a complaint to a Provider, in which event the version of the Policy in effect at the time it was invoked will apply to you until the dispute is over, all such changes will be binding upon you with respect to any domain name registration dispute, whether the dispute arose before, on or after the effective date of our change. In the event that you object to a change in this Policy, your sole remedy is to cancel your domain name registration with us, provided that you will not be entitled to a refund of any fees you paid to us. The revised Policy will apply to you until you cancel your domain name registration


**Dispute Resolution (/en/help/dispute-resolution)**

**Domain Name Dispute Resolution (/en/help/dndr)**

**Charter Eligibility Dispute Resolution Policy (/en/help/dndr/cedrp)**

**Eligibility Requirements Dispute Resolution Policy (/en/help/dndr/erdrp)**

**Intellectual Property Defensive Registration Challenge Policy (/en/help/dndr/ipdrcp)**

**Qualification Challenge Policy (/en/help/dndr/proqcp)**

**Restrictions Dispute Resolution Policy (/en/help/dndr/rdrp)**

**Transfer Dispute Resolution Policy (/en/help/dndr/tdrp)**

**Uniform Domain Name Dispute Resolution Policy (/en/help/dndr/udrp)**

**Policy Document (/en/help/dndr/udrp/policy)**

**Providers (/en/help/dndr/udrp/providers)**

**Provider Approval Process (/en/help/dndr/udrp/provider-approval-process)**

**Rules (/en/help/dndr/udrp/rules)**

**Principal Documents (/en/help/dndr/udrp/principal)**

**Proceedings (/en/help/dndr/udrp/proceedings)**

**Historical Documents (/en/help/dndr/udrp/historical)**

**Timeline (/en/help/dndr/udrp/schedule)**

**Name Collision (/en/help/name-collision)**

**Registrar Problems (http://www.icann.org/en/news/announcements/announcement-06mar07-en.htm)**

**Whois Data Correction (http://www.icann.org/en/help/dispute-resolution#whois)**

**Independent Review Process (/en/help/irp/irp-questions-19jun10-en.htm)**

**Request for Reconsideration (http://www.icann.org/en/groups/board/governance/reconsideration-requests)**

**Privacy Policy (/en/help/privacy)**

**Site Map (/en/sitemap)**

**Archive Site (http://archive.icann.org)**

## Stay Connected

Your email address please.

News Alerts: ☐ HTML  ☐ Plain Text
Newsletter: ☐ HTML  ☐ Plain Text
Compliance Newsletter: ☐ HTML  ☐ Plain Text
Policy Update: ☐ HTML  ☐ Plain Text

**Subscribe**

**Follow us @icann (https://twitter.com/#!/icann)**

**Videos (http://www.youtube.com/icannnews)**

**Photos on Flickr (http://www.flickr.com/photos/icann/)**

**Facebook (http://www.facebook.com/icannorg)**

**ICANN Blog (http://blog.icann.org/)**

**Community Wiki (https://community.icann.org/)**

**Planet ICANN (/en/groups/planet-icann)**

**RSS Feeds (/en/news/rss)**

© 2014 Internet Corporation For Assigned Names and Numbers.  <u>Press (/news/press)</u>  |  <u>Site Map (/sitemap)</u>  |  <u>Privacy Policy (/help/privacy)</u>

ICANN Network
myICANN (http://www.myicann.org/)
ASO (http://aso.icann.org)
ALAC (http://www.atlarge.icann.org)
ccNSO (http://ccnso.icann.org)
GAC (http://gac.icann.org)
GNSO (http://gnso.icann.org)
RSSAC (/en/groups/rssac)
SSAC (/en/groups/ssac)
Community Wiki (http://community.icann.org)
Meetings (http://meetings.icann.org)
New gTLDs (http://newgtlds.icann.org)
WHOIS (http://whois.icann.org)
Help

(/en/help)
Acronym Helper

Example: ccTLD

**Internet Corporation for Assigned Names and Numbers**

HELP (/EN/HELP) › DOMAIN NAME DISPUTE RESOLUTION (/EN/HELP/DNDR) › UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY (/EN/HELP/DNDR/UDRP)

# Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules")

**551**

| Español (/es/help/dndr/udrp/rules) | Français (/fr/help/dndr/udrp/rules) | 日本語 (/ja/help/dndr/udrp/rules) |
| --- | --- | --- |
| 한국어 (/ko/help/dndr/udrp/rules) | Русский (/ru/help/dndr/udrp/rules) | 简体中文 (/zh/help/dndr/udrp/rules) |
| العربية (/ar/help/dndr/udrp/rules) | | |

As approved by the ICANN (Internet Corporation for Assigned Names and Numbers) Board of Directors on 30 October 2009 (/en/minutes/resolutions-30oct09-en.htm#1).

**These Rules are in effect for all UDRP (Uniform Domain-Name Dispute Resolution Policy) proceedings in which a complaint is submitted to a provider on or after 1 March 2010. The prior version of the Rules, applicable to all proceedings in which a complaint was submitted to a Provider on or before 28 February 2010, is at http://www.icann.org/en/dndr/udrp/uniform-rules-24oct99-en.htm (/en/dndr/udrp/uniform-rules-24oct99-en.htm). UDRP (Uniform Domain-Name Dispute Resolution Policy) Providers may elect to adopt the notice procedures set forth in these Rules prior to 1 March 2010.**

Administrative proceedings for the resolution of disputes under the Uniform Dispute Resolution Policy adopted by ICANN (Internet Corporation for Assigned Names and Numbers) shall be governed by these Rules and also the Supplemental Rules of the Provider administering the proceedings, as posted on its web site. To the extent that the Supplemental Rules of any Provider conflict with these Rules, these Rules supersede.

1. Definitions

In these Rules:

**Complainant** means the party initiating a complaint concerning a domain-name registration.

**ICANN (Internet Corporation for Assigned Names and Numbers)** refers to the Internet

**ICANN (Internet Corporation for Assigned Names and Numbers)** refers to the Internet Corporation for Assigned Names and Numbers.

**Mutual Jurisdiction** means a court jurisdiction at the location of either (a) the principal office of the Registrar (provided the domain-name holder has submitted in its Registration Agreement to that jurisdiction for court adjudication of disputes concerning or arising from the use of the domain name) or (b) the domain-name holder's address as shown for the registration of the domain name in Registrar's Whois database at the time the complaint is submitted to the Provider.

**Panel** means an administrative panel appointed by a Provider to decide a complaint concerning a domain-name registration.

**Panelist** means an individual appointed by a Provider to be a member of a Panel.

**Party** means a Complainant or a Respondent.

**Policy** means the Uniform Domain Name Dispute Resolution Policy (/en/dndr/udrp/policy.htm) that is incorporated by reference and made a part of the Registration Agreement.

**Provider** means a dispute-resolution service provider approved by ICANN (Internet Corporation for Assigned Names and Numbers). A list of such Providers appears at http://www.icann.org/en/dndr/udrp/approved-providers.htm (/en/dndr/udrp/approved-providers.htm).

**Registrar** means the entity with which the Respondent has registered a domain name that is the subject of a complaint.

**Registration Agreement** means the agreement between a Registrar and a domain-name holder.

**Respondent** means the holder of a domain-name registration against which a complaint is initiated.

**Reverse Domain Name Hijacking** means using the Policy in bad faith to attempt to deprive a registered domain-name holder of a domain name.

**Supplemental Rules** means the rules adopted by the Provider administering a proceeding to supplement these Rules. Supplemental Rules shall not be inconsistent with the Policy or these Rules and shall cover such topics as fees, word and page limits and guidelines, file size and format modalities, the means for communicating with the Provider and the Panel, and the form of cover sheets.

**Written Notice** means hardcopy notification by the Provider to the Respondent of the commencement of an administrative proceeding under the Policy which shall inform the respondent that a complaint has been filed against it, and which shall state that the Provider has electronically transmitted the complaint including any annexes to the Respondent by the means specified herein. Written notice does not include a hardcopy of the complaint itself or of any annexes.

2.  Communications

(a) When forwarding a complaint, including any annexes, electronically to the Respondent, it shall be the Provider's responsibility to employ reasonably available means calculated to achieve actual notice to Respondent. Achieving actual notice, or employing the following measures to do so, shall discharge this responsibility:

(i) sending Written Notice of the complaint to all postal-mail and facsimile addresses (A) shown in the domain name's registration data in Registrar's Whois database for the registered domain-name holder, the technical contact, and the administrative contact and (B) supplied by Registrar to the Provider for the registration's billing contact; and

(ii) sending the complaint, including any annexes, in electronic form by e-mail to:

> (A) the e-mail addresses for those technical, administrative, and billing contacts;
>
> (B) postmaster@<the contested domain name>; and
>
> (C) if the domain name (or "www." followed by the domain name) resolves to an active web page (other than a generic page the Provider concludes is maintained by a registrar or ISP (Internet Service Provider) for parking domain-names registered by multiple domain-name holders), any e- mail address shown or e-mail links on that web page; and

(iii) sending the complaint, including any annexes, to any e-mail address the Respondent has notified the Provider it prefers and, to the extent practicable, to all other e-mail addresses provided to the Provider by Complainant under Paragraph 3(b)(v).

(b) Except as provided in Paragraph 2(a), any written communication to Complainant or Respondent provided for under these Rules shall be made electronically via the Internet (a record of its transmission being available), or by any reasonably requested preferred means stated by the Complainant or Respondent, respectively (see Paragraphs 3(b)(iii) and 5(b)(iii)).

(c) Any communication to the Provider or the Panel shall be made by the means and in the manner (including, where applicable, the number of copies) stated in the Provider's Supplemental Rules.

(d) Communications shall be made in the language prescribed in Paragraph 11.

(e) Either Party may update its contact details by notifying the Provider and the Registrar.

(f) Except as otherwise provided in these Rules, or decided by a Panel, all communications provided for under these Rules shall be deemed to have been made:

> (i) if via the Internet, on the date that the communication was transmitted, provided that the date of transmission is verifiable; or, where applicable
>
> (ii) if delivered by telecopy or facsimile transmission, on the date shown on the confirmation of transmission; or
>
> (iii) if by postal or courier service, on the date marked on the receipt.

(g) Except as otherwise provided in these Rules, all time periods calculated under these Rules to begin when a communication is made shall begin to run on the earliest date that the communication is deemed to have been made in accordance with Paragraph 2(f).

(h) Any communication by

> (i) a Panel to any Party shall be copied to the Provider and to the other Party;

(ii) the Provider to any Party shall be copied to the other Party; and

(iii) a Party shall be copied to the other Party, the Panel and the Provider, as the case may be.

(i) It shall be the responsibility of the sender to retain records of the fact and circumstances of sending, which shall be available for inspection by affected parties and for reporting purposes. This includes the Provider in sending Written Notice to the Respondent by post and/or facsimile under Paragraph 2(a)(i).

(j) In the event a Party sending a communication receives notification of non-delivery of the communication, the Party shall promptly notify the Panel (or, if no Panel is yet appointed, the Provider) of the circumstances of the notification. Further proceedings concerning the communication and any response shall be as directed by the Panel (or the Provider).

## 3. The Complaint

(a) Any person or entity may initiate an administrative proceeding by submitting a complaint in accordance with the Policy and these Rules to any Provider approved by ICANN (Internet Corporation for Assigned Names and Numbers). (Due to capacity constraints or for other reasons, a Provider's ability to accept complaints may be suspended at times. In that event, the Provider shall refuse the submission. The person or entity may submit the complaint to another Provider.)

(b) The complaint including any annexes shall be submitted in electronic form and shall:

(i) Request that the complaint be submitted for decision in accordance with the Policy and these Rules;

(ii) Provide the name, postal and e-mail addresses, and the telephone and telefax numbers of the Complainant and of any representative authorized to act for the Complainant in the administrative proceeding;

(iii) Specify a preferred method for communications directed to the Complainant in the administrative proceeding (including person to be contacted, medium, and address information) for each of (A) electronic-only material and (B) material including hard copy (where applicable);

(iv) Designate whether Complainant elects to have the dispute decided by a single-member or a three-member Panel and, in the event Complainant elects a three-member Panel, provide the names and contact details of three candidates to serve as one of the Panelists (these candidates may be drawn from any ICANN-approved Provider's list of panelists);

(v) Provide the name of the Respondent (domain-name holder) and all information (including any postal and e-mail addresses and telephone and telefax numbers) known to Complainant regarding how to contact Respondent or any representative of Respondent, including contact information based on pre-complaint dealings, in sufficient detail to allow the Provider to send the complaint as described in Paragraph 2(a);

(vi) Specify the domain name(s) that is/are the subject of the complaint;

(vii) Identify the Registrar(s) with whom the domain name(s) is/are registered at the time the complaint is filed;

(viii) Specify the trademark(s) or service mark(s) on which the complaint is based and, for each mark, describe the goods or services, if any, with which the mark is used (Complainant may also separately describe other goods and services with which it intends, at the time the complaint is submitted, to use the mark in the future.);

(ix) Describe, in accordance with the Policy, the grounds on which the complaint is made including, in particular,

> (1) the manner in which the domain name(s) is/are identical or confusingly similar to a trademark or service mark in which the Complainant has rights; and
>
> (2) why the Respondent (domain-name holder) should be considered as having no rights or legitimate interests in respect of the domain name(s) that is/are the subject of the complaint; and
>
> (3) why the domain name(s) should be considered as having been registered and being used in bad faith

(The description should, for elements (2) and (3), discuss any aspects of Paragraphs 4(b) (/en/dndr/udrp/policy.htm#4b) and 4(c) (/en/dndr/udrp/policy.htm#4c) of the Policy that are applicable. The description shall comply with any word or page limit set forth in the Provider's Supplemental Rules.);

(x) Specify, in accordance with the Policy, the remedies sought;

(xi) Identify any other legal proceedings that have been commenced or terminated in connection with or relating to any of the domain name(s) that are the subject of the complaint;

(xii) State that a copy of the complaint, including any annexes, together with the cover sheet as prescribed by the Provider's Supplemental Rules, has been sent or transmitted to the Respondent (domain-name holder), in accordance with Paragraph 2(b);

(xiii) State that Complainant will submit, with respect to any challenges to a decision in the administrative proceeding canceling or transferring the domain name, to the jurisdiction of the courts in at least one specified Mutual Jurisdiction;

(xiv) Conclude with the following statement followed by the signature (in any electronic format) of the Complainant or its authorized representative:

> "Complainant agrees that its claims and remedies concerning the registration of the domain name, the dispute, or the dispute's resolution shall be solely against the domain-name holder and waives all such claims and remedies against (a) the dispute-resolution provider and panelists, except in the case of deliberate wrongdoing, (b) the registrar, (c) the registry administrator, and (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers,

Names and Numbers, as well as their directors, officers, employees, and agents."

"Complainant certifies that the information contained in this Complaint is to the best of Complainant's knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument."; and

(xv) Annex any documentary or other evidence, including a copy of the Policy applicable to the domain name(s) in dispute and any trademark or service mark registration upon which the complaint relies, together with a schedule indexing such evidence.

(c) The complaint may relate to more than one domain name, provided that the domain names are registered by the same domain-name holder.

## 4.  Notification of Complaint

(a) The Provider shall review the complaint for administrative compliance with the Policy and these Rules and, if in compliance, shall forward the complaint, including any annexes, electronically to the Respondent and shall send Written Notice of the complaint (together with the explanatory cover sheet prescribed by the Provider's Supplemental Rules) to the Respondent, in the manner prescribed by Paragraph 2(a), within three (3) calendar days following receipt of the fees to be paid by the Complainant in accordance with Paragraph 19.

(b) If the Provider finds the complaint to be administratively deficient, it shall promptly notify the Complainant and the Respondent of the nature of the deficiencies identified. The Complainant shall have five (5) calendar days within which to correct any such deficiencies, after which the administrative proceeding will be deemed withdrawn without prejudice to submission of a different complaint by Complainant.

(c) The date of commencement of the administrative proceeding shall be the date on which the Provider completes its responsibilities under Paragraph 2(a) in connection with sending the complaint to the Respondent.

(d) The Provider shall immediately notify the Complainant, the Respondent, the concerned Registrar(s), and ICANN (Internet Corporation for Assigned Names and Numbers) of the date of commencement of the administrative proceeding.

## 5.  The Response

(a) Within twenty (20) days of the date of commencement of the administrative proceeding the Respondent shall submit a response to the Provider.

(b) The response, including any annexes, shall be submitted in electronic form and shall:

(i) Respond specifically to the statements and allegations contained in the complaint and include any and all bases for the Respondent (domain-name holder) to retain registration and use of the disputed domain name (This portion of the response shall comply with any word or page limit set forth in the Provider's Supplemental Rules.);

(ii) Provide the name, postal and e-mail addresses, and the telephone and telefax numbers of the Respondent (domain-name holder) and of any representative authorized to act for the Respondent in the administrative proceeding;

(iii) Specify a preferred method for communications directed to the Respondent in the administrative proceeding (including person to be contacted, medium, and address information) for each of (A) electronic-only material and (B) material including hard copy (where applicable);

(iv) If Complainant has elected a single-member panel in the complaint (see Paragraph 3(b)(iv)), state whether Respondent elects instead to have the dispute decided by a three-member panel;

(v) If either Complainant or Respondent elects a three-member Panel, provide the names and contact details of three candidates to serve as one of the Panelists (these candidates may be drawn from any ICANN-approved Provider's list of panelists);

(vi) Identify any other legal proceedings that have been commenced or terminated in connection with or relating to any of the domain name(s) that are the subject of the complaint;

(vii) State that a copy of the response including any annexes has been sent or transmitted to the Complainant, in accordance with Paragraph 2(b); and

(viii) Conclude with the following statement followed by the signature (in any electronic format) of the Respondent or its authorized representative:

> "Respondent certifies that the information contained in this Response is to the best of Respondent's knowledge complete and accurate, that this Response is not being presented for any improper purpose, such as to harass, and that the assertions in this Response are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument."; and

(ix) Annex any documentary or other evidence upon which the Respondent relies, together with a schedule indexing such documents.

(c) If Complainant has elected to have the dispute decided by a single-member Panel and Respondent elects a three-member Panel, Respondent shall be required to pay one-half of the applicable fee for a three-member Panel as set forth in the Provider's Supplemental Rules. This payment shall be made together with the submission of the response to the Provider. In the event that the required payment is not made, the dispute shall be decided by a single-member Panel.

(d) At the request of the Respondent, the Provider may, in exceptional cases, extend the period of time for the filing of the response. The period may also be extended by written stipulation between the Parties, provided the stipulation is approved by the Provider.

(e) If a Respondent does not submit a response, in the absence of exceptional circumstances, the Panel shall decide the dispute based upon the complaint.

6. Appointment of the Panel and Timing of Decision

(a) Each Provider shall maintain and publish a publicly available list of panelists and their qualifications.

(b) If neither the Complainant nor the Respondent has elected a three-member Panel (Paragraphs 3(b)(iv) and 5(b)(iv)), the Provider shall appoint, within five (5) calendar days following receipt of the response by the Provider, or the lapse of the time period for the submission thereof, a single Panelist from its list of panelists. The fees for a single-member Panel shall be paid entirely by the Complainant.

(c) If either the Complainant or the Respondent elects to have the dispute decided by a three-member Panel, the Provider shall appoint three Panelists in accordance with the procedures identified in Paragraph 6(e). The fees for a three-member Panel shall be paid in their entirety by the Complainant, except where the election for a three-member Panel was made by the Respondent, in which case the applicable fees shall be shared equally between the Parties.

(d) Unless it has already elected a three-member Panel, the Complainant shall submit to the Provider, within five (5) calendar days of communication of a response in which the Respondent elects a three-member Panel, the names and contact details of three candidates to serve as one of the Panelists. These candidates may be drawn from any ICANN-approved Provider's list of panelists.

(e) In the event that either the Complainant or the Respondent elects a three-member Panel, the Provider shall endeavor to appoint one Panelist from the list of candidates provided by each of the Complainant and the Respondent. In the event the Provider is unable within five (5) calendar days to secure the appointment of a Panelist on its customary terms from either Party's list of candidates, the Provider shall make that appointment from its list of panelists. The third Panelist shall be appointed by the Provider from a list of five candidates submitted by the Provider to the Parties, the Provider's selection from among the five being made in a manner that reasonably balances the preferences of both Parties, as they may specify to the Provider within five (5) calendar days of the Provider's submission of the five-candidate list to the Parties.

(f) Once the entire Panel is appointed, the Provider shall notify the Parties of the Panelists appointed and the date by which, absent exceptional circumstances, the Panel shall forward its decision on the complaint to the Provider.

## 7. Impartiality and Independence

A Panelist shall be impartial and independent and shall have, before accepting appointment, disclosed to the Provider any circumstances giving rise to justifiable doubt as to the Panelist's impartiality or independence. If, at any stage during the administrative proceeding, new circumstances arise that could give rise to justifiable doubt as to the impartiality or independence of the Panelist, that Panelist shall promptly disclose such circumstances to the Provider. In such event, the Provider shall have the discretion to appoint a substitute Panelist.

## 8. Communication Between Parties and the Panel

No Party or anyone acting on its behalf may have any unilateral communication with the Panel. All communications between a Party and the Panel or the Provider shall be made to a case administrator appointed by the Provider in the manner prescribed in the Provider's Supplemental Rules.

## 9. Transmission of the File to the Panel

The Provider shall forward the file to the Panel as soon as the Panelist is appointed in the case of a Panel consisting of a single member, or as soon as the last Panelist is appointed in the case of a three-member Panel.

10. General Powers of the Panel

> (a) The Panel shall conduct the administrative proceeding in such manner as it considers appropriate in accordance with the Policy and these Rules.
>
> (b) In all cases, the Panel shall ensure that the Parties are treated with equality and that each Party is given a fair opportunity to present its case.
>
> (c) The Panel shall ensure that the administrative proceeding takes place with due expedition. It may, at the request of a Party or on its own motion, extend, in exceptional cases, a period of time fixed by these Rules or by the Panel.
>
> (d) The Panel shall determine the admissibility, relevance, materiality and weight of the evidence.
>
> (e) A Panel shall decide a request by a Party to consolidate multiple domain name disputes in accordance with the Policy and these Rules.

11. Language of Proceedings

> (a) Unless otherwise agreed by the Parties, or specified otherwise in the Registration Agreement, the language of the administrative proceeding shall be the language of the Registration Agreement, subject to the authority of the Panel to determine otherwise, having regard to the circumstances of the administrative proceeding.
>
> (b) The Panel may order that any documents submitted in languages other than the language of the administrative proceeding be accompanied by a translation in whole or in part into the language of the administrative proceeding.

12. Further Statements

In addition to the complaint and the response, the Panel may request, in its sole discretion, further statements or documents from either of the Parties.

13. In-Person Hearings

There shall be no in-person hearings (including hearings by teleconference, videoconference, and web conference), unless the Panel determines, in its sole discretion and as an exceptional matter, that such a hearing is necessary for deciding the complaint.

14. Default

> (a) In the event that a Party, in the absence of exceptional circumstances, does not comply with any of the time periods established by these Rules or the Panel, the Panel shall proceed to a decision on the complaint.
>
> (b) If a Party, in the absence of exceptional circumstances, does not comply with any provision of, or requirement under, these Rules or any request from the Panel, the Panel shall draw such inferences therefrom as it considers appropriate.

15. Panel Decisions

> (a) A Panel shall decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems

(b) In the absence of exceptional circumstances, the Panel shall forward its decision on the complaint to the Provider within fourteen (14) days of its appointment pursuant to Paragraph 6.

(c) In the case of a three-member Panel, the Panel's decision shall be made by a majority.

(d) The Panel's decision shall be in writing, provide the reasons on which it is based, indicate the date on which it was rendered and identify the name(s) of the Panelist(s).

(e) Panel decisions and dissenting opinions shall normally comply with the guidelines as to length set forth in the Provider's Supplemental Rules. Any dissenting opinion shall accompany the majority decision. If the Panel concludes that the dispute is not within the scope of Paragraph 4(a) (/en/dndr/udrp/policy.htm#4a) of the Policy, it shall so state. If after considering the submissions the Panel finds that the complaint was brought in bad faith, for example in an attempt at Reverse Domain Name Hijacking or was brought primarily to harass the domain-name holder, the Panel shall declare in its decision that the complaint was brought in bad faith and constitutes an abuse of the administrative proceeding.

## 16. Communication of Decision to Parties

(a) Within three (3) calendar days after receiving the decision from the Panel, the Provider shall communicate the full text of the decision to each Party, the concerned Registrar(s), and ICANN (Internet Corporation for Assigned Names and Numbers). The concerned Registrar(s) shall immediately communicate to each Party, the Provider, and ICANN (Internet Corporation for Assigned Names and Numbers) the date for the implementation of the decision in accordance with the Policy.

(b) Except if the Panel determines otherwise (see Paragraph 4(j) (/en/dndr/udrp/policy.htm#4j) of the Policy), the Provider shall publish the full decision and the date of its implementation on a publicly accessible web site. In any event, the portion of any decision determining a complaint to have been brought in bad faith (see Paragraph 15(e) of these Rules) shall be published.

## 17. Settlement or Other Grounds for Termination

(a) If, before the Panel's decision, the Parties agree on a settlement, the Panel shall terminate the administrative proceeding.

(b) If, before the Panel's decision is made, it becomes unnecessary or impossible to continue the administrative proceeding for any reason, the Panel shall terminate the administrative proceeding, unless a Party raises justifiable grounds for objection within a period of time to be determined by the Panel.

## 18. Effect of Court Proceedings

(a) In the event of any legal proceedings initiated prior to or during an administrative proceeding in respect of a domain-name dispute that is the subject of the complaint, the Panel shall have the discretion to decide whether to suspend or terminate the administrative proceeding, or to proceed to a decision.

(b) In the event that a Party initiates any legal proceedings during the pendency of an administrative proceeding in respect of a domain-name dispute that is the subject of the complaint, it shall promptly notify the Panel and the Provider. See Paragraph 8 above.

## 19. Fees

(a) The Complainant shall pay to the Provider an initial fixed fee, in accordance with the Provider's Supplemental Rules, within the time and in the amount required. A Respondent electing under Paragraph 5(b)(iv) to have the dispute decided by a three-member Panel, rather than the single-member Panel elected by the Complainant, shall pay the Provider one-half the fixed fee for a three-member Panel. See Paragraph 5(c). In all other cases, the Complainant shall bear all of the Provider's fees, except as prescribed under Paragraph 19(d). Upon appointment of the Panel, the Provider shall refund the appropriate portion, if any, of the initial fee to the Complainant, as specified in the Provider's Supplemental Rules.

(b) No action shall be taken by the Provider on a complaint until it has received from Complainant the initial fee in accordance with Paragraph 19(a).

(c) If the Provider has not received the fee within ten (10) calendar days of receiving the complaint, the complaint shall be deemed withdrawn and the administrative proceeding terminated.

(d) In exceptional circumstances, for example in the event an in-person hearing is held, the Provider shall request the Parties for the payment of additional fees, which shall be established in agreement with the Parties and the Panel.

## 20. Exclusion of Liability

Except in the case of deliberate wrongdoing, neither the Provider nor a Panelist shall be liable to a Party for any act or omission in connection with any administrative proceeding under these Rules.

## 21. Amendments

The version of these Rules in effect at the time of the submission of the complaint to the Provider shall apply to the administrative proceeding commenced thereby. These Rules may not be amended without the express written approval of ICANN (Internet Corporation for Assigned Names and Numbers).

**Dispute Resolution (/en/help/dispute-resolution)**

**Domain Name Dispute Resolution (/en/help/dndr)**

**Charter Eligibility Dispute Resolution Policy (/en/help/dndr/cedrp)**

**Eligibility Requirements Dispute Resolution Policy (/en/help/dndr/erdrp)**

**Intellectual Property Defensive Registration Challenge Policy (/en/help/dndr/ipdrcp)**

**Qualification Challenge Policy (/en/help/dndr/proqcp)**

**Restrictions Dispute Resolution Policy (/en/help/dndr/rdrp)**

**Transfer Dispute Resolution Policy (/en/help/dndr/tdrp)**

**Uniform Domain Name Dispute Resolution Policy (/en/help/dndr/udrp)**

**Policy Document (/en/help/dndr/udrp/policy)**

**Providers (/en/help/dndr/udrp/providers)**

**Provider Approval Process (/en/help/dndr/udrp/provider-approval-process)**

**Rules (/en/help/dndr/udrp/rules)**

**Principal Documents (/en/help/dndr/udrp/principal)**

**Proceedings (/en/help/dndr/udrp/proceedings)**

**Historical Documents (/en/help/dndr/udrp/historical)**

**Timeline (/en/help/dndr/udrp/schedule)**

**Name Collision (/en/help/name-collision)**

**Registrar Problems (http://www.icann.org/en/news/announcements/announcement-06mar07-en.htm)**

**Whois Data Correction (http://www.icann.org/en/help/dispute-resolution#whois)**

**Independent Review Process (/en/help/irp/irp-questions-19jun10-en.htm)**

**Request for Reconsideration (http://www.icann.org/en/groups/board/governance/reconsideration-requests)**

**Privacy Policy (/en/help/privacy)**

**Site Map (/en/sitemap)**

**Archive Site (http://archive.icann.org)**

## Stay Connected

Your email address please.

News Alerts: ☐ HTML ☐ Plain Text
Newsletter: ☐ HTML ☐ Plain Text
Compliance Newsletter: ☐ HTML ☐ Plain Text
Policy Update: ☐ HTML ☐ Plain Text

**Subscribe**

**Follow us @icann (https://twitter.com/#!/icann/)**

**Videos (http://www.youtube.com/icannnews)**

**Photos on Flickr (http://www.flickr.com/photos/icann/)**

**Facebook (http://www.facebook.com/icannorg)**

**ICANN Blog (http://blog.icann.org/)**

**Community Wiki (https://community.icann.org/)**

**Planet ICANN (/en/groups/planet-icann)**

**RSS Feeds (/en/news/rss)**

© 2014 Internet Corporation For Assigned Names and Numbers.  <u>Press (/news/press)</u>  |  <u>Site Map (/sitemap)</u>  |  <u>Privacy Policy (/help/privacy)</u>

ICANN Network
myICANN (http://www.myicann.org/)
ASO (http://aso.icann.org)
ALAC (http://www.atlarge.icann.org)
ccNSO (http://ccnso.icann.org)
GAC (http://gac.icann.org)
GNSO (http://gnso.icann.org)
RSSAC (/en/groups/rssac)
SSAC (/en/groups/ssac)
Community Wiki (http://community.icann.org)
Meetings (http://meetings.icann.org)
New gTLDs (http://newgtlds.icann.org)
WHOIS (http://whois.icann.org)
Help

(/en/help)
Acronym Helper

Example: ccTLD

# EXHIBIT C



We're here to help. Call 1-866-731-6556

- Webmail
- Renew
- Get Help
- Shopping Cart
- About
- Sign In

Back

# The best email addresses anywhere

## Hover combines unique domain names and search techniques to get you the best personal email address you will find anywhere.

### Doesn't Hover offer the same addresses as everyone else?

No. Hover benefits from Tucows' ownership of an exclusive collection of named-based domain names (mcreynolds.com, smith.net, gonzales.com). Tucows makes these available as shared domains for email addresses. Hover also benefits from its status as an accredited registrar. We have immediate access to every top-level domain registry to find out which domain names are taken and which ones are available.

### The magic of our email search

Using the shared domains, multiple TLDs, nicknames and other permutations, we explore every possible combination of your first name and last name to present you with a list of the best available email addresses.

### Shared Domains vs. Available Domains

Some of the names in this list will be based on our shared domain names and some will be based on available domain names. If you choose an email address based on an available domain name, that domain name is also yours to use for a web address. Through the purchase process, we will help you select whichever your prefer and help you with the administrative details associated with owning your new mailbox, no matter what the underlying domain name is.

## Search for your name. It might be available.

firstname                    lastname

# Who is Hover?

Hover is a division of Tucows Inc., an ICANN accredited, publicly-traded technology company serving thousands of businesses and millions of internet users worldwide since 1994.

Learn More

## Getting Started

- Thunderbird
- Outlook
- Apple Mail
- iPhone/iOS
- Android
- Windows Mail
- Mobile Devices

## Important Details

- Email Policy
- Renewing
- Refund Policy
- Cancel Service
- Getting a Receipt

## Popular Tutorials

- Server Settings
- Accessing Webmail
- Internet Headers from an Email

Copyright © 2011 Hover. All Rights Reserved

- Software Downloads
- About Tucows Inc.
- Jobs at Tucows Inc.
- Terms of Service

# EXHIBIT D

-------- Original Message --------
**Subject:** Re: jeffers.com domain
    **Date:** Mon, 17 Mar 2014 21:57:41 -0600
   **From:** John Jeffers <john@jeffers.cc>
      **To:** Tech Contact <techonlinellc@gmail.com>


I had three addresses in my account:

john@jeffers.com
leanne@jeffers.com
sarah@jeffers.com

You say this is a technical issue, but I lost those addresses a few years ago.  I got an email from Hover saying that all emails for that domain were being discontinued.  I assumed that you were selling the domain back then.

Anyway, I would be interested in getting those addresses back if possible.  I'm a little wary, though, because Hover took them away from me without much notice before.  I guess there's no guarantee that it couldn't happen again.  That's why I asked about buying the domain.  You can surely understand what a pain it is to have to change an email address you've been using for over 10 years.  I don't want to go through that again.

Thanks,
John




On Mar 17, 2014, at 4:38 PM, Tech Contact <techonlinellc@gmail.com> wrote:


    Hi John,

    We have some technical issues at the moment and we intend to restore the email service. What is
    the email address that you had purchased? Would you like us to restore this email address once
    we have our email services running again?

    Best Regards,

    Matt
    Jeffers.com Customer Support

    On Sat, Mar 15, 2014 at 10:04 PM, John Jeffers <john@jeffers.cc> wrote:

Is jeffers.com for sale?  I used to have hosted email service through Hover.com using this domain, but it was yanked a few years ago with no explanation.  If it's not being used, I would appreciate a chance to purchase it.

Thanks,
John Jeffers

**From:** John Jeffers <john@jeffers.cc>
**Sent:** March 15, 2014 10:04:59 PM PDT
**To:** techonlinellc@gmail.com
**Subject:** jeffers.com domain

Is jeffers.com for sale?  I used to have hosted email service through Hover.com using
this domain, but it was yanked a few years ago with no explanation.  If it's not being
used, I would appreciate a chance to purchase it.


Thanks,

John Jeffers

# EXHIBIT E

**From:** Domain Disputes <domain.disputes@wipo.int>
**Sent:** May 8, 2014 12:29:08 AM PDT
**To:** "lrobins@edwardswildman.com" <lrobins@edwardswildman.com>, "KDonahue@edwardswildman.com"
<KDonahue@edwardswildman.com>, "jeffers.com@contactprivacy.com" <jeffers.com@contactprivacy.com>,
"techonlinellc@gmail.com" <techonlinellc@gmail.com>
**Cc:** "disputes@opensrs.org" <disputes@opensrs.org>
**Subject:** (HC) D2014-0314 <jeffers.com> Notification of Decision

Dear Parties,

Please find attached the full text of the decision issued on April 30, 2014  by the Administrative Panel in the above-referenced case.

The Administrative Panel's finding is as follows:

"For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name <jeffers.com> be transferred to Complainant."

Pursuant to Paragraph 4(k) of the Uniform Domain Name Dispute Resolution Policy, the concerned Registrar Tucows Inc. shall proceed to implement the above decision on the tenth business day (as observed in the location of that Registrar's principal office) after receiving this notification.  The concerned Registrar will not implement the decision if, before the 10-day waiting period has expired, the Respondent submits official documentation (such as a copy of a complaint, file stamped by the clerk of the court) to the Registrar demonstrating that it has commenced a legal proceeding against the Complainant in a jurisdiction to which the Complainant has submitted under Paragraph 3(b)(xiii) of the Rules for Uniform Domain Name Dispute Resolution Policy (the Rules).

Pursuant to Rules, Paragraph 16(a), the Registrar is directed to inform the Complainant, the Respondent, the Internet Corporation for Assigned Names and Numbers (ICANN) and the WIPO Arbitration and Mediation Center as soon as possible of the specific date on which the Administrative Panel's decision will be implemented, absent a notification by the Respondent in accordance with the above.

A signed version of the Decision shall be forwarded to the parties in due course.

Sincerely,

Hui Cao
Case Manager



**ARBITRATION
AND
MEDIATION CENTER**

# ADMINISTRATIVE PANEL DECISION

## Jeffers, Inc. v. Contact Privacy Inc. / Technology Online LLC
## Case No. D2014-0314

### 1. The Parties

Complainant is Jeffers, Inc. of Dothan, Alabama, United States of America, represented by Edwards Wildman Palmer LLP, United States of America.

Respondent is Contact Privacy Inc. of Toronto, Ontario, Canada / Technology Online LLC of Silver Springs, Nevada, United States of America ("U.S.").

### 2. The Domain Name and Registrar

The disputed domain name <jeffers.com> is registered with Tucows Inc. (the "Registrar").

### 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on February 28, 2014.  On February 28, 2014, the Center transmitted by email to the Registrar a request for registrar verification in connection with the disputed domain name.  On February 28, 2014 and March 5, 2014, the Registrar transmitted by email to the Center its verification response disclosing registrant and contact information for the disputed domain name which differed from the named Respondent and contact information in the Complaint.  The Center sent an email communication to Complainant on March 5, 2014 providing the registrant and contact information disclosed by the Registrar, and inviting Complainant to submit an amendment to the Complaint.  Complainant filed an amended Complaint on March 7, 2014.

The Center verified that the Complaint together with the amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on March 11, 2014.  In accordance with the Rules, paragraph 5(a), the due date for Response was March 31, 2014.  Respondent did not submit any response. Accordingly, the Center notified Respondent's default on April 1, 2014.

The Center appointed Lynda J. Zadra-Symes as the sole panelist in this matter on April 16, 2014.  The Panel finds that it was properly constituted.  The Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.


**4. Factual Background**

Complainant is the owner of the mark JEFFERS, U.S. Trademark Registration No. 2102912, registered on October 7, 1997, for use in connection with non-medicated grooming preparations for pets, cats, dogs, horses, livestock, namely, topical shampoos, conditioners, sprays, crams, balms, ointments, *etc.* in Classes 3 and 5.  The registration claims a date of first use of January 15, 1976.

Complainant has operated since at least 1976 under the JEFFERS trademark in connection with retail animal health supply industry.  Complainant now operates a retail website, distributes over 3.46 million product catalogs each year and owns a 120,000 square foot distribution warehouse.  Complainant operates online retail websites at "www.jefferspet.com", "www.jeffersequine.com" and "www.jefferslivestock.com" and prominently displays its JEFFERS mark on the top of each page of its website.

The disputed domain name was initially registered on March 6, 1996.  From early 1999 to October 2000, the disputed domain name resolved to a website offering email services provided by <mailbank.com>, Inc.  From 2001-2005, the disputed domain name resolved to a "www.netidentity.com" site that also offered a personalized email service.  In 2008 and 2009, the disputed domain name resolved to various third party websites including "www.morningstar.org", "www.vallin.org" and "www.information.com", each website containing finance, travel, home mortgage, foreclosure and other links not related to Complainant's business.  Sometime between April 10, 2012 and June 7, 2012, Respondent changed the content appearing on the website at the disputed domain name so that it appeared to be a "portal site" providing reverse searching links to third-party websites that compete with Complainant by offering information and products relating to equine supplies, horse products, horse veterinary supplies, discount equine supplies, equine veterinary supplies, horse saddlery, veterinary advice, and veterinary colleges.  Complainant submitted copies of printouts from the "Way Back Machine" showing use of the website on these various dates, printed on February 26, 2014.


**5. Parties' Contentions**

**A. Complainant**

Complainant contends that the disputed domain name is identical and confusingly similar to its trademark JEFFERS, that Respondent has no rights or legitimate interests in respect of the disputed domain name and that Respondent has registered and is using the disputed domain name in bad faith.


**B. Respondent**

Respondent did not reply to Complainant's contentions.


**6. Discussion and Findings**

**A. Identical or Confusingly Similar**

Complainant owns U.S. Trademark registration No. 2102912 registered on October 7, 1997, claiming a date of first use of January 15, 1976.  The disputed domain name incorporates Complainant's trademark in its entirety.

The Panel finds that the disputed domain name is confusingly similar to Complainant's trademark.

**B. Rights or Legitimate Interests**

Based on previous UDRP decisions, "a complainant is required to make out a *prima facie* case that the respondent lacks rights or legitimate interests.  Once such a *prima facie* case is made, the burden shifts to the respondent to come forward with appropriate allegations or evidence demonstrating rights or legitimate interests in the domain name.  If the respondent fails to come forward with such appropriate allegations or evidence, a complainant is generally deemed to have satisfied paragraph 4(a)(ii) of the UDRP."  See WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Second Edition ("WIPO Overview 2.0"), paragraph 2.1.

Complainant's allegations in the Complaint and evidence submitted on this issue are sufficient to make out a *prima facie* case that Respondent has no rights or legitimate interests in the disputed domain name.

Respondent has no relationship with Complainant and has no permission from Complainant to use Complainant's trademark or any domain name incorporating that trademark.  There is no evidence that Respondent is commonly known by the name "Jeffers".  Nothing in the WhoIs contact information for Respondent implies that it is commonly known by that name.

The disputed domain name currently links to a portal website that offers links to numerous third party sites, some of which sell the same or similar goods and services as Complainant.  Respondent presumably receives compensation in the form of "click through" or web page impression revenues from the third parties to whom visitors to the site are redirected.  Prior panels have found that such conduct cannot constitute a *bona fide* offering of goods or services.  See *Mpire Corporation v. Michael Frey*, WIPO Case No. D2009-0258;  *L'Oréal, Biotherm, Lancôme Parfums et Beauté & Cie v. Unasi, Inc*, WIPO Case No. D2005-0623; *Humana Inc. v. Cayman Trademark Trust*, WIPO Case No. D2006-0073.  Accordingly, Respondent is not making a legitimate noncommercial or fair use of the disputed domain name.

Respondent has failed to come forward with any evidence demonstrating rights or legitimate interests in the disputed domain name.

The Panel finds that Respondent lacks any rights or legitimate interests in the disputed domain name.

**C. Registered and Used in Bad Faith**

Whether a domain name is registered and used in bad faith for purposes of the Policy may be determined by evaluating four (non-exhaustive) factors set forth in the Policy:  (i) circumstances indicating that the registrant has registered or acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of the registrant's documented out-of-pocket costs directly related to the domain name;  or (ii) the registrant has registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that the registrant has engaged in a pattern of such conduct;  or (iii) the registrant has registered the domain name primarily for the purpose of disrupting the business of a competitor;  or (iv) by using the domain name, the registrant has intentionally attempted to attract, for commercial gain, Internet users to the registrant's website or other online location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of the registrant's website or location or of a product or service on the registrant's website or location.  (Policy, paragraph 4(b).

The factors delineated in the Policy, paragraph 4(b), as supporting bad faith registration and use are "without limitation."

Although Complainant's U.S. trademark was registered on October 7, 1997, the registration claims a date of

first use of January 15, 1976, which is unrebutted.  Thus, the evidence indicates that Complainant had used its JEFFERS mark for more than 20 years prior to the registration of the disputed domain name by Respondent or its predecessor in interest.  In addition, Respondent's use of the disputed domain name to provide links to equine products and other goods and services that compete with Complainant's goods and services indicates that Respondent has knowledge of Complainant's rights in its JEFFERS mark.

There is also evidence that Respondent has a track record of registering domain names that are identical or confusingly similar to third party marks and using those domain names to deceptively misdirect visitors to other third party websites.  See, *Urban Home v. Technology Online LLC / Whois Privacy Service Pty Ltd.*, WIPO Case No. D2012-2437;  *American Council on Education, GED Testing Service LLC v. Registrant* [4065093]: *Domain Manager, Technology Online LLC*, WIPO Case No. D2012-2287.

The evidence indicates that Respondent was aware of Complainant's trademark rights at the time of Respondent's registration of the disputed domain name and that the disputed domain name is being used in bad faith.

The Panel finds that Respondent has registered and is using the disputed domain name in bad faith.


**7. Decision**

For the foregoing reasons, in accordance with paragraphs 4(i) of the Policy and 15 of the Rules, the Panel orders that the disputed domain name <jeffers.com> be transferred to Complainant.



**Lynda J. Zadra-Symes**
Sole Panelist
Date:  April 30, 2014